No. 24-8013

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

CAROL W. GARRETT AND TERRY LEE GARRETT

Plaintiff – Appellants,

vs.

WELLS FARGO BANK, N.A.

Defendant – Appellee.

_____

On Appeal from the United States District Court for the district of Wyoming,
The Honorable Judge Scott W. Skavdahl Presiding
Case No. 1:24-CV-00007-SWS

_____

**BRIEF OF APPELLANT CAROL W. GARRETT AND
TERRY LEE GARRETT**

J. AUSTIN DUNLAP
Wyoming Bar #7-4586
P.O. Box 4803
Jackson, WY 83001
Telephone (307) 690-8568
Facsimile (307) 316-8101
austindunlap@gmail.com

*Attorney for Petitioners – Appellants*

**ORAL ARGUMENT IS NOT REQUESTED**

APPENDIX

TABLE OF CONTENTS

DISTRICT COURT DOCKET SHEET..........................................................................3

ECF Doc. 1 - NOTICE OF REMOVAL.................................................................…6

ECF Doc. 2 - SUMMONS AND COMPLAINT.........................................…108

ECF Doc. 3 - ORDER OF REMOVAL.........................................................199

ECF Doc. 4 - MOTION TO DISMISS....................................................…202

ECF Doc. 8 - RESPONSE IN OPPOSITION.............................................217

ECF Doc. 9 - REPLY.................................................................................257

ECF Doc. 10 - ORDER..............................................................................269

# District Court Docket Sheet

**U.S. District Court**
**District of Wyoming (Casper)**
**CIVIL DOCKET FOR CASE #: 1:24-cv-00007-SWS**

| | |
|---|---|
| Garrett et al v. Wells Fargo Bank NA | Date Filed: 01/08/2024 |
| Assigned to: Honorable Scott W Skavdahl | Date Terminated: 02/07/2024 |
| Referred to: Honorable Kelly H Rankin - DO NOT USE | Jury Demand: Both |
| Case in other court: Ninth Judicial District Court, 2023-CV-18974 | Nature of Suit: 190 Contract: Other |
| USCA 10th Circuit, 24-08013 | Jurisdiction: Diversity |
| Cause: 28:1441 Petition for Removal- Contract Dispute | |

**Plaintiff**

**Carol W Garrett**                                      represented by   **Jared Austin Dunlap**
                                                                          AUSTIN DUNLAP LAW
                                                                          P.O. Box 4803
                                                                          Jackson, WY 83001
                                                                          307-690-8568
                                                                          Email: austindunlap@gmail.com
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Lee Garrett**                                   represented by   **Jared Austin Dunlap**
                                                                          (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Wells Fargo Bank NA**                                 represented by   **Isaac Nathan Sutphin**
                                                                          HOLLAND & HART LLP
                                                                          2020 Carey Avenue
                                                                          Suite 800
                                                                          Cheyenne, WY 82001
                                                                          307-778-4200
                                                                          Fax: 307-778-8175
                                                                          Email: insutphin@hollandhart.com
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/08/2024 | 1 | NOTICE OF REMOVAL from Ninth Judicial District Court, 2023-CV-18974. **Counsel - payment is due within three calendar days. To pay the filing fee with a credit card, please use the event Notice of Civil Filing Fee in CM/ECF or send a check to the Clerk of US District Court, 2120 Capitol Avenue Room 2131, Cheyenne, WY 82001,** filed by Wells Fargo Bank NA. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Order) (Court Staff, stmo) (Additional attachment(s) added on 1/8/2024: # 3 Magistrate Consent Form) (Court Staff, stmo). (Entered: 01/08/2024) |
| 01/08/2024 | 2 | STATE COURT COMPLAINT with Jury Demand, filed 10/10/2023 in the Ninth Judicial District, Teton County, by Carol W Garrett, Terry Lee Garrett. (Court Staff, stmo) Modified text on 1/9/2024 (Court Staff, stmo). Modified text on 1/10/2024 (Court Staff, semt). Added jury demand text on 1/12/2024 (Court Staff, semt). (Entered: 01/08/2024) |
| 01/08/2024 | | Notice of Civil Case Filing Fee Payment - filed by Defendant Wells Fargo Bank NA. Filing fee $ 405, receipt number AWYDC-2365455. (Sutphin, Isaac) (Entered: 01/08/2024) |
| 01/09/2024 | 3 | ORDER ON REMOVAL regarding 1 Notice of Removal, filed by Wells Fargo Bank NA by the Honorable Scott W Skavdahl. Certified copy of Order mailed to the Ninth Judicial District Court on this date via U.S. mail. (Court Staff, stmo) Modified text on 1/10/2024 (Court Staff, semt). (Entered: 01/09/2024) |

| 01/16/2024 | 4 | MOTION to Dismiss filed by Defendant Wells Fargo Bank NA. (Attachments: # 1 Memorandum of Law, # 2 Exhibit 1 to Memorandum of Law, # 3 Exhibit 2 to Memorandum of Law)(Sutphin, Isaac) (Entered: 01/16/2024) |
| --- | --- | --- |
| 01/18/2024 | 5 | TRANSMITTAL of State Court Record. (Attachments: # 1 Appendix A) (Sutphin, Isaac) (Entered: 01/18/2024) |
| 01/19/2024 | 6 | STATE COURT DOCKET SHEET, Ninth Judicial District, Teton County, 2023-CV-18974 (Court Staff, semt) (Entered: 01/19/2024) |
| 01/19/2024 | 7 | SUMMONS Returned Executed, filed in Ninth Judicial District, Teton County, 2023-CV-18974. Wells Fargo Bank NA served on 11/17/2023, answer due on 12/8/2023 (Court Staff, semt) (Entered: 01/19/2024) |
| 01/30/2024 | 8 | RESPONSE in Opposition re 4 MOTION to Dismiss filed by Plaintiffs Carol W Garrett, Terry Lee Garrett. (Attachments: # 1 Exhibit, # 2 Exhibit) (Dunlap, Jared) (Entered: 01/30/2024) |
| 02/06/2024 | 9 | REPLY to 8 Response re 4 Motion to Dismiss filed by Defendant Wells Fargo Bank NA. (Attachments: # 1 Exhibit 1) (Sutphin, Isaac) Modified text on 2/7/2024 (Court Staff, semt). (Entered: 02/06/2024) |
| 02/07/2024 | 10 | ORDER Granting Defendant's Rule 12 (b)(6) Motion to Dismiss by the Honorable Scott W Skavdahl re 4 Motion to Dismiss. All causes of action alleged against Wells Fargo in this lawsuit are hereby DISMISSED WITHOUT PREJUDICE. (Court Staff, stbd) (Entered: 02/07/2024) |
| 02/07/2024 | 11 | JUDGMENT in favor of Defendant against Plaintiff by the Honorable Scott W Skavdahl. The AO133 Bill of Cost form is available at https://www.wyd.uscourts.gov/forms/bill-costs (Court Staff, stbd) Modified/NEF regenerated on 2/12/2024 (Court Staff, stbd). (Entered: 02/07/2024) |
| 03/07/2024 | 12 | NOTICE OF APPEAL as to 10 Order on Motion to Dismiss, 11 Judgment filed by Plaintiffs Carol W Garrett, Terry Lee Garrett. (Dunlap, Jared) Added link on 3/8/2024 (Court Staff, sbh). (Entered: 03/07/2024) |
| 03/07/2024 | 13 | USCA Appeal Fees received $605 receipt number 2-2794 re 12 Notice of Appeal (Attorney) filed by Carol W Garrett, Terry Lee Garrett (Court Staff, stmo) (Entered: 03/07/2024) |
| 03/08/2024 | 14 | Preliminary Record of Appeal sent to USCA and counsel re 12 Notice of Appeal. **The procedures and appeals forms may be obtained from the U.S. Court of Appeals website: www.ca10.uscourts.gov.** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, sbh) (Entered: 03/08/2024) |
| 03/08/2024 | 15 | Appeal Number **24-8013** received from USCA for 12 Notice of Appeal filed by Carol W Garrett, Terry Lee Garrett. Civil case docketed. Preliminary record filed. DATE RECEIVED: 03/08/2024 Docketing statement, transcript order form, and notice of appearance due 03/22/2024 for Carol W. Garrett and Terry Lee Garrett. Disclosure statement and notice of appearance due on 03/22/2024 for Wells Fargo Bank N.A. [24-8013] (Court Staff, sbh) (Entered: 03/08/2024) |
| 03/15/2024 | 16 | TRANSCRIPT REQUEST (No Transcripts Necessary) by Plaintiffs Carol W Garrett, Terry Lee Garrett re 12 Notice of Appeal (Attorney). (Dunlap, Jared) (Entered: 03/15/2024) |
| 03/15/2024 | 17 | (TEXT-ONLY) APPEAL ORDER from USCA as to 12 Notice of Appeal filed by Carol W Garrett, Terry Lee Garrett **Record on appeal/Notice due 3/22/2024**. Minute order filed - Notice due that record is complete by 03/22/2024 for Margaret Botkins. (Text Only - No Attachment) [24-8013] (Court Staff, semt) (Entered: 03/15/2024) |
| 03/15/2024 | 18 | Transcript Letter transmitted to USCA re 12 Notice of Appeal (Attorney). No transcripts are required for this appeal. For purpose of appeal, the record is now ready. (Court Staff, semt) (Entered: 03/15/2024) |

ECF Doc 1

# Notice of Removal

Isaac N. Sutphin, P.C. (Wyo. State Bar # 6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.



**FILED**

**Margaret Botkins
Clerk of Court**

2:50 pm, 1/8/24

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

CAROL W. GARRETT AND TERRY LEE
GARRETT,

           Plaintiffs,

    v.

WELLS FARGO BANK, N.A.,

           Defendant.

Civil Action No. ___24-CV-7-SWS___

(*Removed from the District Court of the Ninth Judicial District in and for Teton County, State of Wyoming at Civil Action No. 2023-CV-18974*)

---

### NOTICE OF REMOVAL

---

**PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, and

U.S.D.C.L.R. 81.1, Defendant Wells Fargo Bank, N.A. (Wells Fargo), through undersigned

counsel, hereby gives Notice of Removal of the above-captioned case to the United States

District Court for the District of Wyoming. Removal is warranted under 28 U.S.C. § 1441(b)

because this is a diversity action over which the Court has original jurisdiction under 28 U.S.C. §

1332. In support of this Notice of Removal, Defendant states as follows:

### THE ACTION

1.      On or about October 10, 2023, Plaintiffs Carol W. Garrett and Terry Lee Garrett

commenced this litigation by filing a Complaint against Wells Fargo in the District Court of the

Ninth Judicial District in and for Teton County, State of Wyoming as Civil Action No. 2023-CV-

18974. (*See* Complaint attached hereto as **Exhibit A**)

2.      Plaintiffs' Complaint asserts claims regarding an alleged wrongful foreclosure

under W.S. § 34-4-103(a)(iii) - failure to record assignment, alleged wrongful foreclosure under

W.S. § 34-4-103(a)(iv) – failure to notify occupant, and alleged breach of the implied covenant

of good faith and fair dealing. (**Exhibit A**)

3.      On or about November 17, 2023, Plaintiff served Wells Fargo, a Delaware

corporation, through a registered agent.

4.      On December 7, 2023, Plaintiffs and Defendant agreed to extend the pending case

deadlines. Wells Fargo filed an Unopposed Motion for Extension of Time to respond to

Plaintiffs' Complaint to January 8, 2024. (*See* Motion attached hereto as **Exhibit B**). The State

District Court granted Defendant's Motion on December 8, 2023, resetting the pending case

deadlines to January 8, 2024. (*See* Order attached hereto as **Exhibit C**).

### PARTIES, JURISDICTION, AND VENUE

5.      28 U.S.C. § 1441 establishes when an action is removable. Section 1441(a) states

that "any civil action brought in a state of which the district courts of the United States have

original jurisdiction, may be removed by the defendant or the defendants, to the district court of

the United States for the district and division embracing the place where such action is pending."

28 U.S.C. § 1441(a).

6.      This Court's subject matter jurisdiction, and Wells Fargo's basis for removal, is

founded upon 28 U.S.C. § 1332, which states, in relevant part, that "[t]he district courts shall

have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or

value of $75,000, exclusive of interest and costs, and is between – (1) citizens of different States;

[or] citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332.

7.      As alleged in their Complaint, Plaintiffs are residents of the State of Florida. (*See*

**Exhibit A** Complaint ⁋ 1)

8.      Defendant Wells Fargo is a Delaware corporation with its principal place of

business in South Dakota. Accordingly, Defendant Wells Fargo is a citizen of South Dakota and

Delaware for purposes of determining diversity under 28 U.S.C. § 1332(c)(1).

9.      Therefore, this action involves "citizens of different States." *See* 28 U.S.C. §

1332(a)(1)-(2). Because Plaintiffs are Florida citizens and no other named defendant is a citizen

of either South Dakota or Delaware, complete diversity exists, and removal of this action is

proper under 28 U.S.C. § 1441(b).

10.      Although the Complaint does not detail the amount of damages Plaintiffs seek, it

is facially apparent that the amount in controversy in this case exceeds $75,000, exclusive of

interests and costs, based on Plaintiffs' allegation that they have been deprived of at least $2.1

million. (**Exhibit A** Complaint ⁋ 49) This is clear given the nature of Plaintiffs' claims, and the

fact that Plaintiffs are seeking, among other things, compensatory, statutory, punitive, and

exemplary damages. *See* 28 U.S.C. § 1332(a).

11.      Further, even when a plaintiff does not explicitly allege damages in excess of the

jurisdictional limit, "the amount in controversy is determined by examining contested factual

assertions in the case that make it possible that at least [$]75,000 dollars is at issue*." Carbaugh

v. Home Depot U.S.A., Inc.*, No. 13-CV-02848-REB-MEH, 2014 U.S. Dist. LEXIS 100115, *3

(D. Colo. July 23, 2014) (citing *McPhail v. Deere & Co*., 529 F.3d 947, 954-55 (10th Cir.

2008)). "A complaint that presents a combination of facts and theories of recovery that may

support a claim in excess of $75,000 can support removal." *McPhail,* 529 F.3d at 955-956. "The

amount in controversy is not proof of the amount the plaintiff will recover. Rather, it is an

estimate of the amount that will be put at issue in the course of the litigation." *Id.* at 956. Here, the face of Plaintiffs' Complaint makes clear that the amount in controversy is more than $75,000. Accordingly, the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs. See 28 U.S.C. § 1332.

12.     This court has original jurisdiction under 28 U.S.C. § 1332 for the reasons set forth above.

## PROCEDURE FOR REMOVAL

13.     As required by 28 U.S.C. §§ 1446(a) and 1441(a), this Notice of Removal is being filed in the United States District Court for the District of Wyoming because it is the United States District Court for the district and division within which the State District Court action being removed is pending.

14.     28 U.S.C. §§ 1446 establishes the time frame and procedure to properly effectuate removal. 28 U.S.C. §§ 1446(b) provides that "[t]he notice of removal of a civil action or proceedings shall be filed within thirty days after the receipt by the defendants, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." The Parties to this action agreed to extend all pending deadlines as of December 7, 2023, for thirty days, up to and including January 8, 2024. Thus, this removal is timely.

15.     Pursuant to 28 U.S.C. § 1446(d) and U.S.D.C.L.R. 81.1, a copy of the Notice of Removal will be filed contemporaneously with this filing in the District Court of the Ninth Judicial District in and for Teton, Wyoming in the form attached as **Exhibit D**. That filing serves as written notice to all adverse parties and effects removal in accordance with 28 U.S.C. § 1446(d).

16.     This Notice of Removal is signed pursuant to Rule 11 of the Federal Rules of

Civil Procedure, as required by 28 U.S.C. § 1446(a).

17.     A completed Civil Cover Sheet is being filed with this Notice of Removal and all appropriate fees are being submitted herewith.

18.     By virtue of this Notice of Removal and the Notice filed in the State District Court, Wells Fargo does not waive any rights to file any other motions permitted by the Federal Rules of Civil Procedure.

WHEREFORE, Wells Fargo hereby removes the action now pending in the District Court of the Ninth Judicial District, Teton County, Wyoming, Civil Action No. 2023-CV-18974, to the United States District Court for the District of Wyoming, which shall assume full jurisdiction over this action as provided by law, and Defendant Wells Fargo respectfully requests that this action proceed herein. A proposed Order on Removal is submitted herewith.

Dated this 8th day of January 2024.


Isaac N. Sutphin, P.C. (Wyo. State Bar #6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 8, 2024, I served the foregoing by via email and by

placing a true and correct copy thereof in the United States mail, postage prepaid and properly

addressed to the following:

> J. Austin Dunlap
> Austin Dunlap Law
> P.O. Box 4803
> Jackson, WY 83001
> austindunlap@gmail.com

# EXHIBIT A



# Notice of Service of Process

DB2 / ALL
Transmittal Number: 28028067
Date Processed: 11/17/2023

| | |
|---|---|
| **Primary Contact:** | WF West - WF Bank<br>Corporation Service Company- Wilmington, DELAWARE<br>251 Little Falls Dr<br>Wilmington, DE 19808-1674 |

| | |
|---|---|
| **Entity:** | Wells Fargo Bank, N.A.<br>Entity ID Number  2013649 |
| **Entity Served:** | Wells Fargo Bank, N.A. |
| **Title of Action:** | Carol W. Garrett vs. Wells Fargo Bank, N.A. |
| **Matter Name/ID:** | Carol W. Garrett vs. Wells Fargo Bank, N.A. (14873679) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Teton County District Court, WY |
| **Case/Reference No:** | 2023-CV-18974 |
| **Jurisdiction Served:** | Wyoming |
| **Date Served on CSC:** | 11/17/2023 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Sayer Law Group, P.C.<br>307-690-8568 |
| **Client Requested Information:** | Matter Management User Groups: [Service of Process]<br>Routing Rules (CSC): R1663<br>Classification: Standard |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

SERVICE COPY

## IN THE DISTRICT COURT OF THE NINTH JUDICIAL DISTRICT

## WITHIN AND FOR TETON COUNTY, WYOMING

CAROL W. GARRETT AND ) 
TERRY LEE GARRETT )
)
    Plaintiffs, )          *2023- CV- 18974*
)
v. )
)
WELLS FARGO BANK, N.A. )
)
    Defendant. )

### SUMMONS

TO:   Wells Fargo Bank, N.A.
      Corporation Service Company
      1821 Logan Ave
      Cheyenne, WY 82001 USA

    YOU ARE HEREBY SUMMONED and required to file with the clerk and serve upon Petitioner's attorney and answer to the *Plaintiffs' Complaint and Jury Demand*, which is herewith served upon you, within twenty (20) days after service of this Summons upon you, exclusive of the day of service. (If service upon you is made outside of the State of Wyoming, you are required to file and serve your answer to the *Petition* within thirty (30) days after service of this Summons upon you, exclusive of the day of service.) If you fail to do so, judgment by default will be taken against you for the relief demanded in the *Complaint*.

    DATED this 10th day of October 2023.

J. Austin Dunlap - *Counsel for the Plaintiff*
Wyoming State Bar # 7-4586
P.O. Box 4803
Jackson, WY 83001
Telephone (307) 690-8568
austindunlap@gmail.com

Clerk of the District Court
BY:

J. Austin Dunlap
WSB 7-4586
PO Box 4803
Jackson, WY 83001
Tel. 307-690-8568
Fax 307-316-8101
austindunlap@gmail.com
*Attorney for Plaintiffs*

FILED 4:15pm

OCT 10 2023

DISTRICT COURT
9TH JUDICIAL DISTRICT
TETON COUNTY WYOMING

# IN THE DISTRICT COURT OF THE NINTH JUDICIAL DISTRICT

## WITHIN AND FOR TETON COUNTY, WYOMING

CAROL W. GARRETT AND )
TERRY LEE GARRETT )
)
    Plaintiffs, )
)   *2023- CV-18974*
v. )
)
WELLS FARGO BANK, N.A. )
)
    Defendant. )

## PLAINTIFFS' COMPLAINT AND JURY DEMAND

COMES NOW, Carol W. Garrett and Terry Lee Garrett, husband and wife, by and through their attorney, J. Austin Dunlap, for their cause of actions and claims of relief against the Defendant, hereby state and allege as follow:

### I. PARTIES

1.    Plaintiffs Carol Garrett and Terry Garrett are residents of Florida and were owners of real property in Jackson, Teton County, Wyoming commonly known as 1045 Upper Cache Creek Drive.

2.    Defendant Wells Fargo Bank, N.A., ("Wells Fargo") is a corporation organized under the laws of South Dakota, and doing business in Teton County, Wyoming with offices at 50 Buffalo Way, Jackson, Teton County, Wyoming, and 110 Center Street, Jackson, Teton County, Wyoming.

3.    It is upon information and belief that Wells Fargo acquired the Garretts' mortgage for the property commonly known as 1045 Upper Cache Creek Drive, Jackson, Teton County, Wyoming from First Union National Bank of Delaware, the original lender.

## II. JURISDICTION AND VENUE

4.    Plaintiffs incorporate by reference all statement and allegations above.

5.    This Court has personal jurisdiction over the parties consistent with W.S.§ 5-1-107.

6.    Pursuant to W.S. §5-9-128(a)(i), the damages caused by the events complained of herein are in excess of $50,000.00, thus placing original jurisdiction of this matter within this Court.

7.    Pursuant to W.S. §1-5-101(a)(i), venue in the Ninth Judicial District Court in Teton County, Wyoming is proper because that is the county in which the subject property is located, and the acts and omissions complained of herein occurred.

## III. FACTS COMMON TO ALL CLAIMS

8.    Plaintiffs incorporate by reference all statements and allegations above.

9.  In 2001, Carol and Terry Garret built a single-family residence at 1045 Upper Cache Creek Drive, Jackson, Wyoming.

10.  Terry Garrett is a Vietnam War combat veteran who is wheelchair bound and legally blind due to his injuries suffered in the Vietnam War.

11.  The home they built in Jackson was wheelchair accessible and built to accommodate Terry's needs.

12.  The home was partially financed through a mortgage dated July 31, 2001, from First Union National Bank of Delaware ("Mortgagor" or "Lender") (Exhibit 1).

13.  The Garretts had a tenant, Michael Melf, living in the house in July 2023.

14.  Mr. Melf returned home one day in July 2023 to find his neighbors, Mike Mason and Nancy Watkins outside – they share a common drive way with the Garretts.

15.  The neighbors indicated that a stranger had been at the Garrett residence earlier in the day, and the stranger indicated that he had purchased the home at 1045 Upper Cache Creek Drive.

16.  The neighbors contacted the Garretts directly by phone.

17.  This is how the Garretts and Mr. Melf, the legal tenant, found out about the foreclosure sale.

18.  The Teton County Sheriff's Office conducted a foreclosure sale for 1045 Upper Cache Creek Drive on March 16, 2023.

19.    The Teton County Sheriff's Office received an Affidavit of Service of Written Notice of Intent to Foreclose Mortgage from Defendant's representative C. Morgan Lasley, Esquire of the Sayer Law Group, P.C.

20.    C. Morgan Lasley affirmed that written notice of intent to foreclose by advertisement and sale had been served upon the record owner and the person in possession by certified mail, return receipt requested, mailed to the last known address of the record owner, and the person in possession.  (*See* Exhibit 2).

21.    A Certificate of Purchase was also issued March 23, 2023. (Exhibit 3).

22.    After the tolling of the redemption period, a Sheriff's Deed was issued on July 19, 2023.  (Exhibit 4).

23.    Sometime in August, the Garretts neighbors encountered one of the new purchasers at the property, being the first time Mr. Melf or Petitioners became aware of any foreclosure proceedings involving the 1045 Upper Cach Creek Drive house.

24.    Upon information and belief, the Garrett's outstanding balance on the Mortgage was approximately $76,500.00.

25.    The home at 1045 Upper Cache Creek Drive appraised for $2,900,000.00. (*See* Exhibit 5).

26.    The highest bid at public auction was $825,000.00 by John Caldwell and Joan Schank. (See Exhibit 3).

27.     Defendant Wells Fargo failed to follow the statutory requirements in recording the assignment and giving their notice of foreclosure resulting in the Garretts being damaged in excess of $2.1 million.

28.     The Garretts' total damages is an amount that will be proven at trial.

## IV. CLAIMS

### COUNT I - WRONGFUL FORECLOSURE UNDER W.S.§ 34-4-103(a)(iii) – FAILURE TO RECORD ASSIGNMENT

29.     Plaintiffs incorporate by reference all statements and allegations above.

30.     W.S. §34-4-103(a)(iii) requires "[t]hat the mortgage containing the power of sale has been duly recorded; and if it has been assigned, that all assignments have been recorded."

31.     The Garretts entered into a mortgage agreement with First Union National Bank of Delaware and not Defendant. (Exhibit 1).

32.     The assignment from First Union National Bank of Delaware to Defendant is not recorded in the Teton County Records as evidenced by the Title Commitment provided by Northern Title. (*See* Exhibit 6).

33.     Defendant has failed to follow the statutory requirements in W.S. §34-4-103 and Plaintiffs have suffered substantial economic damages as a result.

### COUNT II - WRONGFUL FORECLOSURE UNDER W.S. §34-4-103(a)(iv) – FAILURE TO NOTIFY OCCUPANT

34.     Plaintiffs incorporate by reference all statements and allegations above.

35.    Michael Melf was the legal tenant of 1045 Upper Cache Creek Drive and had been for the previous 12 years.

36.    It is reasonable to assume that the legal occupant has a different address than the legal owner of the property.

37.    Defendant made no effort to distinguish addresses between the owner and the occupant as set forth in his affidavit below.  The notice for the occupant was sent to the address of record of the owner.

38.    The United State Postal Service does not deliver mail to 1045 Upper Cach Creek Drive as further evidenced by the tracking notations on the certified mailings.

39.    Michael Melf did not receive notice of intent to foreclose as required by W.S.§ 34-4-103(a)(iv).

40.    Defendant asserted the following:

That written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the person in possession by certified mail, return receipt requested, mailed to the last known address of the record owner and the person in possession at least ten (10) days before commencement of the first publication of the notice of the foreclosure sale as follows and that a copy of the published Foreclosure Sale Notice was mailed, certified mail, return receipt requested to all parties as required by Wyoming  Statutes, before the notice was published as follows:…

41.    Defendant lists a tracking number for certified mailings to the "Current Occupants":  9489009000276449884146 for its Notice of Intent to Foreclose.

42.    The United States Postal Service tracking information for certified mail no. 9489009000276449884146 sent on December 8, 2022, to the "current occupants" at 1045 Upper Cache Creek Drive states "Insufficient Address" on December 15, 2022 (emphasis added).

43.    The mailing was returned to the original sender undelivered.

44.    Defendant lists a tracking number for the "Current Occupants": 9489009000276449867972 for its Foreclosure Sale Notice.

45.    The United States Postal Service tracking information for certified mail no. 9489009000276449867972 sent on January 30, 2023, to the "current occupants" at 1045 Upper Cache Creek Drive never arrived in Jackson, Wyoming.

46.    Defendant has failed to follow the statutory requirements in W.S. §34-4-103 and Plaintiffs have suffered substantial economic damages as a result.

COUNT THREE –
BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

47.    Plaintiffs incorporate by reference all statements and allegations above.

48.    Plaintiff entered into a mortgage agreement on July 31, 2001.

49.    Defendant's actions have deprived Plaintiff of approximately $2.1 million in an effort satisfy its $76,000 loan.

50.    Defendant's failure to record the assignment of the mortgage and failure to notify the current occupant of the intent to foreclose as statutorily

required are breaches of community standards of decency, fairness, and reasonableness.

51.   Defendants breach of the implied covenant of good faith and fair dealing has resulted in Plaintiffs suffering substantial economic damages.

## PUNATIVE DAMAGES

52.   Plaintiffs incorporate by reference all statements and allegations above.

53.   At all relevant times, Defendant acted outrageously with willful and wanton misconduct.

54.   Defendant's failure to perform the basic statutory requirements were in reckless disregard of the consequences and Defendant knew or should have known the significant harm their actions caused.

55.   Defendant failed to follow the basic statutory requirements.

56.   Defendant disregard of the statutory requirements resulted in deprivation to the Plaintiffs of at least $2.1 million to satisfy a $76,000 loan.

57.   In addition, Plaintiffs lost their home of 21 years that had been specifically designed and built for Terry Garrett's needs.

## PRAYER FOR RELIEF AS TO ALL CLAIMS

WHEREFORE, the Plaintiffs respectfully requests this Honorable Court enter judgment:

A.   Declaring that the conduct of Defendant was in violation of W.S. §34-4-103 for failing to record the assignment and failing to give proper notice to the occupant;

*Garrett v. Wells Fargo Bank*
Complaint and Jury Demand
Page 8 of 10

B.      Rescinding the foreclosure sale and restoring ownership of 1045 Upper Cache Creek Drive to the Plaintiffs;

C.      In the alternative, award Plaintiffs their damages in an amount to be proven at trial;

D.      Awarding Plaintiff their costs, expenses of bringing this action; and

E.      Awarding Plaintiff punitive and exemplary damages against Defendants in order to punish Defendants for engaging in such conduct so as to intentionally fail to follow the statute and recklessly deprive Plaintiff of their property, and in order to deter Defendant and others similarly situated to Defendants form engaging in wrongful foreclosures; and

F.      Granting Plaintiff such other and further relief as the Court deems just and property.

## JURY DEMAND

Attached is a demand for a twelve-person jury.

RESPECTFULLY SUBMITTED this *10th* day of October 2023.

J. Austin Dunlap
WSB 7-4586
P.O. Box 4803
Jackson, WY 83001
*Counsel for the Plaintiffs*

# IN THE DISTRICT COURT OF THE NINTH JUDICIAL DISTRICT

## WITHIN AND FOR TETON COUNTY, WYOMING

|  |  |
|---|---|
| CAROL W. GARRETT AND<br>TERRY LEE GARRETT | ) <br> ) <br> ) |
| Plaintiffs, | ) |
| v. | ) |
| WELLS FARGO BANK, N.A. | ) <br> ) |
| Defendant. | ) |

**FILED** 4:15 pm.

OCT 10 2023

DISTRICT COURT
9TH JUDICIAL DISTRICT
TETON COUNTY WYOMING

2023-CV-18974

## JURY DEMAND

## DEMAND FOR JURY

The Plaintiffs demand a trial by jury of twelve peers on all issues so triable.

J. Austin Dunlap
WSB 7-4586
P.O. Box 4803
Jackson, WY 83001
*Counsel for the Plaintiffs*

*Garrett v. Wells Fargo Bank*
Complaint and Jury Demand
Page 10 of 10

COURTESY RECORDING
: document is being recorded solely as a courtesy ...
... modation to the parties therein.  Land Title Co. hac ...
'nly disclaims any responsibility or liability for ...
... of the content thereof.

**After Recording, Mail To:**
First Union National Bank of Delaware
C/O Service Center
Internet Sales Support (SC 39 only)  NC5510
8740 Research Dr. - 1st Floor
Charlotte, NC 28262

**Prepared By:**
First Union National Bank of Delaware
C/O Service Center
Internet Sales Support (SC 39 only)  NC5510
8740 Research Dr. - 1st Floor
Charlotte, NC 28262

Account Number: 4386579010234457/300069655        Parcel Number 22-41-16-34-4-02-018
45-600.00

| RELEASED | |
|---|---|
| INDEXED | ✓ |
| ABSTRACTED | ✓ |
| SCANNED | ✓ |

# MORTGAGE

THIS MORTGAGE is made this day July 31, 2001, between the Mortgagor, **CAROL W GARRETT, MARRIED and TERRY LEE GARRETT,   HER HUSBAND, TENANTS BY THE ENTIRETY   and CLARA WALSH,    SEPARATED** whose mailing address is the property address (herein "Borrower"), and the Mortgagee, First Union National Bank of Delaware, a national banking association organized and existing under the laws of the United States of America, whose address is One Rodney Square, 920 King Street, Wilmington, DE 19801 (herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. **$75,000.00**, which indebtedness is evidenced by Borrower's Note dated July 31, 2001 and extensions, modifications and renewals thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of indebtedness, if not sooner paid, due and payable on **July 30, 2021.**

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in the County of ~~ALACHUA~~, State of WYOMING:

 Teton

SEE ATTACHED SCHEDULE A.

which has the address of **1045 UPPER CACHE CREEK DRIVE, JACKSON, WY 83001** and Parcel No. _____ (herein "Property Address");

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property."

**Any Rider ("Rider") attached hereto and executed of even date is incorporated herein and the covenant and agreements of the Rider shall amend and supplement the covenants and agreements of this Mortgage, as if the Rider were a part hereof.**

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record.  Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.**  Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note.  This Mortgage secures payment of said Note according to its terms, which are incorporated herein by reference.

**2. Prior Mortgages and Deeds of Trust; Charges; Liens.**  Borrower shall perform all of Borrower's obligations, under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due.  Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

**3. Hazard Insurance.**  a) Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and any other hazards, including floods or flood, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.  If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 5.

*(left margin, vertical text)*
Grantor: GARRETT, CAROL W ET AL
Grantee: FIRST UNION NATIONAL BANK OF
Doc #519832 bk 432 pg 493-411 filed at 4:31 on 08/28/01
Sherry L Daigle, Teton County Clerk fees: 22.00
By KIMBERLEE JENSEN  Deputy

WY Mortgage
231336 wymtg (Rev 06, 11-00)

Page 1

Loan Number: 963  8981336907/300069655

b) All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly to Borrower.

c) Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

d) Except as provided in subparagraph 3(e) below, should partial or complete destruction or damage occur to the Property, Borrower hereby agrees that any and all instruments evidencing insurance proceeds received by Lender as a result of said damage or destruction, shall be placed in a non-interest bearing escrow account with Lender. At Lender's discretion, Lender may release some or all of the proceeds from escrow after Borrower presents Lender with a receipt(s), invoice(s), written estimates(s) or other document(s) acceptable to Lender which relates to the repair and/or improvements of the Property necessary as a result of said damage and/or destruction. Absent an agreement to the contrary, Lender shall not be required to pay Borrower any interest on the proceeds held in the escrow account. Any amounts remaining in the account after all repairs and/or improvements have been made to the Lender's satisfaction, shall be applied to the sums secured by this Deed of Trust, Deed to Secure Debt, or Mortgage. Borrower further agrees to cooperate with Lender by endorsing all, checks, drafts and/or other instruments evidencing insurance proceeds; and any necessary documents. Should Borrower fail to provide any required endorsement and/or execution within thirty (30) days after Lender sends borrower notice that Lender has received an instrument evidencing insurance proceeds, or document(s) requiring Borrower's signature, Borrower hereby authorizes Lender to endorse said instrument and/or document(s) on Borrowers behalf, and collect and apply said proceeds at Lender's option, either to restoration or repair of the Property or to sums secured by this Deed of Trust, Deed to Secure Debt, or Mortgage. It is not the intention of either party that this escrow provision, and/or Lender's endorsement or execution of an instrument(s) and/or document(s) on behalf of Borrower create a fiduciary or agency relationship between Lender and Borrower.

e) Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of the payments. If under paragraph 15 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument.

4.   **Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

5.   **Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such actions as is necessary to protect Lender's interest.

Any amounts disbursed by Lender pursuant to this paragraph 5, with interest thereon from the date of disbursal, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 5 shall require Lender to incur any expense or take any action hereunder.

6.   **Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefore related to Lender's interest in the Property.

7.   **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender subject to the terms of any mortgage, deed

of trust or other security agreement with a lien which has priority over this Mortgage.

**8. Borrower Not Released; Forbearance By Lender Not a Waiver.** The Borrower shall remain liable for full payment of the principal and interest on the Note (or any advancement or obligation) secured hereby, notwithstanding any of the following:  (a) the sale of all or a part of the premises, (b) the assumption by another party of the Borrower's obligations hereunder, (c) the forbearance or extension of time for payment or performance of any obligation hereunder, whether granted to Borrower or a subsequent owner of the property, and (d) the release of all or any part of the premises securing said obligations or the release of any party who assumes payment of the same.  None of the foregoing shall in any way affect the full force and effect of the lien of this Mortgage or impair Lender's right to a deficiency judgment (in the event of foreclosure) against Borrower or any party assuming the obligations hereunder, to the extent permitted by applicable law.

Any forbearance by Lender in exercising any right or remedy hereunder or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**9. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 14, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender.

**10. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by first class mail addressed to Borrower or the current owner at the Property Address or at such other address as Borrower may designate in writing by notice to Lender as provided herein, and any other person personally liable on this Note as these person's names and addresses appear in the Lender's records at the time of giving notice and (b) any notice to Lender shall be given by first class mail to Lender's address stated herein or to such other address as lender may designate by notice to Borrower as provided herein.  Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**11. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located.  The foregoing sentence shall not limit the applicability of Federal law to this Mortgage.  In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflicts shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable.  As used herein "costs", "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**12. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note, this Mortgage and Rider(s) at the time of execution or after recordation hereof.

**13. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair or other loan agreement which Borrower enters into with Lender.  Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**14. Transfer of the Property or a Beneficial Interest in Borrower, Assumption.** As used in this Section 14, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by federal law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a

WY Mortgage
231336 wymlg (Rev 06, 11-00)

Page 3

Loan Number: 963  8881338907/300069855

period of not less than 30 days from the date the notice is given in accordance with Section 10 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies by this Security Instrument without further notice or demand on Borrower.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**15.   Default; Acceleration; Remedies.**   Upon Borrower's breach of any covenant or agreement of Borrower in this entire Mortgage, including the covenants to pay when due any sums under the Note secured by this Mortgage, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without demand or notice, notice of the exercise of such option being hereby expressly waived. Lender may invoke the power of sale hereby granted. Lender shall have the right to enter upon and take possession of the property hereby conveyed and after or without taking such possession shall have the right to sell the same at public auction for cash, after first giving notice of the time, place and terms of such sale by publication once a week for three consecutive weeks prior to said sale, in some newspaper published in said county, and upon payment of the purchase money, the Lender, or owner of the debt and Mortgage, or auctioneer, shall execute to the purchaser for and in the name of the Mortgagors, a good and sufficient deed to the property sold; the Lender shall apply the proceeds of said sale: first, to the expense of advertising, selling and conveying said property, including a reasonable attorney's fee; second, to the payment of any amounts that may then have been expended or that may then be necessary to expend in paying insurance, taxes and other encumbrances, with interest thereon; third, to the payment in full of the principal indebtedness and interest thereon, whether the same shall or shall not have fully matured at the date of said sale, but no interest shall be collected beyond the date of said sale; and fourth, the balance if any, shall be paid over to the said Borrowers or to whom ever then appears of record to be the owner of said property. The Lender may bid and become the purchaser of the mortgaged property at any foreclosure sale hereunder.

**16.   Borrower's Right to Reinstate.**   Notwithstanding Lender's acceleration of the sums secured by this Mortgage, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued if: (a) Borrower pays Lender all sums which would be then due under this Mortgage, this Note and Notes securing Future Advances, if any, had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in Paragraph 15 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action, as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

**17.   Assignment of Rents; Appointment of Receiver.**   As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that so long as Borrower is not in default hereunder, Borrower shall, prior to acceleration under paragraph 15 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration and/or foreclosure under paragraph 15 hereof, or abandonment of the Property, Lender, in person or by agent, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the property including those past due. The Lender shall be liable to account only for those rents actually received prior to foreclosure sale as provided in paragraph 15. Lender shall not be liable to account to Borrower or to any other person claiming any interest in the Property for any rents received after foreclosure.

**18.   Loan Charges.**   If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (1) any such loan charges shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (2) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by mailing a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Note.

**19.   Legislation.**   If, after the date hereof, enactment or expiration of applicable laws have the effect either of rendering the provisions of the Note, the Mortgage or any Rider, unenforceable according to their terms, or all or any part of the sums secured hereby uncollectible, as otherwise provided in this Mortgage or the Note, or of diminishing the value of Lender's security, then Lender, at Lender's option, may declare all sums secured by the Mortgage to be immediately due and payable.

**20.   Satisfaction.**   Upon payment of all sums secured by this Mortgage, the conveyance of the property pursuant to this Mortgage shall become null and void and Lender shall release this Mortgage. Borrower shall pay all costs of recordation, if any. Lender, at Lender's option, may allow a partial release of the Property on terms acceptable to Lender and Lender may charge a release fee.

**21. Waiver of Homestead.** Borrower hereby releasing and waiving all rights under and by virtue of the homestead exemption laws of this State, and relinquishes all rights of dower and courtesy in the Property.

**22. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal, or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 22, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 22, "Environmental law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection.

### REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE
### UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

WY Mortgage
231336 wymtg (Rev 06, 11-00)

Page 5

Loan Number: 963  8881338907/300069555

Appellant's Appendix
Page 30 of 281

**IN WITNESS WHEREOF,** Borrower has executed this Mortgage and adopted as his seal the word ("SEAL") appearing beside his name.

Signed, sealed and delivered In the presence of:

_(signature)_ [SEAL]
**CAROL W GARRETT**

_(signature)_ [SEAL]
**TERRY LEE GARRETT**

_(signature)_ [SEAL]
**CLARA WALSH**

[Space Below This Line For Acknowledging]

STATE OF ~~WYOMING~~ Florida

COUNTY OF Alachua

The foregoing instrument was acknowledged before me by **CAROL W GARRETT**, and **TERRY LEE GARRETT** and **CLARA WALSH**, this 31st day of July, 2001.

WITNESS my hand and official seal

Signature: _(signature)_ (SEAL)

My Commission Expires: 11-4-2004

THOMAS R. TURK, JR.
MY COMMISSION # CC 963830
EXPIRES: November 4, 2004
Bonded Thru Notary Public Underwriters

# PRIME EQUITY LINE RIDER

PEL Account Number: 4386579010234457

THIS PRIME EQUITY LINE RIDER is made this day **July 31, 2001** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Mortgagor") to secure the Prime Equity Line Agreement and Disclosure Statement executed by the Mortgagor of the same date (said Agreement is referenced in the Security Instrument and this Rider as "Note") to First Union National Bank of Delaware, (the "Lender") and covering the property described in the Security Instrument and located at:

**1045 UPPER CACHE CREEK DRIVE, JACKSON, WY 83001**
Property Address

**ADDITIONAL COVENANTS**
In addition to the covenants and agreements made in the Security Instrument, Mortgagor and Lender further covenant and agree to the following additional terms and conditions:

1. **Adjustable Rate**
   The Security Instrument secures a Note that provides for changes in the interest rate, as more particularly described in said Note.

2. **Amendments to the Security Instrument Maturity Date**
   The second paragraph on page one of the Security Instrument is deleted in its entirety and shall read as follows:

   "The Lender has made a loan to Mortgagor the maximum indebtedness at any one time shall not exceed $75,000.00 which loan is an open-end line of credit as evidenced by Mortgagor's Note and extensions, modifications and renewals thereof which provides for obligatory advances of all or part of the loan proceeds from time to time, subject to provisions in the Note. The entire indebtedness evidenced by the Note, if not sooner paid, will be due and payable on **July 30, 2021**."

   Paragraph 20 of the Security Instrument shall be deleted in its entirety and read as follows:

   "When the balance of all outstanding sums including finance charges and other charges, if any, secured by the Security Instrument is zero, the Lender shall upon request of the Borrower, release the Security Instrument. Borrower will pay all recordation costs, if any. Absent a request from the Borrower, the Security Instrument shall remain in full force and effect for the term set forth above. Lender, at Lender's option, may allow a partial release of the Property on terms acceptable to Lender and Lender may charge a release fee."

3. **Obligation to Lend**
   Lender is absolutely obligated under the terms of the Note to make advances not to exceed, at any one time in the aggregate, the amount stated in the Note and Mortgagor has agreed to repay any advances under the terms of the Note. Lender's absolute obligation to make advances to Mortgagor under the Note ends when Lender terminates the right to make advances and demands repayment of the outstanding obligation or prohibits additional extensions of credit under the Note or the Security Instrument. Nevertheless, Lender may waive the right to terminate or prohibit additional advances. If Lender does not terminate or prohibit additional advances, Lender remains obligated to make advances to Mortgagor under the terms of the Note. However, that waiver does not bind Lender if the same or a different event occurs or is continuing at a later time.

4. **Note Provisions - Conflict**
   In case of a conflict between the terms of the Note and the Security Instrument governing remedies of default or termination of advances, the terms of the Note shall control.

By signing below, Mortgagor accepts and agrees to the terms and conditions contained in this Rider.

_____ [SEAL]
TERRY LEE GARRETT

_____ [SEAL]
CAROL W GARRETT

_____ [SEAL]
CLARA WALSH

[Space Below This Line For Acknowledging]

STATE OF ~~WYOMING~~ Flcida

COUNTY OF Alachua            ) ss
                             )

The foregoing instrument was acknowledged before me by TERRY LEE GARRETT  and CAROL W GARRETT and CLARA WALSH , this 3\_\_ day of July         .

WITNESS my hand and official seal

Signature: _____ (SEAL)

My Commission Expires: _11-4-01___



## Legal Description

All that certain parcel of land situated in CITY OF JACKSON being known as All that certain property situated in CITY OF JACKSON in the county of TETON and state of WYOMING and being described in a deed dated 08/21/1986 and recorded 08/26/1986 in book 180 page 562 among the land records of the county and state set forth above and referenced as follows: PART OF LOT 9, RIDGE ADDITION , PLAT 562   Parcel ID Number:  22-41-16-34-4-02-018 and being more fully described in Deed Book 180 Page 562 recorded on 08/26/1986 among the land records of TETON County, WY.

Parcel ID Number:  22-41-16-34-4-02-018

**EXHIBIT A**

**AFFIDAVIT OF SERVICE OF WRITTEN NOTICE OF**

**INTENT TO FORECLOSE MORTGAGE**

STATE OF IOWA           )
                      )SS

COUNTY OF BLACK HAWK   )

Brian G. Sayer of lawful age, being first duly sworn upon his oath, deposes and says:

1.      That he is an attorney admitted generally to practice law in the State of Wyoming and is a member of the law firm of The Sayer Law Group, P.C., who are the attorneys representing the Mortgagee in a procedure to foreclose a certain real estate mortgage dated 07/31/2001 (the "Mortgage"), and recorded on 08/24/2001, as Instrument No. 0549832, Book 432, Page 403 in the records of the office of the County Clerk and ex-officio Register of Deeds in and for Teton County, State of Wyoming, wherein Carol W. Garrett, married and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh, separated ("Mortgagor(s)"), the named mortgagor(s), and First Union National Bank of Delaware, a Corporation, is the named mortgagee.

2.      That written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the person in possession by certified mail, return receipt requested, mailed to the last known address of the record owner and the person in possession at least ten (10) days before commencement of the first publication of the notice of the foreclosure sale as follows and that a copy of the published Foreclosure Sale Notice was mailed, certified mail, return receipt requested, to all parties as required by Wyoming statutes, before the notice was published, as follows:

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 22
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 58
Carol W. Garrett, Terry Lee Garrett and Clara Walsh
1045 Upper Cache Creek Dr.
Jackson, WY 83001

WY220113

Exhibit 2

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 39
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 65
Carol W. Garrett, Terry Lee Garrett and Clara Walsh
830 NW 61ST TER
GAINESVILLE , FL 32605

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 46
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 72
Current Occupants
1045 Upper Cache Creek Dr.
Jackson, WY 83001

3.      That the notice of intent to foreclose the Mortgage was sent on 12/08/2022
and the date of the first publication of the notice of foreclosure sale was 02/01/2022.

FURTHER AFFIANT SAYETH NAUGHT.

20 MAR 2023
_____
Date

_____
Brian G. Sayer
/C. Morgan Lasley
Marcello G. Rojas
The Sayer Law Group, P.C.
925 E. 4th St.
Waterloo, Iowa 50703
319-234-2530
319-232-6341

This instrument was acknowledged before me on the 20 day of March
2023 by C Morgan Lasley as attorney of The Sayer Law Group, P.C.

_____
Notary Public

SHANNON SAUL
COMMISSION NO. 773843
MY COMMISSION EXPIRES
7-12-24

WY220113



## FORECLOSURE SALE NOTICE

WHEREAS, default in the payment of principal and interest has occurred under the terms of a promissory note (the "Note") dated July 31, 2001, executed and delivered by Carol W. Garrett, Terry Lee Garrett and Clara Walsh to First Union National Bank of Delaware and a real estate mortgage (the "Mortgage") of the same date securing the Note, which Mortgage was executed and delivered by Carol W. Garrett, her husband, tenants by the entirety and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh separated (the "Mortgagors"), to First Union National Bank of Delaware and which Mortgage was recorded on August 24, 2001 as Instrument No. 0548532, Book 429, Page 410 in the records of the office of the County Clerk and Ex-officio Register of Deeds in and for Teton County, State of Wyoming; and

WHEREAS, the Mortgage contains a power of sale which by reason of said default, the Mortgagee declares to have become operative, and no suit or proceeding has been instituted at law to recover the debt secured by the Mortgage, or any part thereof, nor has any such suit or proceeding been instituted and the same discontinued; and

WHEREAS, written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the party in possession of the mortgaged premises at least ten (10) days prior to the commencement of the publication, and the amount due upon the Mortgage on the date of first publication of this notice of sale being the total sum of $76,719.18 which sum consists of the unpaid principal balance of $76,500.00 plus interest accrued to the date of the first publication of this notice in the amount of $207.18, plus attorneys' fees, costs expended, and accruing interest and late charges to the date of first publication of this notice of sale;

WHEREAS, the property being foreclosed upon may be subject to other liens and encumbrances that will not be extinguished at the sale. Any prospective purchaser should research the status of the before submitting a bid.

NOW, THEREFORE, Wells Fargo Bank, N.A., successor by merger to Wachovia Bank, National Association, FKA First Union National Bank of Delaware, as the Mortgagee, will have the mortgage foreclosed as by law provided by causing the mortgaged property to be sold at public venue by the Sheriff for Deputy Sheriff in and for Teton County, Wyoming to the highest bidder for cash at 10:00 o'clock in the forenoon on March 16, 2023, at 180 South King, Jackson, WY 83001, for application on the above-described amounts secured by the Mortgage, said mortgaged property being described as follows, to wit:

The following-described real estate, situate in the County of Teton, State of Wyoming, being all of the premises and security all described by the terms of the Mortgage and compliance of this State of Wyoming to wit:

A portion of Lot 9 of the Estes Addition to the Town of Jackson, Teton County, Wyoming, according to that plat recorded in the Office of the Teton County Clerk on February 16, 1934 as Plat No. 552, described as follows:

Beginning at the southeast corner of said Lot 9, thence N00 degrees 12 minutes 14 seconds W, 149.91 feet to a point; thence N61 degrees 13 minutes 19 seconds W, 84.46 feet to a point; thence N06 degrees 53 minutes 11 seconds W, 73.01 feet to a point thence S41 degrees 21 minutes 23 seconds W, 178.01 feet to a point; thence S87 degrees 42 minutes 35 seconds E, 207.94 feet to the point of beginning.

With an address of: 1045 Upper Cache Creek Dr., Jackson, WY 83001

Together with all improvements thereon situate and all fixtures and appurtenances thereto

Date: 01/30/2023      Brian G. Sayer
                      Brian G. Sayer
                      C. Morgan Lasley
                      Marcello G. Rojas
                      THE SAYER LAW GROUP, P.C.
                      925 E. 4th St.
                      Waterloo, Iowa 50703
                      319-234-2530
                      319-232-6341

Publish: 02/08, 02/15, 02/22, 03/01/23

EXHIBIT C

AFFIDAVIT OF ATTORNEY

STATE OF IOWA            )
                         )SS
COUNTY OF BLACK HAWK     )

Brian G. Sayer of lawful age, being first duly sworn upon his oath, deposes and says:

1.      That he is an attorney admitted generally to practice law in the State of Wyoming and is a member of the law firm of The Sayer Law Group, P.C., who are the attorneys representing the Mortgagee in a procedure to foreclose a certain real estate mortgage.

2.      That The Sayer Law Group, P.C., as attorneys for the Mortgagee, will charge the Mortgagee fees totaling $2969.26 as compensation for services actually rendered in the foreclosure proceeding.

| | |
|---|---|
| Attorney Fees | $ 1700.00 |
| Publication | $ 990.00 |
| Certified Mail | $ 40.26 |
| Title Search | $ 0.00 |
| Conduct Sale Fee | $ 175.00 |
| Record Cert. of Sale | $ 39.00 |
| Record Sheriff's Deed | $ 15.00 |
| Sheriff's Fee- Sale | $ 10.00 |
| | |
| TOTAL | $ 2969.26 |

3.      That the above-mentioned fee for services rendered and incurred in connection with the foreclosure sale shall be retained entirely by the law firm of The Sayer Law Group, P.C. There is no agreement, express or implied, between such attorneys and their client, nor between such attorneys and any other person not a practicing attorney of the State of Wyoming engaged with them as an attorney in the foreclosure proceeding, for any sharing or division of said fee.

WY220113

FURTHER AFFIANT SAYETH NAUGHT.

17 MAR 2023
Date

Brian G. Sayer
X C. Morgan Lasley
Marcello G. Rojas
The Sayer Law Group, P.C.
925 E. 4th St.
Waterloo, Iowa 50703
319-234-2530
319-232-6341

This instrument was acknowledged before me on the 17 day of March, 20 23 by C. Morgan Lasley as attorney of The Sayer Law Group, P.C.

Notary Public

SHANNON SAUL
COMMISSION NO. 779843
MY COMMISSION EXPIRES

7-12-24

WY220113

GRANTOR: TETON COUNTY SHERIFF
GRANTEE: CALDWELL, JOHN
Doc 1056038 Filed At 15:21 ON 03/22/23
Maureen Murphy Teton County Clerk   fees: 33.00
By Kellie Dickerson  Deputy Clerk

## CERTIFICATE OF PURCHASE

I, Mary L. Faulkner, being duly sworn and of legal age, hereby certify that I am the Civil Process & Warrant Specialist in the Sheriff's Office of Teton County, Wyoming, and further state:

1. I conducted a public sale on the 16th day of March, 2023, commencing at or about the hour of 10:00 a.m. on the front steps of the Teton County Courthouse, 180 S. King Street, Jackson, Wyoming, for the property described below:

> Beginning at the southeast corner of said Lot 9, thence N00 degrees 12 minutes 14 seconds W, 149.91 feet to a point; thence N51 degrees 13 minutes 19 seconds W, 84.46 feet to a point; thence N66 degrees 53 minutes 11 seconds W, 73.0 feet to a point; thence S41 degrees 21 minutes 23 seconds W, 173.01 feet to a point; thence S67 degrees 42 minutes 35 seconds E, 267.84 feet to the point of beginning.
>
> Property commonly known as 1045 Upper Cache Creek Drive, Jackson, WY.

2. That such sale was conducted after an Affidavit of Service of Written Notice of Intent to Foreclose Mortgage was sent by certified mail, return receipt requested, to the last known address of the record owner and the person in possession of said property at least ten days prior to commencement of the first publication of the foreclosure sale notice, as shown by the affidavit attached hereto as **Exhibit "A".**

3. That such sale was conducted after a Notice of Foreclosure Sale was published in a newspaper of general circulation in Teton County, Wyoming, once per week for four consecutive weeks, giving the time, place and conditions of such sale as evidenced by the Attorney's Affidavit and Proof of Publication attached hereto as **Exhibit "B"**.

4. That the sum of $2969.26 is to be paid to The Sayer Law Group, P.C., the attorneys for the Mortgagee, as compensation for service actually rendered in the foreclosure proceeding, said attorneys having made an affidavit as required by the statutes of the State of Wyoming, a copy of said Affidavit of Attorney attached hereto as **Exhibit "C".**

5. The highest bidder at such sale was John Caldwell and Joan Schank ("Purchaser"), and the amount bid for the Foreclosed Property was $825,000.00 ("Purchase Price").

6. Pursuant to Wyo. Stat. § 1-18-102, the Purchaser is entitled to a deed for the Foreclosed Property at the expiration of the period of redemption unless the Foreclosed Property is redeemed prior to that

Exhibit 3

date as provided by law.  The period in which the Mortgagor has the right to redeem the Foreclosed

Property is three (3) months after the date of the foreclosure sale.

DATED this 23rd day of March, 2023.

Matt Carr, Sheriff in and for
Teton County, State of Wyoming

*Mary L. Faulkner*

Mary L. Faulkner
Civil Process & Warrant Specialist
Teton County Sheriff's Office

STATE OF WYOMING)
                                    ) ss.
COUNTY OF TETON)

The foregoing instrument was acknowledged before me on the 23rd day of March, 2023 by Mary L. Faulkner
as Civil Process & Warrant Specialist, in the Sheriff's Office of Teton County, Wyoming.

(Seal, if any)

JILL CALLAWAY
NOTARY PUBLIC
STATE OF WYOMING
COMMISSION ID: 140876
MY COMMISSION EXPIRES: 07/31/2028

My commission expires: 7/31/28

Signature of notarial officer

Notary

Title of notarial officer

## EXHIBIT A

## AFFIDAVIT OF SERVICE OF WRITTEN NOTICE OF

## INTENT TO FORECLOSE MORTGAGE

STATE OF IOWA                     )
                                  )SS
COUNTY OF BLACK HAWK              )

Brian G. Sayer of lawful age, being first duly sworn upon his oath, deposes and says:

1.      That he is an attorney admitted generally to practice law in the State of Wyoming and is a member of the law firm of The Sayer Law Group, P.C., who are the attorneys representing the Mortgagee in a procedure to foreclose a certain real estate mortgage dated 07/31/2001 (the "Mortgage"), and recorded on 08/24/2001, as Instrument No. 0549832, Book 432, Page 403 in the records of the office of the County Clerk and ex-officio Register of Deeds in and for Teton County, State of Wyoming, wherein Carol W. Garrett, married and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh, separated ("Mortgagor(s)"), the named mortgagor(s), and First Union National Bank of Delaware, a Corporation, is the named mortgagee.

2.      That written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the person in possession by certified mail, return receipt requested, mailed to the last known address of the record owner and the person in possession at least ten (10) days before commencement of the first publication of the notice of the foreclosure sale as follows and that a copy of the published Foreclosure Sale Notice was mailed, certified mail, return receipt requested, to all parties as required by Wyoming statutes, before the notice was published, as follows:

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 22
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 58
Carol W. Garrett, Terry Lee Garrett and Clara Walsh
1045 Upper Cache Creek Dr.
Jackson, WY 83001

WY220113

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 39
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 65
Carol W. Garrett, Terry Lee Garrett and Clara Walsh
830 NW 61ST TER
GAINESVILLE , FL 32605

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 46
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 72
Current Occupants
1045 Upper Cache Creek Dr.
Jackson, WY 83001

    3.    That the notice of intent to foreclose the Mortgage was sent on 12/08/2022
and the date of the first publication of the notice of foreclosure sale was 02/01/2022.

    FURTHER AFFIANT SAYETH NAUGHT.

20 MAR 2023
_____
Date

_____
Brian G. Sayer
XC. Morgan Lasley
Marcello G. Rojas
The Sayer Law Group, P.C.
925 E. 4th St.
Waterloo, Iowa 50703
319-234-2530
319-232-6341

This instrument was acknowledged before me on the 20 day of March
20 23 by C Morgan Lasley, as attorney of The Sayer Law Group, P.C.

_____
Notary Public

SHANNON SAUL
COMMISSION NO. 773843
MY COMMISSION EXPIRES

7-12-24

WY220113



# FORECLOSURE SALE NOTICE

WHEREAS, default in the payment of principal and interest has occurred under the terms of a promissory note (the "Note") dated July 31, 2001, executed and delivered by Carol W. Garrett, Terry Lee Garrett and Clara Walsh to First Union National Bank of Delaware and a real estate mortgage (the "Mortgage") of the same date securing the Note, which Mortgage was executed and delivered by Carol W. Garrett, married and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh, separated (the "Mortgagors") to First Union National Bank of Delaware and which Mortgage was recorded on August 24, 2001, as Instrument No. 0549832, Book 432, Page 403 in the records of the office of the County Clerk and ex-officio Register of Deeds in and for Teton County, State of Wyoming; and

WHEREAS, the Mortgage contains a power of sale which by reason of said default, the Mortgagee declares to have become operative, and no suit or proceeding has been instituted at law to recover the debt secured by the Mortgage, or any part thereof, nor has any such suit or proceeding been instituted and the same discontinued; and

WHEREAS, written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the party in possession of the mortgaged premises at least ten (10) days prior to the commencement of this publication, and the amount due upon the Mortgage on the date of first publication of this notice of sale being the total sum of $76,719.18 which sum consists of the unpaid principal balance of $76,500.00 plus interest accrued to the date of the first publication of this notice in the amount of $207.18, plus attorneys' fees, costs expended, and accruing interest and late charges after the date of first publication of this notice of sale;

WHEREAS, the property being foreclosed upon may be subject to other liens and encumbrances that will not be extinguished at the sale. Any prospective purchaser should research the status of title before submitting a bid;

NOW, THEREFORE Wells Fargo Bank, N.A., successor by merger to Wachovia Bank, National Association, FKA First Union National Bank of Delaware, as the Mortgagee, will have the Mortgage foreclosed as by law provided by causing the mortgaged property to be sold at public venue by the Sheriff or Deputy Sheriff in and for Teton County, Wyoming to the highest bidder for cash at 10:00 o'clock in the forenoon on March 16, 2023, at 180 South King, Jackson, WY 83001, for application on the above-described amounts secured by the Mortgage, said mortgaged property being described as follows, to-wit:

The following described real estate, situate in the County of Teton, State of Wyoming, hereby waiving and releasing all rights under and by virtue of the home-stead exemption laws of the State of Wyoming, to-wit:

A portion of Lot 9 of the Ridge Addition to the Town of Jackson, Teton County, Wyoming, according to that plat recorded in the Office of the Teton County Clerk on February 16, 1984 as Plat No. 562, described as follows:

Beginning at the southeast corner of said Lot 9, thence N00 degrees 12 minutes 14 seconds W, 149.91 feet to a point; thence N51 degrees 13 minutes 19 seconds W, 84.46 feet to a point; thence N66 degrees 53 minutes 11 seconds W, 78.0 feet to a point; thence S41 degrees 21 minutes 23 seconds W, 173.04 feet to a point; thence S67 degrees 42 minutes 35 seconds E, 257.84 feet to the point of beginning.

With an address of: 1045 Upper Cache Creek Dr., Jackson, WY 83001

Together with all improvements thereon situate and all fixtures and appurtenances thereto.

Date: 01/30/2023   Brian G. Sayer
Brian G. Sayer
C. Morgan Lasley
Marcello G. Rojas
THE SAYER LAW GROUP, P.C.
925 E. 4th St.
Waterloo, Iowa 50703
319-234-2530
319-232-6341

Publish: 02/08, 02/15, 02/22, 03/01/23

EXHIBIT C

## AFFIDAVIT OF ATTORNEY

STATE OF IOWA            )
                         )SS
COUNTY OF BLACK HAWK     )

Brian G. Sayer of lawful age, being first duly sworn upon his oath, deposes and says:

1.      That he is an attorney admitted generally to practice law in the State of Wyoming and is a member of the law firm of The Sayer Law Group, P.C., who are the attorneys representing the Mortgagee in a procedure to foreclose a certain real estate mortgage.

2.      That The Sayer Law Group, P.C., as attorneys for the Mortgagee, will charge the Mortgagee fees totaling $2969.26 as compensation for services actually rendered in the foreclosure proceeding.

| | |
|---|---|
| Attorney Fees | $ 1700.00 |
| Publication | $ 990.00 |
| Certified Mail | $ 40.26 |
| Title Search | $ 0.00 |
| Conduct Sale Fee | $ 175.00 |
| Record Cert. of Sale | $ 39.00 |
| Record Sheriff's Deed | $ 15.00 |
| Sheriff's Fee- Sale | $ 10.00 |
| | |
| TOTAL | $ 2969.26 |

3.      That the above-mentioned fee for services rendered and incurred in connection with the foreclosure sale shall be retained entirely by the law firm of The Sayer Law Group, P.C. There is no agreement, express or implied, between such attorneys and their client, nor between such attorneys and any other person not a practicing attorney of the State of Wyoming engaged with them as an attorney in the foreclosure proceeding, for any sharing or division of said fee.

WY220113

FURTHER AFFIANT SAYETH NAUGHT.

17 MAR 2023
Date

Brian G. Sayer
X C. Morgan Lasley
Marcello G. Rojas
The Sayer Law Group, P.C.
925 E. 4th St.
Waterloo, Iowa 50703
319-234-2530
319-232-6341

This instrument was acknowledged before me on the 17 day of March,
20 23 by C. morgan Lasley as attorney of The Sayer Law Group, P.C.

_____
Notary Public

SHANNON SAUL
COMMISSION NO. 773843
MY COMMISSION EXPIRES

7-12-24

WY220113

GRANTOR: TETON COUNTY SHERIFF
GRANTEE: CALDWELL, JOHN
Doc 1063792 Filed At 14:04 ON 07/20/23
Maureen Murphy Teton County Clerk   fees: 15.00
By Kellie Dickerson   Deputy Clerk

## SHERIFF'S DEED

KNOW ALL MEN BY THESE PRESENTS, that I, Mary L. Faulkner, being duly sworn and of legal age, hereby certify that I am Civil Process & Warrant Specialist for the Sheriff of Teton County, Wyoming, and that the Teton County, Wyoming Sheriff's Office conducted a public sale on the 16 day of March, 2023, commencing at or about the hour of 10:00 a.m. on the front steps of the Teton County Courthouse, 180 South King Street, Jackson, Wyoming, of the property described below that was encumbered by a Mortgage dated July 31, 2001 (the "Mortgage"), given by Carol W. Garrett, married and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh in favor of First Union National Bank of Delaware ("Mortgagee"), recorded in the records of the Teton County, Wyoming Clerk on August 24, 2001, as Instrument No. 0549832, in Book 432, at page 403 that encumbers the property described below (the "Foreclosed Property"):

Lot 9A, The Ridge Subdivision.

Property commonly known as 1045 Upper Cache Creek Drive, Jackson, WY.

On March 23, 2023, the Teton County, Wyoming Sheriff's Office issued a Certificate of Purchase for 1045 Upper Cache Creek Drive, Jackson, WY to John Caldwell and Joan Schank, which made the highest bid for the Foreclosed Property at the foreclosure sale. The Certificate of Purchase for the above property was recorded in the records of the Teton County, Wyoming Clerk as Document Number 1056038.

All redemption periods for the Foreclosed Property have expired without the Foreclosed Property being redeemed, and John Caldwell and Joan Schank are, therefore, entitled to a deed to the Foreclosed Property.

NOW, THEREFORE, KNOW ALL MEN BY THIS DEED, that I, Mary Faulkner, Civil Process & Warrant Specialist for the Sheriff of Teton County, Wyoming, in consideration of the premises, have granted and sold and do hereby convey to John Caldwell and Joan Schank, its successors and assigns, whose address is 1045 Upper Cache Creek Drive, Jackson, WY, the

Exhibit 4

Foreclosed Property, to have and to hold the described premises, with all appurtenances, to John Caldwell and Joan Schank, its successors and assigns, forever.

IN WITNESS WHEREOF, the undersigned has caused this Sheriff's Deed to be executed and delivered on the 19th day of July 2023.

Matt Carr, Sheriff in and for
Teton County, State of Wyoming

By: *Mary L. Faulkner*
Mary L. Faulkner
Civil Process & Warrant Specialist
Teton County Sheriff's Office

STATE OF WYOMING      )
                           ) ss.

COUNTY OF TETON       )

The above and foregoing Sheriff's Deed was acknowledged before me on the 19th day of July 2023 by Mary Faulkner as Civil Process & Warrant Specialist for the Sheriff of Teton County, Wyoming.

(Seal, if any)

LYNDA KAYE RUDOLPH - NOTARY PUBLIC
County of Teton      State of Wyoming
My Commission Expires 2/2/2024

*Lynda Kaye Rudolph*
Signature of notarial officer

*Administrative Assistant*
Title of notarial officer

My commission expires: 2/2/2024

## SALIENT FACTS

| | | |
|---|---|---|
| 1. | Physical Address: | 1045 Upper Cache Creek Dr<br>Jackson, WY 83001 |
| 2. | Legal Description: | Lot 9A, The Ridge<br>Teton County, Wyoming |
| 3. | PIDN: | 22-41-16-34-4-02-018 |
| 4. | Property Type: | Single-Family Residential |
| 5. | Site Area: | 0.75 acres |
| 6. | Owner of Record: | Caldwell, John & Schank, Joan |
| 7. | Date of Value: | August 25, 2023 |
| 8. | Inspection Date: | August 25, 2023 |
| 9. | Signature Date: | September 19, 2023 |
| 10. | Value: | Fair Market Value |
| 11. | Estimated Value Opinion: | $2,900,000 |

Exhibit 5

Appellant's Appendix
Page 53 of 281

SUBJECT PROPERTY





**Teton Valley Appraisals**
PO Box 737 - Victor, ID 83455 - 208.399.9099

September 18, 2023

Austin Dunlap
Kearney, McWilliams & Davis, PLLC
PO Box 4803
Jackson, WY 83001

At your request, an Appraisal Report has been developed of the estimated fair market value of the home located at 1045 Upper Cache Creek Drive in Teton County, Wyoming, as of the effective date of August 25, 2023 for litigation purposes. Additional Intended Users of this report include Carol & Terry Garrett.

The research and analysis outlined in this report, resulted in an opinion of fair market value of the subject real estate, as of the effective date of the appraisal, August 25, 2023 of:

<u>Two Million Nine-Hundred Thousand Dollars</u>
($2,900,000)

The stated value opinion has been prepared in accordance with IRS Form 8283 for noncash charitable contributions, subject to the stated scope of work, purpose of the appraisal, reporting requirements of this report form, certain assumptions and limiting conditions, certifications and the definition of fair market value. The attached appraisal presents summary discussions of the data, reasoning, and analyses used in the appraisal process to develop the opinion of value.  Supporting documentation that is not provided with the report concerning the data, reasoning, and analyses is retained in the appraiser's work file.

If you should have any questions regarding the attached appraisal report, please contact our office at (208) 399-9099. Thank you and we appreciate the opportunity to provide you with our appraisal services.

Sincerely,

Gena Howald
Certified Residential Appraiser

**INTENDED USE AND INTENDED USER(S)**
The Intended Use of the appraisal is to develop a fair market value opinion of the real property located at 1045 Upper Cache Creek Drive in Jackson, Wyoming as of August 25, 2023 for litigation purposes. Additional Intended Users include Carol & Terry Garrett.

**SCOPE OF WORK**
An exhaustive volume of data is gathered and analyzed in order to derive at a supportable fair market value conclusion for the subject property. The appraiser has performed a complete visual evaluation of the property. The interior of the home is observed with the exception of attic and crawl space areas; as well as an observation of the subject exterior and yard and property boundaries, followed by reviewing the subject plat/survey map and the Teton County GIS. The subject property is measured. The measurements for the subject property comply with ANSI Standards Z765-2021. The gross living area is considered all square footage contained within the existing structure based on exterior measurements. In an effort to determine the extent of the improvements made to the home over the years and the amount of associated depreciation, I have interviewed the original builder of the subject property, Michael Melf.

The subject neighborhood is also observed in order to determine the characteristics and market appeal of the area in order to obtain the appropriate comparable sales and listing data. Comparable properties that are geographically, physically, functionally and economically similar to the subject property, reflecting current buyer and seller actions were researched and considered. If prior access to comparable properties was not obtained, an inspection of the comparable from at least the street was performed, and the listing agent, selling agent or both were contacted in order to confirm the sale and to discuss the property and any terms or concessions associated with the sale. Appropriate adjustments (if any) were applied to the sales to reflect market reactions/conditions as of the effective date of the appraisal. The appraiser relies on closed sales information to develop an opinion of current market value; however, in a declining market or a market that is not stable, active and pending sales information must also be considered as these properties portray current market activity, and indicate market trends.

All information, estimates and opinions furnished to the appraiser and contained in this report, are obtained from a variety of sources, which include the following: county records, Teton County Multiple List Service, real estate agents, colleagues, bankers, building contractors and property owners. These sources are considered reliable, and deemed to be true and correct.

There are 3 approaches to determining the market value of an improved property: 1) the Sales Comparison Approach 2) the Cost Approach and 3) the Income Approach. The Sales Comparison Approach is the most reliable methodology for determining market value in the current real estate climate. If any approach is not utilized, the reason for its exclusion is summarized in the corresponding addendum.

The appraiser is a member of the Teton MLS, which is the leading source of listed and sold properties throughout Teton County, Wyoming. The appraiser possesses the required geographic competency and extensive knowledge of the market, its varied housing segments and buyer profiles involving both the resort and non-resort properties throughout the Teton Valley market. Additionally, the appraiser has developed an extensive network of real estate professionals to include realtors, developers and builders to recognize evolving market trends and to accurately interpret and report buyer and seller behavior in the Jackson real estate market.

## HIGHEST AND BEST USE ANALYSIS

Highest and Best Use is generally defined as: The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.
- The use of the real estate existing as of the date of the value is single-family residential.
- The use of the real estate reflected in the appraisal is single-family residential.
- The subject property is located in a neighborhood that exhibits residential improvements only, which reflect extensive remaining economic life, surrounded by established residential housing and subdivisions, and void of any commercial or industrial development.
- The zoning establishes the highest and best use of the land for residential use. The land as though vacant, is most suitable for a residential property, based both on its size and location in the market.
- The highest and best use of the subject property is single-family residential.

## SUBJECT PROPERTY ANALYSIS
**Current Owner**
Caldwell, John & Schank, Joan

**3-Year Sales History/Current Listings**
Per Teton County Sheriff Deed #1063792, the subject transferred 07/20/2023 from Teton County Sheriff to Caldwell, John & Schank, Joan. A Certificate of Purchase of the subject property was documented on 03/22/2023 of the public sale of the subject property to the highest bidders John Caldwell and Joan Schank in the amount of $825,000.

**Legal Description**
Lot 9A, The Ridge

**Plat Map No.**
00562

**Year Built**
1987

**Parcel Identification No.**
22-41-16-34-4-02-018

**2022 Taxes**
$9,865.00

**Site Size**
0.75 acres

**Zoning**
NL-1

**Zoning Description**
General Intent: The intent of the Neighborhood Low Density-1 (NL-1) zone is to provide for places with enough open space and sufficient lot size to provide a predominance of landscape and yards over buildings. Buildings and development should be oriented to respect steep slopes, preserve open space, and provide for wildlife movement through the property. This zone is intended for Stable neighborhoods where increased residential density is not intended. Land Use: Single-family detached homes, accessory structures, and ARUs are the primary land uses.

**Description of the Land & Existing Site Improvements**

**· Site - Conditions or External Factors**
The subject site size and characteristics are compatible with the neighborhood. The site has been through a lot split. It is irregular in shape and 0.75-acres in size. It is accessed via a shared asphalt driveway with the adjacent Lot 9B. An official easement was recorded 01/31/2020, per Easement Document #0990414. The subdivision is located on a hillside and the lot is sloping with mature, forested trees surrounding the property and a filtered view of the Teton Mountain Range to the north. The subject is connected to the City of Jackson water and sewer. There is no lawn or landscaping. The site exhibits adequate drainage. Seasonal variations may occur, and subsurface drainage conditions are unknown.

I have checked land records that are available through the Teton County Assessor's office online, for recorded adverse easements, encroachments, special assessments, environmental conditions, slide areas, etc. that may affect the value of the subject, and no adverse documents were associated with the subject. Unless otherwise noted, standard utility and right-of-way easements are insignificant to value.

The appraiser did not observe the presence of any hazardous material. The appraiser has no knowledge of the existence of such material(s) on or in the property. The appraiser, however, is not qualified to detect such substance(s). The value estimate is predicated on the assumption that there are no adverse materials or environmental conditions associated with the property that the appraiser could not observe that would cause a loss in value. No responsibility is assumed for such conditions, or for expertise or engineering knowledge required to discover them.

<u>**SUBJECT PHOTOS**</u>



Kitchen

*Teton Valley Appraisals*          *1045 Upper Cache Creek Dr, Jackson, WY 83001*



Dining Area



Living Room, Photo #1



Living Room, Photo #2



Primary Bedroom



Primary Bathroom



Hall ¾ Bathroom



Bedroom



Bedroom



Bathroom

Teton Valley Appraisals                    1045 Upper Cache Creek Dr, Jackson, WY 83001



Attic





AERIAL MAP ADDENDUM



Teton Valley Appraisals          1045 Upper Cache Creek Dr, Jackson, WY 83001

**DESCRIPTION OF PROPERTY BEING APPRAISED**
The subject is a 2,490sf, 2-story home with a 783sf. built-in garage below a 330sf unfinished attic. The home was constructed in 1987 and features original finishes throughout to include: Oak hardwood floors in the living room, vaulted tongue and groove wood ceilings and walls, pellet stove, Linoleum kitchen flooring, original Oak cabinets and Formica countertops, tile hall floors, tiled showers, carpeted upstairs bedrooms, combination electric baseboard and Cadet wall heat units, wood casement windows, hollow core interior doors.

The home has been well maintained and features limited physical deprecation due to normal wear and tear. Major components associated with the home have yet to require replacement, and it appears any items of repair have been addressed in an ongoing basis. The estimated age of the home is less than its actual age.

The attic space over the garage, is not finished. (See attached photo) Therefore, it is not included in the GLA. (gross living area)

**DESCRIPTION OF IMPROVEMENTS – PROPERTY CONDITION**
The home has been very well maintained and features limited physical depreciation due to normal wear and tear. The estimated effective age is less than its actual age at approximately 18 years. The home requires staining and the front deck is in disrepair.

**DEPRECIATION**
Depreciation is a decrease or a loss in value due to any cause. The primary sources of depreciation include age, wear and tear, and/or market conditions. An appraiser determines the improvements actual age (the number of days or years that have lapsed since the completed construction of the improvement) and the effective age (the actual age minus the condition and utility of an improvement or building, which is based upon the appraiser's knowledge of market perceptions and judgement.) Effective age is relative to other properties that perform the same function.

An appraiser must also take into account:
- Curable Physical Deterioration (deferred maintenance items such as a hole in a door or cracked windows)
- Incurable Physical Depreciation (short-lived items, components that are expected to have a shorter remaining life than the actual structure, such as roof coverings, floor coverings, appliances, etc. Long-lived items are expected to have the same remaining useful life as the actual structure such as wall studs, foundation, insulation, etc.)
- Curable Functional Obsolescence is observed when a structure is deficient in something that is common throughout properties in a particular market area, or when a property possesses either a substandard item compared to other market properties or it may be defective and require an addition or modernization.
- Incurable Functional Obsolescence involves greater costs to replace an unacceptable or outdated component of the structure than the anticipated increase in value (a deficiency or superadequacy).

The subject property was originally constructed in 1987, possessing an actual age of approximately 36 years. I estimate the effective age of the home is approximately 18 years. I did not observe any signs of curable or incurable physical depreciation or any functional obsolescence.

## REPLACEMENT COST NEW-LESS-DEPRECIATION APPROACH TO VALUATION

|  | Units | Price | Cost |
|---|---|---|---|
| Montesano Builders | 2,490sf | $425/sf | $1,058,250 |
| Proctor Construction | 2,490sf | $450/sf | $1,120,500 |
| Average RCN |  |  | $1,089,375 |

Based on the lump sum depreciation rate of 18%, derived from Market Extraction and applying this rate to the average RCN ($1,089,375 x 18%-($196,088) = $893,288+$1,500,000 (Land Value) suggests a fair market value of the home of approximately $2,393,288.

### AGE-LIFE METHOD

This method estimates depreciation as a ratio between the effective age of an improvement and its total economic life, and is applied to the current cost of the improvements. Market research indicates the total economic life of properties similar to the subject can be up to 100+ years. Based upon my effective age estimate of approximately 18 years than depreciation would be as follows by dividing the estimated effective age by the estimated total economic life.

| RCN | $ 1,089,375 |
|---|---|
| Less Total Depreciation (18/65=27%) | $   -267,300 |
| **Depreciated Cost** | **$   822,075** |
| Depreciated Site Improvements | $   +10,000 |
| Land Value | $ +1,500,000 |
| Indicated Value of Depreciated Improvement by Age-Life Method | $  2,332,075 |

### LAND VALUE COMMENTS

The following sales have been considered in developing an estimated value of the subject land. Per MLS 21-3068, sold 10/05/2021 (no market changes) located just below the subject property with the same NL-1 zoning, sold a 1.41-acre parcel with comparable views and mature trees for $2,495,000 or $40.62/sf to suggest a market value for the subject land of approximately $1,327,000.

Per MLS 21-3069, a 1.00-acre lot immediately north of the subject in the subject neighborhood, elevated and with Teton views, sold 09/30/2021 for an estimated $2,155,000. The sale price was not disclosed in the MLS, and the price is anecdotal. The lot was listed for sale 41 days at $2,395,000. The sale suggests a $/sf price of $49/sf to suggest a market value for the subject land of approximately $1,600,000.

Additionally considered in the land value analysis is the more recent sale of MLS 22-1792 on 08/26/2022 for $1,425,000. This 0.18-acre lot features similar zoning and build-out with Teton views. The sale price indicates a value floor for the subject vacant land.

As of the effective date of the appraisal, averaging the above sales on Upper Cache Creek Drive, the subject has a current land value of approximately $1,465,000. The land value opinion is rounded to $1.5M as not to indicate a higher degree of accuracy than should be associated with developing an estimated value opinion.

## SALES COMPARISON APPROACH

| | Subject | Comp Sale #1 | | Comp Sale #2 | | Comp Listing #3 | |
|---|---|---|---|---|---|---|---|
| Address | 1045 Upper Cache Creek Jackson, WY | 730 Snow King Jackson, WY | | 510 Cache Creek Dr Jackson, WY | | 430 Henley Rd Jackson, WY | |
| Sale Price | | $2,750,000 | | $4,066,380 | | 3,495,000 | |
| Sales or Financing Concessions | | None | | None | | Active Listing | |
| Date of Sale | | 08/01/2023 | | 10/20/2022 | | Active Listing | |
| Location | Cache Creek | Snow King | | Cache Creek | | East Jackson | |
| Site | 32,670 sf | 10,890 sf | 0 | 26,136 sf | 0 | 6098 sf | 0 |
| View | Teton | Teton | | SUP Zone | -$500,000 | Teton | |
| Quality of Construction | Good | Good | | Superior | -$418,200 | Good | |
| Actual Age | 36 | 38 | | 56 | | 26 | |
| Condition | Good | Superior | – $200,000 | Good | | Upgrades | -$150,000 |
| Gross Living Area | 2,490sf | 1,449 sf | +$364,350 | 2,788sf | -$81,950 | 2,333sf | 0 |
| Rooms/Bed/Bath | 5  3  3 | 5  3  2 | | 8  2  1.1 | | 6  4  3.1 | |
| Basement GLA | 0sf | 0sf | | 1,130sf | -$310,750 | 1,553sf | -$232,950 |
| Bed/Bath | 0    0 | 0    0 | 0 | 2    2 | | 0    0 | 0 |
| Garage | 3-Car Garage | None | +$25,000 | 2-Car Garage | | 2-Car Garage | |
| Adjusted Sale Price of Comps | | $2,939,350 | | $2,755,480 | | $3,112,050 | |

Comparables are obtained through the Teton County MLS service, supplemented by a search of county transfer records. An extensive search is conducted in order to obtain closed sales that are most comparable to the subject property. Data collection parameters for acquiring a pool of properties that can be narrowed down to more accurately reflect a value for the subject include: construction type, gross living area, quality, condition, age of the improvement and its location in the subject market area. The selected comparables were carefully evaluated, considering the aforementioned similarities, and represent the best available sales in the current market to result in a value opinion for the subject property. Condition adjustments are percentage adjustments based on realtor interviews, inspections and appraiser opinion.

Quality of construction adjustments in the Jackson real estate market are difficult to quantify due to the unique, custom nature of the housing market, varying degree of amenities and upgrades in competition with location in the market and views. The range can vary between $250-$400/sf for additional square footage in the subject price point. The appraiser makes every attempt to obtain sales with similar quality ratings. Quality adjustments are made based on the difference in value per square foot, based on extracting the improvement value from the sale price after site, garage and basement values and considering depreciation, if any.

Excessive Amenity Adjustments
- Age adjustments are derived from paired sales in sub-markets due to the severe lack of sales; thus paired sales data.
- Typically, no adjustment for 10 years +/- age differences
- No adjustments are made for the difference in the number of total rooms, bedrooms or bathrooms because the data is not adequate to support a responsible adjustment, and rather GLA adjustments are made instead. A custom housing market with a broad range of property types, purchasing decisions are centered primarily on square footage and location, and amenity types and amounts can vary greatly, having less effect on buyer purchasing decisions.
- No adjustments are made for the difference garage bays or size because the data is not adequate to support a responsible adjustment.

- No adjustments are made based on differences in kitchen appliances, heating/cooling, fireplace/woodstove amenity, or deck amenity. All comparables are evaluated to be relatively similar in these items. This overall similarity between the comparables and the subject did not support any data based adjustments.
- No adjustment is made for a square footage difference of +/- 200sf due to the inaccuracies of the reporting sources, and most MLS reports include the square footage of multiple staircases.

RECONCILIATION OF SALES COMPARISON APPROACH
Comp #1 is the most recent sale to occur in the neighborhood real estate market. It is located in the adjacent Snow King Estates. The site is smaller, but features identical utility and a Teton view. The home is comparable in age but has received upgrades throughout to include a remodeled kitchen and bathrooms. However, it features much less GLA and is adjusted at a higher $/sf, and no garage. It is my opinion the subject would sell for more than comp #1.

Comp #2 is included because the home is older, but in excellent condition and brackets the age of the subject and is equally dated. However, the overall construction of this home is superior to the subject regardless of age or datedness. Additionally, the land is superior as it offers greater build-out opportunity.

Comp #3 is currently listed for sale. It features a smaller site with a Teton view, and requires no site adjustment. The home is identical with regard to age and quality, but has received updates; thus the superior condition adjustment.

I have given full consideration to comp sale #1, which is the most recent sale, located in a similar setting among mature forest with Teton views in East Jackson. Based on the Sales Comparison Approach to value, as of the effective date of the appraisal, the subject has a current market value of approximately $2,900,000, based on a 4-6 month exposure time.

Marketing & Exposure Time
Critical to determining market values, is the level of exposure that any given property receives to the open market prior to the sale of the property. In a stable market, an average marketing time is 4-6 months.

Exposure Time
Exposure time is the amount of time a property would be offered for sale, prior to its sale on the date of value. Exposure time refers to the past.

Marketing Time
Marketing time is similar yet instead of being retrospective; it is prospective in that it is the amount of time necessary to market the property starting today to sell it at some future date.

This is the average number of days a property is typically offered for sale and offers a sufficient amount of time to gain the attention of prospective buyers in the market place. Complex or unique properties, which often attract fewer buyers, will often witness longer marketing times. Properties that may be listed too high to attract buyer, based on the real estate climate as of the effective date of an appraisal, may also witness much higher marketing times. Real estate that is priced too low will exhibit faster marketing times, attracting a plethora of buyers.

RECONCILIATION OF VALUE
Typically, in appraising residential properties, there are 3 approaches to value: 1) Sales Comparison Approach 2) Cost Approach and 3) Income Approach.

*Teton Valley Appraisals*                    *1045 Upper Cache Creek Dr, Jackson, WY 83001*

Appellant's Appendix
Page 69 of 281

The Income Approach relates to the development of the gross rent multiplier (GRM) which is the sales price divided by the gross monthly rent. The GRM is mostly used in the evaluation of commercial properties and apartment buildings. It assumes that the value of a property is related to the income it will produce. Due to the limited quantity of sales and a lack of available data to establish a reliable GRM, the Income Approach to value is not reliable and is not developed.

The Cost Approach is based on the understanding that market participants relate value to cost. However, costs are related to value only in that they establish a value ceiling, since a prudent Buyer would not typically pay more for a property than the cost of producing an equivalent improvement. This approach is particularly useful when valuing new or nearly new improvements since the value of a property may be equal to its costs if the improvement represents the highest and best use of the land. The Cost Approach establishes a minimum value for the subject property, but is less relevant given the age of the home and is not given consideration in the final determination of value.

The Sales Comparison Approach is the most reliable methodology in this market for developing an estimated opinion of value and is given full consideration.

## FINAL VALUE OPINION
As of the effective date of the appraisal, August 25, 2023, the subject has a fair market value of approximately $2,900,000.

## ASSUMPTIONS AND LIMITING CONDITIONS
The following assumptions and limiting conditions, are made with regard to the stated value opinion:
-The appraiser is not a home inspector and the visual inspection of the home is not technically exhaustive. However, upon inspection I did not observe any health or safety violations associated with either the interior or exterior of the home or any functional defects or obsolescence.
-This appraisal assumes all structural, plumbing and electrical components being transferred with the home, are in proper working order.
- The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice, and any applicable federal, state or local laws.
- If this appraisal is indicated as subject to satisfactory completion, repairs, or alterations, the appraiser has based his or her appraisal report and valuation conclusion on the assumption that completion of the improvements will be performed in a workmanlike manner.
- An appraiser's client is the party (or parties) who engage an appraiser in a specific assignment. Any other party acquiring this report from the client does not become a party to the appraiser-client relationship. Any persons receiving this appraisal report because of disclosure requirements applicable to the appraiser's client do not become intended users of this report unless specifically identified by the client at the time of the assignment. -The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public, through advertising, public relations, news, sales, or by means of any other media, or by its inclusion in a private or public database.
-If the appraiser is required to appear in court, the Client will pay all associated travel and stay fees. The court appearance rate is $200/hr.

## CERTIFICATIONS
I certify that, to the best of my knowledge and belief:
- The statements of fact contained in this report are true and correct.
- The credibility of this report, for the stated use by the stated user(s), of the reported analyses, opinions, and conclusions, are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

18 | Page

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- I did not base, either partially or completely, my analysis and/or the opinion of value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property, or of the present owners or occupants of the properties in the vicinity of the subject property.
- I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant appraisal assistance to the person(s) signing this certification.

**DEFINITION OF FAIR MARKET VALUE**
The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably and for self-interest, and assuming that neither is under undue duress.

**APPRAISER CERTIFICATION**

**I certify that to the best of my knowledge:**

1) The statements of fact contained in this report are true and correct.
2) The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, unbiased and professional analyses, opinions and conclusions.
3) I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved with this assignment.
4) My engagement in this assignment is not contingent upon developing or reporting predetermined results.
5) My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client; the amount of value estimate; the attainment of a stipulated result, or the occurrence of a subsequent event.
6) My analyses, opinions and conclusions are developed, and this report is prepared in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.
7) No supplemental professional assistance is provided to the signer of this report.
8) I personally inspected the property, which is the subject of this report.


*Appraiser Signature*

Gena I. Howald                                           *Date:* September 19, 2023
*Appraiser Name*

Current State of the Real Estate Market, January 2023: SINGLE-FAMILY RESIDENTIAL MARKET

Year 2022 witnessed a stable market, following the steady rise in interest rates with fewer Buyers entering the real estate market combined with a sharp decline in inventory. This resulted in a decrease of nearly 50% fewer transactions over 2021. Despite slowing sales activity, listings witnessed minimal price reductions and the average and median sale prices remain stable.

6-Month Year-Over Comparison

The following chart offers the most recent snapshot of current market activity, based on 6-months year-over activity between 2021 and present. The number of sales has continued to decline down 50%, combined with the total sales volume decrease of 34% over last year. However, both the average and median sale prices reveal slight 3%-5% increases.

Non-Disclosure State

Wyoming is considered a non-disclosure state and sale prices are not made public. Real estate professionals rely on sales to be reported by listing/selling parties within the local MLS. In the last 6 months, 9 luxury home properties sold at an undisclosed price, and were listed between $4.8M and $48M for a total listed inventory volume of $158,000,000.

When considering the average list to sale price ratio, an error margin of approximately 4-5% should be taken into consideration in the chart below.

### 6-Month Year-Over-Comparison: Teton County, WY, Single-Family Housing Market
Jan.01, 2023 - July 01, 2023

| Property Type/Area | Units | Volume | Average Sale Price | Median Sale Price | Avg. ADOM |
|---|---|---|---|---|---|
| 01 - Teton Village | 1 | $6,050,000 | $6,050,000 | $6,050,000 | 267 |
| 02 - Racquet Club/Teton Pines | 1 | $6,250,000 | $6,250,000 | $6,250,000 | 324 |
| 03 - W Snake N of Wilson | 1 | $1,017,500 | $1,017,500 | $1,017,500 | 140 |
| 04 - W Snake S of Wilson | 11 | $32,242,500 | $4,030,312 | $5,000,000 | 160 |
| 05 - Skyline Ranch to Sagebrush Dr | 5 | $11,100,000 | $5,550,000 | $0 | 222 |
| 06 - East Gros Ventre Butte | 0 | $0 | $0 | $0 | NA |
| 07 - N of Gros Ventre Jct | 5 | $18,044,750 | $3,608,950 | $3,844,750 | 87 |
| 08 - Town of Jackson | 11 | $40,446,842 | $3,676,986 | $2,750,000 | 183 |
| 09 - South of Jackson to Snake River Bridge | 17 | $44,175,250 | $3,155,375 | $3,200,000 | 146 |
| 10 - South of Snake River Bridge to County Line | 4 | $11,171,163 | $2,792,791 | $2,550,000 | 167 |
| TOTAL | 56 | $170,498,005 | $3,613,191 | $3,000,000 | 188 |

**Jan.01, 2022 - July 01, 2022**

| Property Type/Area | Units | Volume | Average Sale Price | Median Sale Price | Avg. ADOM |
|---|---|---|---|---|---|
| 01 - Teton Village | 1 | $6,850,000 | $6,850,000 | $6,850,000 | 111 |
| 02 - Racquet Club/Teton Pines | 0 | $0 | $0 | $0 | NA |
| 03 - W Snake N of Wilson | 5 | $18,407,000 | $3,681,400 | $2,730,000 | 102 |
| 04 - W Snake S of Wilson | 7 | $30,138,875 | $8,027,775 | $5,575,000 | 186 |
| 05 - Skyline Ranch to Sagebrush Dr | 11 | $66,888,525 | $6,688,652 | $5,350,000 | 151 |
| 06 - East Gros Ventre Butte | 0 | $0 | $0 | $0 | NA |
| 07 - N of Gros Ventre Jct | 6 | $12,125,000 | $3,031,250 | $3,875,000 | 159 |
| 08 - Town of Jackson | 22 | $68,038,300 | $3,401,915 | $2,830,000 | 96 |
| 09 - South of Jackson to Snake River Bridge | 8 | $20,425,000 | $2,553,125 | $2,322,500 | 70 |
| 10 - South of Snake River Bridge to County Line | 10 | $28,126,000 | $2,812,600 | $2,300,000 | 164 |
| **TOTAL** | 70 | $250,998,700 | $3,504,692 | $2,800,000 | 130 |

**Jan.01, 2021 - July 01, 2021**

| Property Type/Area | Units | Volume | Average Sale Price | Median Sale Price | Avg. ADOM |
|---|---|---|---|---|---|
| 01 - Teton Village | 6 | $38,950,000 | $12,983,333 | $7,700,000 | 108 |
| 02 - Racquet Club/Teton Pines | 4 | $11,575,000 | $3,858,333 | $3,987,500 | 70 |
| 03 - W Snake N of Wilson | 10 | $27,941,000 | $2,794,100 | $2,045,000 | 84 |
| 04 - W Snake S of Wilson | 5 | $8,385,000 | $2,096,250 | $2,375,000 | 169 |
| 05 - Skyline Ranch to Sagebrush Dr | 7 | $26,675,222 | $5,335,044 | $6,975,000 | 127 |
| 06 - East Gros Ventre Butte | 2 | $19,875,000 | $9,937,500 | $9,937,500 | 127 |
| 07 - N of Gros Ventre Jct | 25 | $99,595,000 | $4,330,217 | $3,995,000 | 228 |
| 08 - Town of Jackson | 26 | $43,760,500 | $2,083,833 | $1,869,000 | 122 |
| 09 - South of Jackson to Snake River Bridge | 20 | $53,976,000 | $2,998,667 | $2,447,500 | 69 |
| 10 - South of Snake River Bridge to County Line | 8 | $27,725,000 | $3,465,625 | $3,597,500 | 155 |
| **TOTAL** | 113 | $358,457,722 | $4,988,290 | $3,800,000 | 126 |

### 2022 Single-Family Home Sales

The following chart reveals a decrease in the number of sales and total sales volume in single-family home sales. Compared to 2021, as interest rates began to rise in the 2nd quarter 2022, there brought a period of "wait and see" Buyers. The market witnessed a 43% drop in the number of sales, combined with a decrease in sold volume of 34%. However, despite economic concerns, the demand for housing persisted and the median price point has continued to rise, up from 2021 approximately 11% from $2.8M to $3.0M.





Median Sale Price

*(Data Source: Teton Board of Realtors MLS: June 2023)*

## Condominium/Townhome Market Sales

*(Last Updated July 2023)*

Similar to the housing market, the condo/townhome market witnessed fewer sales, a significant decrease in sold volume yet the median price point had increased. This is likely due to new construction, high-end inventory that came onto the market, and sold at a higher price point.





*(Data Source: Teton Board of Realtors MLS)*

### LUXURY HOUSING MARKET

Finally, the luxury housing market has surged significantly upward since the Covid-19 Pandemic began, and city buyers migrated to the area in search of more rural, mountainous, recreational communities. Luxury homes are defined as properties valued at over $3.0M. This market currently represents 80% of market sales. The luxury home market doubled in 2021.

### Housing Supply

The lack of supply for single-family housing is at a record low, and with continued demand, is placing significant upward pressure on prices with an overall 40% increase in the median list price over last year. Inventory is down by nearly 50%.

### Current Workforce Housing Situation

The number of local working-class Buyers continues to decline as inventory in their price range becomes nonexistent, spurred by the migration of a new market participant, referred to by the Jackson Hole Real Estate Report as the "Zoom Town Telecommuters", second home Buyers and early retirees continues to increase. The median price point for a single-family home in the town of Jackson is $3.0M and severe rent hikes, has resulted in a housing crisis for the critical infrastructure workforce with no long-term solutions on the horizon.

### REO/Short Sales

There are no distressed sales occurring in the Jackson Hole Real Estate market. At the collapse of the housing market, which was not realized by the Jackson real estate market until the end of 3rd quarter 2008, the condominium market took the largest hit, experiencing a 60-75% decline in property values. At the height of the market, the median SFR sales price was just over $1M, the condo/townhome market offered a price point at which buyers could afford to get into the housing market; thus, these property types were experiencing significantly high appreciation rates and witnessed a greater decline in property values during the housing collapse.

## APPRAISER CERTIFICATION

### WYOMING REAL ESTATE
COMMISSION & CERTIFIED APPRAISER BOARD

License Number 882                                    NON TRANSFERABLE

## CERTIFIED REAL ESTATE APPRAISER PERMIT

Issued : 04/11/2022
Expires: 04/10/2024

**Gena J. Howald**
Certified Residential Appraiser Permit
AS PROVIDED FOR BY THE LAWS OF WYOMING.

Gena Howald, Appraiser
5320 Fox Creek Dr
Victor ID 83455

AUTHORIZED BY THE WYOMING CERTIFIED
REAL ESTATE APPRAISER BOARD
WITNESS MY HAND AND THE
OFFICIAL SEAL AT CHEYENNE, WYOMING.

*Rebecca J Ziech*
Rebecca J. Ziech, Executive Director





25 | Page

Appellant's Appendix
Page 77 of 281

File Number: NTT-126981

**Thayne Office:**
501 North Main, Suite 1
Thayne, WY 83127
307-883-1400
Fax: 307-883-1402

**Rock Springs/Green River Offices:**
2620 Commercial Way, Suite 101
Rock Springs, WY 82901
26 North 1st East
Green River, WY 82935
307-362-0022/307-875-4422
Fax: 307-362-8833

# NORTHERN **TITLE**

**Afton Office:**
350 South Washington,
Suite 1
Afton, WY 83110
307-885-1400
Fax: 307-885-1402

**Evanston Office:**
848 Front Street
Evanston, WY 82930
307-789-8850
Fax: 307-789-2017

*"Good Deeds Done Daily!"*

**Pinedale Office:**
240 East Pine Street,
Suite A
Pinedale, WY 82941
307-367-3740
Fax: 307-367-3742

**Jackson Office:**
25 South Gros Ventre Street
PO Box 4242
Jackson, WY 83001
307-739-3944
Fax: 307-886-2626

# COMMITMENT FOR TITLE INSURANCE

**Old Republic National Title Insurance Company**, a Minnesota corporation ("Company"), for a valuable consideration, commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the Proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest in the land described or referred to in Schedule A, upon payment of the premiums and charges and compliance with the Requirements; all subject to the provisions of Schedules A and B and to the Conditions of this Commitment. This Commitment shall be effective only when the identity of the Proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A by the Company.

All liability and obligation under this Commitment shall cease and terminate six (6) months after the Effective Date or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue the policy or policies is not the fault of the Company.

The Company will provide a sample of the policy form upon request.

| BUYER/BORROWER: | SELLER/OWNER: |
|---|---|
| Terry Lee Garrett<br>Carol W. Garrett | |
| **SELLING AGENT:** | **LISTING AGENT:** |
| **LENDER:** | **BROKER:** |

Exhibit 6

# ALTA COMMITMENT FOR TITLE INSURANCE



Issued by OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

## NOTICE

**IMPORTANT—READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

## COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I—Requirements; Schedule B, Part II—Exceptions; and the Commitment Conditions, Old Republic National Title Insurance Company, (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured.

If all of the Schedule B, Part I—Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

NTT-126981

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
*A Stock Company*
*1408 North Westshore Blvd., Suite 900, Tampa, Florida 33607*
*(612) 371-1111*                     *www.oldrepublictitle.com*

By    *C Monroe*    President

Attest    *David Wold*    Secretary

Authorized Officer or Agent

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

ORT Form 4757 DA
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021

## COMMITMENT CONDITIONS

1.  **DEFINITIONS**

    a.  "Discriminatory Covenant": Any covenant, condition, restriction, or limitation that is unenforceable under applicable law because it illegally discriminates against a class of individuals based on personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or other legally protected class.

    b.  "Knowledge" or "Known": Actual knowledge or actual notice, but not constructive notice imparted by the Public Records.

    c.  "Land": The land described in Item 5 of Schedule A and improvements located on that land that by State law constitute real property. The term "Land" does not include any property beyond that described in Schedule A, nor any right, title, interest, estate, or easement in any abutting street, road, avenue, alley, lane, right-of-way, body of water, or waterway, but does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

    d.  "Mortgage": A mortgage, deed of trust, trust deed, security deed, or other real property security instrument, including one evidenced by electronic means authorized by law.

    e.  "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

    f.  "Proposed Amount of Insurance": Each dollar amount specified in Schedule A as the Proposed Amount of Insurance of each Policy to be issued pursuant to this Commitment.

    g.  "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

    h.  "Public Records": The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.

    i.  "State": The state or commonwealth of the United States within whose exterior boundaries the Land is located. The term "State" also includes the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and Guam.

    j.  "Title": The estate or interest in the Land identified in Item 3 of Schedule A.

2.  If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3.  The Company's liability and obligation is limited by and this Commitment is not valid without:

    a.  the Notice;

    b.  the Commitment to Issue Policy;

    c.  the Commitment Conditions;

    d.  Schedule A;

    e.  Schedule B, Part I—Requirements;[ and]

    f.  Schedule B, Part II—Exceptions[; and

    g.  a counter-signature by the Company or its issuing agent that may be in electronic form].

4.  **COMPANY'S RIGHT TO AMEND**

    The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company is not liable for any other amendment to this Commitment.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance  issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

ORT Form 4757 DA
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021

5.   LIMITATIONS OF LIABILITY

    a.   The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

        i.   comply with the Schedule B, Part I—Requirements;

        ii.   eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or

        iii.   acquire the Title or create the Mortgage covered by this Commitment.

    b.   The Company is not liable under Commitment Condition 5.a. if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

    c.   The Company is only liable under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

    d.   The Company's liability does not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Condition 5.a. or the Proposed Amount of Insurance.

    e.   The Company is not liable for the content of the Transaction Identification Data, if any.

    f.   The Company is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.

    g.   The Company's liability is further limited by the terms and provisions of the Policy to be issued to the Proposed Insured.

6.   LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT; CHOICE OF LAW AND CHOICE OF FORUM

    a.   Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

    b.   Any claim must be based in contract under the State law of the State where the Land is located and is restricted to the terms and provisions of this Commitment. Any litigation or other proceeding brought by the Proposed Insured against the Company must be filed only in a State or federal court having jurisdiction.

    c.   This Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

    d.   The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

    e.   Any amendment or endorsement to this Commitment must be in writing[ and authenticated by a person authorized by the Company].

    f.   When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7.   IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT

The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for closing, settlement, escrow, or any other purpose.

8.   PRO-FORMA POLICY

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9.   CLAIMS PROCEDURES

This Commitment incorporates by reference all Conditions for making a claim in the Policy to be issued to the Proposed Insured. Commitment Condition 9 does not modify the limitations of liability in Commitment Conditions 5 and 6.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

ORT Form 4757 DA
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021

10. CLASS ACTION

ALL CLAIMS AND DISPUTES ARISING OUT OF OR RELATING TO THIS COMMITMENT, INCLUDING ANY SERVICE OR OTHER MATTER IN CONNECTION WITH ISSUING THIS COMMITMENT, ANY BREACH OF A COMMITMENT PROVISION, OR ANY OTHER CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTION GIVING RISE TO THIS COMMITMENT, MUST BE BROUGHT IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY CLASS OR REPRESENTATIVE PROCEEDING. ANY POLICY ISSUED PURSUANT TO THIS COMMITMENT WILL CONTAIN A CLASS ACTION CONDITION.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance  issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

ORT Form 4757 DA
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021

ALTA COMMITMENT FOR TITLE INSURANCE (07-01-2021)

**Closing/Escrow inquiries to:**

**25 South Gros Ventre Street, PO Box 4242
Jackson, Wyoming  83001**

**Title inquiries to:
Susan Pearce**
(435) 752-3600 x107
susanp@northerntitle.net

# SCHEDULE A

Order No.  NTT-126981

1. Effective Date: September 18, 2023 9:00AM

2. Policy or policies to be issued:

   A.  2021 ALTA Owner's                    Standard Coverage

      Proposed Insured:  **Terry Lee Garrett and Carol W. Garrett**

      **Amount:
      Premium:  $0.00**

   B.  2021 ALTA Loan                        Extended Coverage

      Proposed Insured:

      **Amount:
      Premium:   $0.00**

   C.  Endorsements:

            Endorsement Fee **Included** in Premium:

3. The estate or interest in the land described in the Commitment and covered herein is:

   FEE SIMPLE

4. Title to the estate or interest referred to herein is at the effective date hereof vested in:

   **John Caldwell and Joan Schank**

5. The land referred to in this Commitment is in the State of WY, County of **Teton** and is described as follows:

   See Attached Exhibit "A"

   PROPERTY ADDRESS:    **1045 Upper Cache Creek Drive, Jackson, WY 83001**

NTT-126981

# EXHIBIT "A"

A PORTION OF LOT 9 OF THE RIDGE ADDITION TO THE TOWN OF JACKSON, TETON COUNTY, WYOMING, ACCORDING TO THAT PLAT RECORDED IN THE OFFICE OF THE TETON COUNTY CLERK ON FEBRUARY 16, 1984 AS PLAT NO. 562, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SAID LOT 9; THENCE N00°12'14"W, 149.91 FEET TO A POINT; THENCE N51°13'19"W, 84.46 FEET TO A POINT; THENCE N66°53'11"W, 73.0 FEET TO A POINT; THENCE S41°21'23"W, 173.01 FEET TO A POINT; THENCE S67°42'35"E, 267.84 FEET TO THE POINT OF BEGINNING.

(22-41-16-34-4-02-018)

NTT-126981

## SCHEDULE B - SECTION 1

### REQUIREMENTS

All of the following Requirements must be met:

1. The proposed insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the land.  The Company may then make additional Requirements or Exceptions.

2. Pay the agreed amount for the estate or interest to be insured.

3. Pay the premiums, fees, and charges for the Policy to the Company.

4. Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered and recorded in the Public Records.

In addition to the foregoing, the following requirements must be complied with, to-wit:

NTT-126981

# SCHEDULE B - PART II

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company.

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This Commitment and the Policy treat any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document will be excepted from coverage.**

The policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. Any defect, lien, encumbrance, adverse claim or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I- Requirements are met.

2. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by public record.*

3. Any facts, rights, interest, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.*

4. Easements, liens, or encumbrances, or claims thereof, which are not shown by the public records.*

5. Discrepancies, conflicts in boundary lines, shortages in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the Public Records.

6. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.*

7. Any liens, or rights to a lien, for services, labor, equipment or material heretofore or hereafter furnished, imposed by law and not shown by public records.*

8. Rights of the state or federal government and/or public in and to any portion of the Land for right of way (whether or not such rights are shown by recordings of easements and/or maps in the Public Records by the State of Wyoming showing the general location of these rights of way).

9. Minerals of whatsoever kind, subsurface and surface substance, including but not limited to coal, lignite, oil, gas, uranium, clay, rock, sand and gravel in, on, under and that may be produced from the Land, together with all rights, privileges, and immunities relating thereto, whether or not appearing in the Public Records or listed in Schedule B. Stewart makes no representation as to the present ownership of any such interests. There may be leases, grants, exceptions or reservations of interests that are not listed.

10. Any water or well rights, or rights or title to water or claims thereof, in, on or under the land.

*Paragraphs 1 through 10 will not appear as printed exceptions on extended coverage policies, except as to such parts thereof which may be typed as a Special Exception in Schedule B-Section II.

(See Special exceptions beginning on the next page.)

NTT-126981

# SCHEDULE B – SECTION II

SPECIAL EXCEPTIONS:

1. Taxes for the year 2023 have been assessed in the amount of $11,470.72. Taxes for the first half of 2023 are due and payable in the amount of $5,735.36 but will not become delinquent until November 10, 2023. Taxes for the second half of 2023 will become due and payable in the amount of $5,735.36 on March 1, 2024 but will not become delinquent until May 10, 2024. Taxes for the year 2022 have been paid in full.  Tax Serial No. OJ-002471

2. Said property may be included within the taxing assessment district of 0150, TOWN OF JACKSON,  TETON COUNTY, WYOMING and may be subject to the charges and assessments thereof. (Charges are current according to the information available from the county records.)

3. Minerals of whatsoever kind, subsurface and surface substances, including but not limited to coal, lignite, oil, gas, uranium, clay, rock, sand and gravel in, on, under and that may be produced from the Land, together with all rights, privileges, and immunities relating thereto, whether or not appearing in the Public Records or listed in Schedule B. The Company makes no representation as to the present ownership of any such interests. There may be leases, grants, exceptions or reservations of interests that are not listed.

4. (a)   Unpatented mining claims: (b) Reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) or shown by the public records.

5. Subject to all existing roads, streets, alleys, fences, ditches, reservoirs, utilities, canals, pipelines, power, telephone, cable, fiber optic, sewer, gas, or water lines, and right of way and easements thereof.

6. Easements/Right of Ways, Covenants & Restrictions, Reservations, Warnings, Roadways, Building Setback Lines, Notes, Common Area(s) etc. as delineated and/or dedicated on the recorded plat(s).

7. Access to subject property is via a private road as disclosed by recorded subdivision plat.
   Any unpaid charges or assessments for the maintenance of the private road which services the property described herein.

8. Any fees, assessments, transfer fees, reinvestment fees, dues and other amounts that may be or become due to the homeowners association.

9. All matters, not limited to easements and right of ways as set out on Lot Division recorded in Teton Recorder's office on April 26, 1983, under instrument number 243547.

10. Terms and Conditions of that certain Easement Dated September 6, 1980, recorded December 18, 1980, Entry Number 219528, in Book 106, at Page 747 in the Office of the Recorder of Teton County, Wyoming.

11. All matters, not limited to easements and right of ways as set out on Plat recorded in Teton Recorder's office on August 25, 1986, under instrument number 267403.

12. Covenants, conditions, and restrictions in the declaration of restrictions but omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.
    Book/Page:          158/448

13. Terms and Conditions of that certain Roadway and Utility Easement Dated August 21, 1986, recorded August 26, 1986, Entry Number 267440, in Book 180, at Page 577 in the Office of the Recorder of Teton County, Wyoming.

(continued)

NTT-126981

14. UTILITY EASEMENT

| | |
|---|---|
| Grantor: | Cache Creek Associates, a Wyoming Partnership |
| Grantee: | Terry Lee Garrett and Carol w. Garrett, husband and wife |
| Dated: | August 21, 1986 |
| Recorded: | August 26, 1986 |
| Entry No.: | 267442 |
| Book/Page: | 180/587 |

15. Terms and Conditions of that certain Roadway and Utility Easement Dated November 20, 1987, recorded November 23, 1987, Entry Number 276361, in Book 195, at Page 646 in the Office of the Recorder of Teton County, Wyoming.

16. Terms and Conditions of that certain Roadway and Utility Easement Dated October 27, 1987, recorded November 23, 1987, Entry Number 276362, in Book 195, at Page 653 in the Office of the Recorder of Teton County, Wyoming.

17. SEWER LINE EASEMENT

| | |
|---|---|
| Grantor: | Cache Creek Associates, a Wyoming Partnership |
| Grantee: | Terry Lee Garrett and Carol w. Garrett, husband and wife |
| Dated: | April 27, 1988 |
| Recorded: | April 27, 1988 |
| Entry No.: | 278705 |
| Book/Page: | 199/523 |

18. An Easement for the purpose shown below and right incidental thereto as set forth in a document

| | |
|---|---|
| Granted To: | Lower Valley Power and Light Company |
| Purpose: | Public Utilities Easement |
| Dated: | August 4, 1987 |
| Recorded: | March 29, 1989 |
| Entry No.: | 286285 |
| Book/Page: | 209/490 |

19. Terms and Conditions of that certain Agreement for Relocation of Easement and Covenant Effecting Land Dated July 31, 1995, recorded August 1, 1995, Entry Number 400875, in Book 308, at Page 113 in the Office of the Recorder of Teton County, Wyoming.

20. MORTGAGE

| | |
|---|---|
| Mortgagor: | Terry Lee Garrett and Carol W. Garrett, husband and wife, as tenants by the entireties |
| Mortgagee: | First Union National Bank |
| Amount: | $200,000.00 |
| Dated: | February 2, 2021 |
| Recorded: | February 2, 2021 |
| Entry No.: | 536564 |
| Book/Page: | 417/180 |

ASSIGNMENT OF MORTGAGE

| | |
|---|---|
| Assignor: | Wachovia Bank of Delaware, NA F?K?A First Union National Bank of Delaware |
| Assignee: | Wells Fargo Bank, N.A. |
| Dated: | December 6, 2009 |
| Recorded: | December 21, 2009 |
| Entry No.: | 765202 |
| Book/Page: | 746/919 |

RELEASE OF REAL ESTATE MORTGAGE

| | |
|---|---|
| Dated: | July 18, 2023 |
| Recorded: | July 18, 2023 |
| Entry No.: | 1063565 |

(continued)

NTT-126981

21. MORTGAGE

| | |
|---|---|
| Mortgagor: | Terry Lee Garrett and Carol W. Garrett, husband and wife, as tenants by the entirety |
| Mortgagee: | First Union National Bank of Delaware |
| Amount: | $100,000.00 |
| Dated: | March 29, 2001 |
| Recorded: | April 6, 2001 |
| Entry No.: | 538561 |
| Book/Page: | 419/217 |

RELEASE OF REAL ESTATE MORTGAGE

| | |
|---|---|
| Dated: | July 18, 2023 |
| Recorded: | July 18, 2023 |
| Entry No.: | 1063566 |

22. MORTGAGE

| | |
|---|---|
| Mortgagor: | Carol W. Garrett, married and Terry Lee Garrett, her husband as tenants by the entirety and Clara Walsh, separated |
| Mortgagee: | First Union National Bank of Delaware |
| Amount: | $75,000.00 |
| Dated: | July 31, 2001 |
| Recorded: | August 20, 2001 |
| Entry No.: | 549832 |
| Book/Page: | 432/403 |

CERTIFICATE OF PURCHASE

| | |
|---|---|
| Dated: | March 23, 2023 |
| Recorded: | March 22, 2023 |
| Entry No.: | 1056038 |

SHERIFF'S DEED

| | |
|---|---|
| Grantor: | Mary L. Faulkner, Teton County Sheriff Office |
| Grantee: | John Caldwell and Joan Schank |
| Dated: | July 14, 2023 |
| Recorded: | July 14, 2023 |
| Entry No.: | 1063397 |

Note: Document contains incomplete legal description.

23. Any rights, claims or interest of (the mortgagor) in the land or any claim the foreclosure by (lender) is invalid.

24. The right of any interested party to sue or to petition to set aside or modify or to contest the foreclosure sale and deed pursuant thereto, through which title to the land described herein is derived.

25. Any attempt by an interested party to set aside the deed under which title is vested in a bankruptcy or state insolvency action.

26. Rights of tenant(s) in the land, if any, and rights of all parties claiming by, through or under said tenant(s).

(continued)

NTT-126981

# SCHEDULE B - PART II

SPECIAL EXCEPTIONS:

Note: The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than the certain dollar amount set forth in any applicable arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  If you desire to review the terms of the policy, including any arbitration clause that may be included, contact the office that issued this Commitment or Report to obtain a sample of the policy jacket for the policy that is to be issued in connection with your transaction.

****

NOTE: Judgments, State and Federal Tax Liens were checked on the following names, and if any were found, are disclosed herein:

> Terry Lee Garrett and Carol W. Garrett
> John Caldwell
> Joan Schank

NOTE: In the event this transaction fails to close, a cancellation fee may be charged for services rendered in accordance with the rates that are on file with the Commissioner of Insurance of the State of Wyoming.

Examiner

Chain of Title including all Vesting Deeds recorded in the past 24 months:

ACCORDING TO THE OFFICIAL RECORDS, THERE HAVE BEEN NO DOCUMENTS CONVEYING THE LAND DESCRIBED HEREIN WITH A PERIOD OF 24 MONTHS PRIOR TO THE DATE OF THIS COMMITMENT EXCEPT AS FOLLOWS:

SHERIFFS DEED
|  |  |
|---|---|
| Grantor: | Mary L. Faulkner, Teton County Sheriff Office |
| Grantee: | John Caldwell and Joan Schank |
| Recorded: | July 20, 2023 |
| Entry No.: | 1063792 |

Note: Document contains incomplete legal description.

### CERTIFICATE OF SURVEYOR

I, FRANK J. GRIMES, a duly licensed surveyor as proscribed by Wyoming State Statues, do hereby certify

### CERTIFICATE OF OWNERS

KNOW ALL MEN BY THESE PRESENTS:

### CERTIFICATE OF MORTGAGEE

### CERTIFICATE OF ENGINEER

### CERTIFICATE OF PLANNING COMMISSION

### CERTIFICATE OF APPROVAL

*THE RIDGE ADDITION*
TO THE TOWN OF JACKSON

BEING A PORTION OF LOT 23—FERRIN ADDITION
TO THE TOWN OF JACKSON – PLAT NO. 401
PREPARED OCTOBER 1983





Appellant's Appendix
Page 93 of 281



# EXHIBIT B

FILED 3:33 p.h

DEC 07 2023

DISTRICT COURT
9TH JUDICIAL DISTRICT
TETON COUNTY WYOMING

Isaac N. Sutphin, P.C. (Wyo. State Bar # 6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile: 307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

| | | |
|---|---|---|
| STATE OF WYOMING | ) | IN THE DISTRICT COURT |
| | ) ss | |
| COUNTY OF TETON | ) | NINTH JUDICIAL DISTRICT |

CAROL W. GARRETT AND TERRY LEE
GARRETT,

       Plaintiffs,

    v.

WELLS FARGO BANK, N.A.,

       Defendant.

Civil Action No. 2023-CV-18974

---

### DEFENDANT WELLS FARGO BANK, N.A.'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' COMPLAINT

Defendant Wells Fargo Bank, N.A., ("Wells Fargo"), by and through their undersigned

counsel, respectfully files this Unopposed Motion for an Extension of Time to Respond to

Plaintiffs' Complaint.

As grounds for this Motion, Wells Fargo states the following:

1.     On October 10, 2023, Plaintiffs initiated this action by filing their Complaint.

2.     On November 17, 2023, Plaintiffs served their Complaint upon Wells Fargo.

3.     Wells Fargo's current deadline to respond is December 7, 2023.

4.     The Complaint contains voluminous and detailed allegations. Wells Fargo

requires additional time to investigate the allegations stated in Plaintiffs' Complaint, and to

prepare the appropriate responsive pleadings and/or motions. Wells Fargo therefore seeks an extension to serve its answer, motion to dismiss, or other responsive pleading as permitted by Wyo. R. Civ. P. 6(b).

5.      This Motion is timely filed, as Wells Fargo's Answer to Plaintiffs' Complaint is due on December 7, 2023. This requested extension will not conflict with any scheduling or other order of the Court, as no such orders have been entered.

6.      There have been no prior extensions of time requested by Wells Fargo or granted with respect to Plaintiffs' Complaint.

7.      Wells Fargo has conferred with Plaintiffs' counsel, who has consented to a thirty (30) day extension to respond to Plaintiffs' Complaint, thereby making Wells Fargo's deadline to respond January 8, 2024.

**WHEREFORE**, Defendant, Wells Fargo Bank, N.A., respectfully requests the Court enter an Order granting this Motion for Extension of Time, for thirty (30) days, up to and including Monday, January 8, 2024, to answer, move to dismiss, or otherwise respond to Plaintiffs' Complaint.

Dated this 7th day of December 2023.

Isaac N. Sutphin, P.C. (Wyo. State Bar #6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile: 307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

2

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2023, I served the foregoing by sending a true and

correct copy thereof via electronic mail and United States mail, postage prepaid and properly

addressed to the following:

> J. Austin Dunlap
> Austin Dunlap Law
> P.O. Box 4803
> Jackson, WY 83001
> austindunlap@gmail.com

3

# EXHIBIT C

| | |
|---|---|
| STATE OF WYOMING ) | IN THE DISTRICT COURT |
| ) ss | |
| COUNTY OF TETON ) | NINTH JUDICIAL DISTRICT |

CAROL W. GARRETT AND TERRY LEE
GARRETT,

       Plaintiffs,

   v.

WELLS FARGO BANK, N.A.,

       Defendant.

**FILED**

DEC 08 2023

DISTRICT COURT
9TH JUDICIAL DISTRICT
TETON COUNTY WYOMING

Civil Action No. 2023-CV-18974

---

### ORDER GRANTING DEFENDANT WELLS FARGO BANK, N.A.'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' COMPLAINT

---

THIS MATTER having come before the Court on Defendant Wells Fargo Bank, N.A.'s

Unopposed Motion for Extension of Time to Respond to Plaintiffs' Complaint, and the Court

having considered the Motion and the information presented therein, HEREBY ORDERS that

the Motion for Extension of Time is GRANTED.

Wells Fargo shall file its answer, motion or other responsive pleading to Plaintiffs'

Complaint on or before Monday, January 8, 2024.

DATED this _____8th_____ day of December 2023.

                       _____

                       Ninth Judicial District Court Judge
                       Melissa M-Owens

Copies to:
Isaac Sutphin
J. Austin Dunlap

CERTIFICATE OF SERVICE
This is to certify that a copy of the
foregoing was served by mail/fax upon
the following persons at their last known
address this 8 day of DEC 20 23
J. Austin Dunlap fax
I. Sutphin

By _____

# EXHIBIT D

Isaac N. Sutphin, P.C. (Wyo. State Bar # 6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

| | | |
|---|---|---|
| STATE OF WYOMING | ) | IN THE DISTRICT COURT |
| | ) ss | |
| COUNTY OF TETON | ) | NINTH JUDICIAL DISTRICT |

| | |
|---|---|
| CAROL W. GARRETT AND TERRY LEE GARRETT, | |
| Plaintiffs, | |
| v. | Civil Action No. 2023-CV-18974 |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

---

## NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE that in the above-entitled action, Defendant Wells Fargo Bank,

N.A. (Wells Fargo), by and through undersigned counsel, Holland & Hart LLP, hereby files this

Notice of Filing of Notice Removal pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, and

U.S.D.C.L.R. 81.1. Wells Fargo filed a Notice of Removal in the United States District Court for

the District of Wyoming on January 8, 2024. A true and correct copy of the Notice of Removal

filed in the United States District Court is attached as **Exhibit A**. This filing serves as written

notice to all adverse parties and effects removal in accordance with 28 U.S.C. § 1446(d).

Dated this 8th day of January 2024.

Isaac N. Sutphin, P.C. (Wyo. State Bar #6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2024, I served the foregoing by file and servexpress

and by placing a true and correct copy thereof in the United States mail, postage prepaid and

properly addressed to the following:

> J. Austin Dunlap
> Austin Dunlap Law
> P.O. Box 4803
> Jackson, WY 83001
> austindunlap@gmail.com

JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Carol W. Garrett and Terry Lee Garrett

**DEFENDANTS**

2:23-cv-247

Wells Fargo Bank, N.A.

**(b)** County of Residence of First Listed Plaintiff   Alachua County, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Minnehaha County, SD
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
J. Austin Dunlap, Austin Dunlap Law
P.O. Box 4803, Jackson, WY 83001

(888) 341-0997

Attorneys *(If Known)*
Isaac N. Sutphin, Holland & Hart LLP
2020 Carey Ave, STE 800
Cheyenne, WY 82001; 307-778-4200

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury  - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court 28 USC Section 1441 | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC Sections 1332, 1446; USDCLR 81.1

Brief description of cause:
Wrongful Foreclosure

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE   Melissa M. Owens
DOCKET NUMBER   2023-CV-18974

DATE
01/08/2024

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

CAROL W. GARRETT AND TERRY LEE
GARRETT,

      Plaintiffs,

    v.

WELLS FARGO BANK, N.A.,

      Defendant.

Civil Action No. ____24-CV-7-SWS____
(State Court Docket No. 2023-CV-18974)

---

## ORDER ON REMOVAL

On January 8, 2024, a Notice of Removal of the above-entitled action was filed with the Clerk of the United States District Court, District of Wyoming, removing this action from the District Court, Ninth Judicial District, Teton County, Wyoming.

IT IS THEREFORE ORDERED that pursuant to Rule 81.1 of the Local Rules of this Court, the removing party shall immediately file with the Clerk of the District Court, Ninth Judicial District, Teton County, Wyoming, a copy of the Notice of Removal. The clerk of the state district court is hereby advised that jurisdiction over the parties and subject matter of the above-entitled action is deemed removed from the Ninth Judicial District Court to the United States District Court for the District of Wyoming upon the filing of the Notice of Removal with the Clerk of the Ninth Judicial District Court and the Ninth Judicial District Court should proceed no further, unless the case is later remanded.

IT IS FURTHER ORDERED that, in the event a hearing is pending in the state district court when the Notice of Removal is filed with the clerk of the state district court, the removing party shall immediately notify the state district court judge of the removal of this action.

IT IS FINALLY ORDERED that the removing party shall file with the Clerk of this

Court copies of all records and proceedings in the state district court within fourteen (14) days

after receipt of this Order.

ORDERED this ___ day of _____ 2024.


_____
UNITED STATES DISTRICT COURT JUDGE

ECF Doc 2

# Summons and Complaint

SERVICE COPY

IN THE DISTRICT COURT OF THE NINTH JUDICIAL DISTRICT

WITHIN AND FOR TETON COUNTY, WYOMING

CAROL W. GARRETT AND           )
TERRY LEE GARRETT              )
                              )
        Plaintiffs,            )
                              )        2023-CV-18974
v.                            )
                              )
WELLS FARGO BANK, N.A.         )
                              )
        Defendant.            )

**SUMMONS**

TO:   Wells Fargo Bank, N.A.
      Corporation Service Company
      1821 Logan Ave
      Cheyenne, WY 82001 USA

        YOU ARE HEREBY SUMMONED and required to file with the clerk and serve upon

Petitioner's attorney and answer to the *Plaintiffs' Complaint and Jury Demand*, which is herewith

served upon you, within twenty (20) days after service of this Summons upon you, exclusive of

the day of service.  (If service upon you is made outside of the State of Wyoming, you are required

to file and serve your answer to the *Petition* within thirty (30) days after service of this Summons

upon you, exclusive of the day of service.)  If you fail to do so, judgment by default will be taken

against you for the relief demanded in the *Complaint*.

        DATED this 10th day of October 2023.

J. Austin Dunlap - *Counsel for the Plaintiff*          Clerk of the District Court
Wyoming State Bar # 7-4586                              BY:
P.O. Box 4803
Jackson, WY 83001
Telephone (307) 690-8568
austindunlap@gmail.com

J. Austin Dunlap
WSB 7-4586
PO Box 4803
Jackson, WY 83001
Tel. 307-690-8568
Fax 307-316-8101
austindunlap@gmail.com
*Attorney for Plaintiffs*

FILED 4:15pm

OCT 10 2023

DISTRICT COURT
9TH JUDICIAL DISTRICT
TETON COUNTY WYOMING

# IN THE DISTRICT COURT OF THE NINTH JUDICIAL DISTRICT

## WITHIN AND FOR TETON COUNTY, WYOMING

| | |
|---|---|
| CAROL W. GARRETT AND TERRY LEE GARRETT | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 2023- CV-18974 |
| | ) ) |
| WELLS FARGO BANK, N.A. | ) ) |
| Defendant. | ) ) |

## PLAINTIFFS' COMPLAINT AND JURY DEMAND

COMES NOW, Carol W. Garrett and Terry Lee Garrett, husband and wife,

by and through their attorney, J. Austin Dunlap, for their cause of actions and

claims of relief against the Defendant, hereby state and allege as follow:

### I. PARTIES

1.    Plaintiffs Carol Garrett and Terry Garrett are residents of Florida and

were owners of real property in Jackson, Teton County, Wyoming commonly known

as 1045 Upper Cache Creek Drive.

2.     Defendant Wells Fargo Bank, N.A., ("Wells Fargo") is a corporation organized under the laws of South Dakota, and doing business in Teton County, Wyoming with offices at 50 Buffalo Way, Jackson, Teton County, Wyoming, and 110 Center Street, Jackson, Teton County, Wyoming.

3.     It is upon information and belief that Wells Fargo acquired the Garretts' mortgage for the property commonly known as 1045 Upper Cache Creek Drive, Jackson, Teton County, Wyoming from First Union National Bank of Delaware, the original lender.

## II. JURISDICTION AND VENUE

4.     Plaintiffs incorporate by reference all statement and allegations above.

5.     This Court has personal jurisdiction over the parties consistent with W.S.§ 5-1-107.

6.     Pursuant to W.S. §5-9-128(a)(i), the damages caused by the events complained of herein are in excess of $50,000.00, thus placing original jurisdiction of this matter within this Court.

7.     Pursuant to W.S. §1-5-101(a)(i), venue in the Ninth Judicial District Court in Teton County, Wyoming is proper because that is the county in which the subject property is located, and the acts and omissions complained of herein occurred.

## III. FACTS COMMON TO ALL CLAIMS

8.     Plaintiffs incorporate by reference all statements and allegations above.

9.   In 2001, Carol and Terry Garret built a single-family residence at 1045 Upper Cache Creek Drive, Jackson, Wyoming.

10.   Terry Garrett is a Vietnam War combat veteran who is wheelchair bound and legally blind due to his injuries suffered in the Vietnam War.

11.   The home they built in Jackson was wheelchair accessible and built to accommodate Terry's needs.

12.   The home was partially financed through a mortgage dated July 31, 2001, from First Union National Bank of Delaware ("Mortgagor" or "Lender") (Exhibit 1).

13.   The Garretts had a tenant, Michael Melf, living in the house in July 2023.

14.   Mr. Melf returned home one day in July 2023 to find his neighbors, Mike Mason and Nancy Watkins outside – they share a common drive way with the Garretts.

15.   The neighbors indicated that a stranger had been at the Garrett residence earlier in the day, and the stranger indicated that he had purchased the home at 1045 Upper Cache Creek Drive.

16.   The neighbors contacted the Garretts directly by phone.

17.   This is how the Garretts and Mr. Melf, the legal tenant, found out about the foreclosure sale.

18.   The Teton County Sheriff's Office conducted a foreclosure sale for 1045 Upper Cache Creek Drive on March 16, 2023.

19. The Teton County Sheriff's Office received an Affidavit of Service of Written Notice of Intent to Foreclose Mortgage from Defendant's representative C. Morgan Lasley, Esquire of the Sayer Law Group, P.C.

20. C. Morgan Lasley affirmed that written notice of intent to foreclose by advertisement and sale had been served upon the record owner and the person in possession by certified mail, return receipt requested, mailed to the last known address of the record owner, and the person in possession. (*See* Exhibit 2).

21. A Certificate of Purchase was also issued March 23, 2023. (Exhibit 3).

22. After the tolling of the redemption period, a Sheriff's Deed was issued on July 19, 2023. (Exhibit 4).

23. Sometime in August, the Garretts neighbors encountered one of the new purchasers at the property, being the first time Mr. Melf or Petitioners became aware of any foreclosure proceedings involving the 1045 Upper Cach Creek Drive house.

24. Upon information and belief, the Garrett's outstanding balance on the Mortgage was approximately $76,500.00.

25. The home at 1045 Upper Cache Creek Drive appraised for $2,900,000.00. (*See* Exhibit 5).

26. The highest bid at public auction was $825,000.00 by John Caldwell and Joan Schank. (See Exhibit 3).

27.    Defendant Wells Fargo failed to follow the statutory requirements in

recording the assignment and giving their notice of foreclosure resulting in the

Garretts being damaged in excess of $2.1 million.

28.    The Garretts' total damages is an amount that will be proven at trial.

## IV. CLAIMS

### COUNT I - WRONGFUL FORECLOSURE UNDER W.S.§ 34-4-103(a)(iii) –
### FAILURE TO RECORD ASSIGNMENT

29.    Plaintiffs incorporate by reference all statements and allegations

above.

30.    W.S. §34-4-103(a)(iii) requires "[t]hat the mortgage containing the

power of sale has been duly recorded; and if it has been assigned, that all

assignments have been recorded."

31.    The Garretts entered into a mortgage agreement with First Union

National Bank of Delaware and not Defendant. (Exhibit 1).

32.    The assignment from First Union National Bank of Delaware to

Defendant is not recorded in the Teton County Records as evidenced by the Title

Commitment provided by Northern Title. (*See* Exhibit 6).

33.    Defendant has failed to follow the statutory requirements in W.S. §34-

4-103 and Plaintiffs have suffered substantial economic damages as a result.

### COUNT II - WRONGFUL FORECLOSURE UNDER W.S. §34-4-103(a)(iv) –
### FAILURE TO NOTIFY OCCUPANT

34.    Plaintiffs incorporate by reference all statements and allegations

above.

35.     Michael Melf was the legal tenant of 1045 Upper Cache Creek Drive and had been for the previous 12 years.

36.     It is reasonable to assume that the legal occupant has a different address than the legal owner of the property.

37.     Defendant made no effort to distinguish addresses between the owner and the occupant as set forth in his affidavit below.  The notice for the occupant was sent to the address of record of the owner.

38.     The United State Postal Service does not deliver mail to 1045 Upper Cach Creek Drive as further evidenced by the tracking notations on the certified mailings.

39.     Michael Melf did not receive notice of intent to foreclose as required by W.S.§ 34-4-103(a)(iv).

40.     Defendant asserted the following:

That written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the person in possession by certified mail, return receipt requested, mailed to the last known address of the record owner and the person in possession at least ten (10) days before commencement of the first publication of the notice of the foreclosure sale as follows and that a copy of the published Foreclosure Sale Notice was mailed, certified mail, return receipt requested to all parties as required by Wyoming Statutes, before the notice was published as follows:...

41.     Defendant lists a tracking number for certified mailings to the "Current Occupants":  9489009000276449884146 for its Notice of Intent to Foreclose.

42.    The United States Postal Service tracking information for certified mail no. 9489009000276449884146 sent on December 8, 2022, to the "current occupants" at 1045 Upper Cache Creek Drive states "Insufficient Address" on December 15, 2022 (emphasis added).

43.    The mailing was returned to the original sender undelivered.

44.    Defendant lists a tracking number for the "Current Occupants": 9489009000276449867972 for its Foreclosure Sale Notice.

45.    The United States Postal Service tracking information for certified mail no. 9489009000276449867972 sent on January 30, 2023, to the "current occupants" at 1045 Upper Cache Creek Drive never arrived in Jackson, Wyoming.

46.    Defendant has failed to follow the statutory requirements in W.S. §34-4-103 and Plaintiffs have suffered substantial economic damages as a result.

## COUNT THREE –
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

47.    Plaintiffs incorporate by reference all statements and allegations above.

48.    Plaintiff entered into a mortgage agreement on July 31, 2001.

49.    Defendant's actions have deprived Plaintiff of approximately $2.1 million in an effort satisfy its $76,000 loan.

50.    Defendant's failure to record the assignment of the mortgage and failure to notify the current occupant of the intent to foreclose as statutorily

required are breaches of community standards of decency, fairness, and reasonableness.

51.   Defendants breach of the implied covenant of good faith and fair dealing has resulted in Plaintiffs suffering substantial economic damages.

## PUNATIVE DAMAGES

52.   Plaintiffs incorporate by reference all statements and allegations above.

53.   At all relevant times, Defendant acted outrageously with willful and wanton misconduct.

54.   Defendant's failure to perform the basic statutory requirements were in reckless disregard of the consequences and Defendant knew or should have known the significant harm their actions caused.

55.   Defendant failed to follow the basic statutory requirements.

56.   Defendant disregard of the statutory requirements resulted in deprivation to the Plaintiffs of at least $2.1 million to satisfy a $76,000 loan.

57.   In addition, Plaintiffs lost their home of 21 years that had been specifically designed and built for Terry Garrett's needs.

## PRAYER FOR RELIEF AS TO ALL CLAIMS

WHEREFORE, the Plaintiffs respectfully requests this Honorable Court enter judgment:

A.   Declaring that the conduct of Defendant was in violation of W.S. §34-4-103 for failing to record the assignment and failing to give proper notice to the occupant;

*Garrett v. Wells Fargo Bank*
Complaint and Jury Demand
Page 8 of 10

B.      Rescinding the foreclosure sale and restoring ownership of 1045 Upper Cache Creek Drive to the Plaintiffs;

C.      In the alternative, award Plaintiffs their damages in an amount to be proven at trial;

D.      Awarding Plaintiff their costs, expenses of bringing this action; and

E.      Awarding Plaintiff punitive and exemplary damages against Defendants in order to punish Defendants for engaging in such conduct so as to intentionally fail to follow the statute and recklessly deprive Plaintiff of their property, and in order to deter Defendant and others similarly situated to Defendants form engaging in wrongful foreclosures; and

F.      Granting Plaintiff such other and further relief as the Court deems just and property.

### JURY DEMAND

Attached is a demand for a twelve-person jury.

RESPECTFULLY SUBMITTED this _10th_ day of October 2023.

J. Austin Dunlap
WSB 7-4586
P.O. Box 4803
Jackson, WY 83001
*Counsel for the Plaintiffs*

# IN THE DISTRICT COURT OF THE NINTH JUDICIAL DISTRICT

# WITHIN AND FOR TETON COUNTY, WYOMING

CAROL W. GARRETT AND ) 
TERRY LEE GARRETT )
 )
    Plaintiffs, )
 )
v. )
 )
WELLS FARGO BANK, N.A. )
 )
    Defendant. )

FILED 4:15 pm.

OCT 1 0 2023

DISTRICT COURT
9TH JUDICIAL DISTRICT
TETON COUNTY WYOMING

2023-CV-18974

---

## JURY DEMAND

## DEMAND FOR JURY

The Plaintiffs demand a trial by jury of twelve peers on all issues so triable.

J. Austin Dunlap
WSB 7-4586
P.O. Box 4803
Jackson, WY 83001
*Counsel for the Plaintiffs*

COURTESY RECORDING
: document is being recorded solely as a courtesy :
·· ·odation to the parties therein.  Land Title Co. has ''
··ly disclaims any responsibility or liability for
··of the content thereof.

**After Recording, Mail To:**
First Union National Bank of Delaware
C/O Service Center
Internet Sales Support (SC 39 only)  NC5510
8740 Research Dr. - 1st Floor
Charlotte, NC 28262

**Prepared By:**
First Union National Bank of Delaware
C/O Service Center
Internet Sales Support (SC 39 only)  NC5510
8740 Research Dr. - 1st Floor
Charlotte, NC 28262

Account Number: 4386579010234457/300069655            Parcel Number 22-41-16-34-4-02-018

| RELEASED | |
|---|---|
| INDEXED | ✓ |
| ABSTRACTED | ✓ |
| SCANNED | ✓ |

# MORTGAGE

THIS MORTGAGE is made this day July 31, 2001, between the Mortgagor, **CAROL W GARRETT, MARRIED and TERRY LEE GARRETT,   HER HUSBAND, TENANTS BY THE ENTIRETY   and CLARA WALSH,   SEPARATED** whose mailing address is the property address (herein "Borrower"), and the Mortgagee, First Union National Bank of Delaware, a national banking association organized and existing under the laws of the United States of America, whose address is One Rodney Square, 920 King Street, Wilmington, DE 19801 (herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. **$75,000.00**, which indebtedness is evidenced by Borrower's Note dated July 31, 2001 and extensions, modifications and renewals thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of indebtedness, if not sooner paid, due and payable on **July 30, 2021.**

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in the County of ~~ALACHUA~~ State of WYOMING:

 Teton

SEE ATTACHED SCHEDULE A.

which has the address of **1045 UPPER CACHE CREEK DRIVE, JACKSON, WY 83001** and Parcel No. _____ (herein "Property Address");

Grantor: GARRETT, CAROL W ET AL
Grantee: FIRST UNION NATIONAL BANK OF·
Doc #519832 bk 432 pg 493-411 Filed at 4:31 on 08/28/01
Sherry L Daigle, Teton County Clerk fees: 22.00
By KIMBERLEE JANSEN   Deputy

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property."

Any Rider ("Rider") attached hereto and executed of even date is incorporated herein and the covenant and agreements of the Rider shall amend and supplement the covenants and agreements of this Mortgage, as if the Rider were a part hereof.

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record.  Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.**  Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note.  This Mortgage secures payment of said Note according to its terms, which are incorporated herein by reference.

**2. Prior Mortgages and Deeds of Trust; Charges; Liens.**  Borrower shall perform all of Borrower's obligations, under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due.  Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

**3. Hazard Insurance.**  a) Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and any other hazards, including floods or flood, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld.  If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 5.

Appellant's Appendix
Page 120 of 281

Exhibit 1

b) All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly to Borrower.

c) Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

d) Except as provided in subparagraph 3(e) below, should partial or complete destruction or damage occur to the Property, Borrower hereby agrees that any and all instruments evidencing insurance proceeds received by Lender as a result of said damage or destruction, shall be placed in a non-interest bearing escrow account with Lender. At Lender's discretion, Lender may release some or all of the proceeds from escrow after Borrower presents Lender with a receipt(s), invoice(s), written estimates(s) or other document(s) acceptable to Lender which relates to the repair and/or improvements of the Property necessary as a result of said damage and/or destruction. Absent an agreement to the contrary, Lender shall not be required to pay Borrower any interest on the proceeds held in the escrow account. Any amounts remaining in the account after all repairs and/or improvements have been made to the Lender's satisfaction, shall be applied to the sums secured by this Deed of Trust, Deed to Secure Debt, or Mortgage. Borrower further agrees to cooperate with Lender by endorsing all checks, drafts and/or other instruments evidencing insurance proceeds; and any necessary documents. Should Borrower fail to provide any required endorsement and/or execution within thirty (30) days after Lender sends borrower notice that Lender has received an instrument evidencing insurance proceeds, or document(s) requiring Borrower's signature, Borrower hereby authorizes Lender to endorse said instrument and/or document(s) on Borrowers behalf, and collect and apply said proceeds at Lender's option, either to restoration or repair of the Property or to sums secured by this Deed of Trust, Deed to Secure Debt, or Mortgage. It is not the intention of either party that this escrow provision, and/or Lender's endorsement or execution of an instrument(s) and/or document(s) on behalf of Borrower create a fiduciary or agency relationship between Lender and Borrower.

e) Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of the payments. If under paragraph 15 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument.

4.   **Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

5.   **Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such actions as is necessary to protect Lender's interest.

Any amounts disbursed by Lender pursuant to this paragraph 5, with interest thereon from the date of disbursal, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 5 shall require Lender to incur any expense or take any action hereunder.

6.   **Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefore related to Lender's interest in the Property.

7.   **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender subject to the terms of any mortgage, deed

of trust or other security agreement with a lien which has priority over this Mortgage.

**8. Borrower Not Released; Forbearance By Lender Not a Waiver.** The Borrower shall remain liable for full payment of the principal and interest on the Note (or any advancement or obligation) secured hereby, notwithstanding any of the following: (a) the sale of all or a part of the premises, (b) the assumption by another party of the Borrower's obligations hereunder, (c) the forbearance or extension of time for payment or performance of any obligation hereunder, whether granted to Borrower or a subsequent owner of the property, and (d) the release of all or any part of the premises securing said obligations or the release of any party who assumes payment of the same. None of the foregoing shall in any way affect the full force and effect of the lien of this Mortgage or impair Lender's right to a deficiency judgment (in the event of foreclosure) against Borrower or any party assuming the obligations hereunder, to the extent permitted by applicable law.

Any forbearance by Lender in exercising any right or remedy hereunder or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**9. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 14, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender.

**10. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by first class mail addressed to Borrower or the current owner at the Property Address or at such other address as Borrower may designate in writing by notice to Lender as provided herein, and any other person personally liable on this Note as these person's names and addresses appear in the Lender's records at the time of giving notice and (b) any notice to Lender shall be given by first class mail to Lender's address stated herein or to such other address as lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**11. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of Federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflicts shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein "costs", "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**12. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note, this Mortgage and Rider(s) at the time of execution or after recordation hereof.

**13. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**14. Transfer of the Property or a Beneficial Interest in Borrower, Assumption.** As used in this Section 14, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a

period of not less than 30 days from the date the notice is given in accordance with Section 10 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies by this Security Instrument without further notice or demand on Borrower.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**15. Default; Acceleration; Remedies.** Upon Borrower's breach of any covenant or agreement of Borrower in this entire Mortgage, including the covenants to pay when due any sums under the Note secured by this Mortgage, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without demand or notice, notice of the exercise of such option being hereby expressly waived. Lender may invoke the power of sale hereby granted. Lender shall have the right to enter upon and take possession of the property hereby conveyed and after or without taking such possession shall have the right to sell the same at public auction for cash, after first giving notice of the time, place and terms of such sale by publication once a week for three consecutive weeks prior to said sale, in some newspaper published in said county, and upon payment of the purchase money, the Lender, or owner of the debt and Mortgage, or auctioneer, shall execute to the purchaser for and in the name of the Mortgagors, a good and sufficient deed to the property sold; the Lender shall apply the proceeds of said sale: first, to the expense of advertising, selling and conveying said property, including a reasonable attorney's fee; second, to the payment of any amounts that may have been expended or that may then be necessary to expend in paying insurance, taxes and other encumbrances, with interest thereon; third, to the payment in full of the principal indebtedness and interest thereon, whether the same shall or shall not have fully matured at the date of said sale, but no interest shall be collected beyond the date of said sale; and fourth, the balance if any, shall be paid over to the said Borrowers or to whom ever then appears of record to be the owner of said property. The Lender may bid and become the purchaser of the mortgaged property at any foreclosure sale hereunder.

**16. Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Mortgage, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued if: (a) Borrower pays Lender all sums which would be then due under this Mortgage, this Note and Notes securing Future Advances, if any, had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in Paragraph 15 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action, as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

**17. Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that so long as Borrower is not in default hereunder, Borrower shall, prior to acceleration under paragraph 15 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration and/or foreclosure under paragraph 15 hereof, or abandonment of the Property, Lender, in person or by agent, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the property including those past due. The Lender shall be liable to account only for those rents actually received prior to foreclosure sale as provided in paragraph 15. Lender shall not be liable to account to Borrower or to any other person claiming any interest in the Property for any rents received after foreclosure.

**18. Loan Charges.** If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (1) any such loan charges shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (2) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by mailing a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Note.

**19. Legislation.** If, after the date hereof, enactment or expiration of applicable laws have the effect either of rendering the provisions of the Note, the Mortgage or any Rider, unenforceable according to their terms, or all or any part of the sums secured hereby uncollectible, as otherwise provided in this Mortgage or the Note, or of diminishing the value of Lender's security, then Lender, at Lender's option, may declare all sums secured by the Mortgage to be immediately due and payable.

**20. Satisfaction.** Upon payment of all sums secured by this Mortgage, the conveyance of the property pursuant to this Mortgage shall become null and void and Lender shall release this Mortgage. Borrower shall pay all costs of recordation, if any. Lender, at Lender's option, may allow a partial release of the Property on terms acceptable to Lender and Lender may charge a release fee.

**21. Waiver of Homestead.** Borrower hereby releasing and waiving all rights under and by virtue of the homestead exemption laws of this State, and relinquishes all rights of dower and courtesy in the Property.

**22. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal, or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 22, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 22, "Environmental law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection.

**REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE
UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST**

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

**IN WITNESS WHEREOF,** Borrower has executed this Mortgage and adopted as his seal the word ("SEAL") appearing beside his name.

Signed, sealed and delivered in the presence of:

_(signature)_ [SEAL]
**CAROL W GARRETT**

_(signature)_ [SEAL]
**TERRY LEE GARRETT**

_(signature)_ [SEAL]
**CLARA WALSH**

[Space Below This Line For Acknowledging]

STATE OF ~~WYOMING~~ _Florida_

COUNTY OF _Alachua_

The foregoing instrument was acknowledged before me by **CAROL W GARRETT,** and **TERRY LEE GARRETT** and **CLARA WALSH,** this _31st_ day of _July_, _2001_.

WITNESS my hand and official seal

Signature: _(signature)_ (SEAL)

My Commission Expires: _11-4-2004_

THOMAS R. TURK, JR.
MY COMMISSION # CC 963230
EXPIRES: November 4, 2004
Bonded Thru Notary Public Underwriters

# PRIME EQUITY LINE RIDER

PEL Account Number: 4386579010234457

THIS PRIME EQUITY LINE RIDER is made this day **July 31, 2001** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Mortgagor") to secure the Prime Equity Line Agreement and Disclosure Statement executed by the Mortgagor of the same date (said Agreement is referenced in the Security Instrument and this Rider as "Note") to First Union National Bank of Delaware, (the "Lender") and covering the property described in the Security Instrument and located at:

**1045 UPPER CACHE CREEK DRIVE, JACKSON, WY 83001**
Property Address

**ADDITIONAL COVENANTS**
In addition to the covenants and agreements made in the Security Instrument, Mortgagor and Lender further covenant and agree to the following additional terms and conditions:

1.    **Adjustable Rate**
      The Security Instrument secures a Note that provides for changes in the interest rate, as more particularly described in said Note.

2.    **Amendments to the Security Instrument Maturity Date**
      The second paragraph on page one of the Security Instrument is deleted in its entirety and shall read as follows:

      "The Lender has made a loan to Mortgagor the maximum indebtedness at any one time shall not exceed $75,000.00 which loan is an open-end line of credit as evidenced by Mortgagor's Note and extensions, modifications and renewals thereof which provides for obligatory advances of all or part of the loan proceeds from time to time, subject to provisions in the Note.  The entire indebtedness evidenced by the Note, if not sooner paid, will be due and payable on **July 30, 2021.**"

      Paragraph 20 of the Security Instrument shall be deleted in its entirety and read as follows:

      "When the balance of all outstanding sums including finance charges and other charges, if any, secured by the Security Instrument is zero, the Lender shall upon request of the Borrower, release the Security Instrument. Borrower will pay all recordation costs, if any.  Absent a request from the Borrower, the Security Instrument shall remain in full force and effect for the term set forth above. Lender, at Lender's option, may allow a partial release of the Property on terms acceptable to Lender and Lender may charge a release fee."

3.    **Obligation to Lend**
      Lender is absolutely obligated under the terms of the Note to make advances not to exceed, at any one time in the aggregate, the amount stated in the Note and Mortgagor has agreed to repay any advances under the terms of the Note.  Lender's absolute obligation to make advances to Mortgagor under the Note ends when Lender terminates the right to make advances and demands repayment of the outstanding obligation or prohibits additional extensions of credit under the Note or the Security Instrument. Nevertheless, Lender may waive the right to terminate or prohibit additional advances. If Lender does not terminate or prohibit additional advances, Lender remains obligated to make advances to Mortgagor under the terms of the Note. However, that waiver does not bind Lender if the same or a different event occurs or is continuing at a later time.

4.    **Note Provisions - Conflict**
      In case of a conflict between the terms of the Note and the Security Instrument governing remedies of default or termination of advances, the terms of the Note shall control.

By signing below, Mortgagor accepts and agrees to the terms and conditions contained in this Rider.

_Terry Lee Garrett_ [SEAL]
**TERRY LEE GARRETT**

_Carol W. Garrett_ [SEAL]
**CAROL W GARRETT**

_Clara Walsh_ [SEAL]
**CLARA WALSH**

---

[Space Below This Line For Acknowledging]

STATE OF ~~WYOMING~~ Florida
)
) ss
COUNTY OF Alachua )

The foregoing instrument was acknowledged before me by TERRY LEE GARRETT and CAROL W GARRETT and CLARA WALSH, this 3/7 day of July 2001.

WITNESS my hand and official seal

Signature: _Thomas M. _____ (SEAL)
My Commission Expires: 11-4-01



## Legal Description

All that certain parcel of land situated in CITY OF JACKSON being known as All that certain property situated in CITY OF JACKSON in the county of TETON and state of WYOMING and being described in a deed dated 08/21/1986 and recorded 08/26/1986 in book 180 page 562 among the land records of the county and state set forth above and referenced as follows: PART OF LOT 9, RIDGE ADDITION , PLAT 562   Parcel ID Number:  22-41-16-34-4-02-018 and being more fully described in Deed Book 180 Page 562 recorded on 08/26/1986 among the land records of TETON County, WY.

Parcel ID Number:  22-41-16-34-4-02-018

EXHIBIT A

### AFFIDAVIT OF SERVICE OF WRITTEN NOTICE OF
### INTENT TO FORECLOSE MORTGAGE

STATE OF IOWA     )
           )SS

COUNTY OF BLACK HAWK )

Brian G. Sayer of lawful age, being first duly sworn upon his oath, deposes and says:

1. That he is an attorney admitted generally to practice law in the State of Wyoming and is a member of the law firm of The Sayer Law Group, P.C., who are the attorneys representing the Mortgagee in a procedure to foreclose a certain real estate mortgage dated 07/31/2001 (the "Mortgage"), and recorded on 08/24/2001, as Instrument No. 0549832, Book 432, Page 403 in the records of the office of the County Clerk and ex-officio Register of Deeds in and for Teton County, State of Wyoming, wherein Carol W. Garrett, married and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh, separated ("Mortgagor(s)"), the named mortgagor(s), and First Union National Bank of Delaware, a Corporation, is the named mortgagee.

2. That written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the person in possession by certified mail, return receipt requested, mailed to the last known address of the record owner and the person in possession at least ten (10) days before commencement of the first publication of the notice of the foreclosure sale as follows and that a copy of the published Foreclosure Sale Notice was mailed, certified mail, return receipt requested, to all parties as required by Wyoming statutes, before the notice was published, as follows:

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 22
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 58
Carol W. Garrett, Terry Lee Garrett and Clara Walsh
1045 Upper Cache Creek Dr.
Jackson, WY 83001

WY220113

Exhibit 2

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 39
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 65
Carol W. Garrett, Terry Lee Garrett and Clara Walsh
830 NW 61ST TER
GAINESVILLE , FL 32605


CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 46
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 72
Current Occupants
1045 Upper Cache Creek Dr.
Jackson, WY 83001


    3.     That the notice of intent to foreclose the Mortgage was sent on 12/08/2022 and the date of the first publication of the notice of foreclosure sale was 02/01/2022.


FURTHER AFFIANT SAYETH NAUGHT.


20 MAR 2023
_____
Date

Brian G. Sayer
/CC Morgan Lasley
Marcello G. Rojas
The Sayer Law Group, P.C.
925 E. 4th St.
Waterloo, Iowa 50703
319-234-2530
319-232-6341


This instrument was acknowledged before me on the 20 day of March 2023 by C Morgan Lasley as attorney of The Sayer Law Group, P.C.

_____
Notary Public

NOTARIAL SEAL
IOWA
SHANNON SAUL
COMMISSION NO. 773843
MY COMMISSION EXPIRES
7-12-24

WY220113



## FORECLOSURE SALE NOTICE

WHEREAS, default in the payment of principal and interest has occurred under the terms of a promissory note (the "Note") dated July 31, 2001, executed and delivered by Carol W. Garrett, Terry Lee Garrett and Clara Walsh to First Union National Bank of Delaware and a real estate mortgage (the "Mortgage") of the same date securing the Note, which Mortgage was executed and delivered by Carol W. Garrett, her husband, tenants by the entirety and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh separated (the "Mortgagors"), to First Union National Bank of Delaware and which Mortgage was recorded August 24, 2001 as Instrument No. 0549839, Book 429, Page 430 in the records of the office of the County Clerk and ex-officio Register of Deeds in and for Teton County, State of Wyoming; and

WHEREAS, the Mortgage contains a power of sale which by reason of said default, the Mortgagee declares to have become operative, and no suit or proceeding has been instituted at law to recover the debt secured by the Mortgage, or any part thereof, nor has any such suit or proceeding been instituted and the same discontinued; and

WHEREAS, written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the party in possession of the mortgaged premises at least ten (10) days prior to the commencement of the publication, and the amount due upon the Mortgage on the date of first publication of this notice of sale being the total sum of $76,719.18 which sum consists of the unpaid principal balance of $76,650.00 plus interest accrued to the date of the first publication of this notice in the amount of $207.18, plus attorneys' fees, costs expended, and accruing interest and late charges to the date of first publication of this notice of sale;

WHEREAS, the property being foreclosed upon may be subject to other liens and encumbrances that will not be extinguished at the sale. Any prospective purchaser should research the status of the before submitting a bid;

NOW, THEREFORE Wells Fargo Bank, N.A., successor by merger to Wachovia Bank, National Association, FKA First Union National Bank of Delaware, as the Mortgagee, will have the Mortgage foreclosed as by law provided by causing the mortgaged property to be sold at public venue by the Sheriff for Deputy Sheriff in and for Teton County, Wyoming to the highest bidder in cash at 10:00 o'clock in the forenoon on March 16, 2023, at 180 South King, Jackson, WY 83001, for application on the above-described amounts secured by the Mortgage, said mortgaged property being described as follows, to wit:

The following described real estate, situate in the County of Teton, State of Wyoming, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining and hereby releasing and waiving all rights under and by virtue of the homestead exemption laws of the State of Wyoming, to wit:

A portion of Lot 9 of the Rietze Addition to the Town of Jackson, Teton County, Wyoming, according to the plat recorded in the Office of the Teton County Clerk on February 16, 1934 as Plat No. 552, described as follows:

Beginning at the southeast corner of said Lot 9, thence N00 degrees 12 minutes 14 seconds W, 149.91 feet to a point; thence N51 degrees 13 minutes 19 seconds W, 84.46 feet to a point; thence N06 degrees 53 minutes 11 seconds W, 78.01 feet to a point; thence S41 degrees 21 minutes 23 seconds W, 178.01 feet to a point; thence S87 degrees 42 minutes 35 seconds E, 207.94 feet to the point of beginning.

With an address of: 1045 Upper Cache Creek Dr., Jackson, WY 83001

Together with all improvements thereon situate and all fixtures and appurtenances thereto

Date: 01/30/2023          Brian G. Sayer
                          Brian G. Sayer
                          C. Morgan Lasley
                          Marcello G. Rojas
                          THE SAYER LAW GROUP, P.C.
                          925 E. 4th St.
                          Waterloo, Iowa 50703
                          319-234-2630
                          319-232-6341

Publish: 02/08, 02/15, 02/22, 03/01/23

## EXHIBIT C

### AFFIDAVIT OF ATTORNEY

STATE OF IOWA          )
                       )SS
COUNTY OF BLACK HAWK   )

Brian G. Sayer of lawful age, being first duly sworn upon his oath, deposes and says:

1.      That he is an attorney admitted generally to practice law in the State of Wyoming and is a member of the law firm of The Sayer Law Group, P.C., who are the attorneys representing the Mortgagee in a procedure to foreclose a certain real estate mortgage.

2.      That The Sayer Law Group, P.C., as attorneys for the Mortgagee, will charge the Mortgagee fees totaling $2969.26 as compensation for services actually rendered in the foreclosure proceeding.

| | |
|---|---|
| Attorney Fees | $ 1700.00 |
| Publication | $ 990.00 |
| Certified Mail | $ 40.26 |
| Title Search | $ 0.00 |
| Conduct Sale Fee | $ 175.00 |
| Record Cert. of Sale | $ 39.00 |
| Record Sheriff's Deed | $ 15.00 |
| Sheriff's Fee- Sale | $ 10.00 |
| | |
| TOTAL | $ 2969.26 |

3.      That the above-mentioned fee for services rendered and incurred in connection with the foreclosure sale shall be retained entirely by the law firm of The Sayer Law Group, P.C. There is no agreement, express or implied, between such attorneys and their client, nor between such attorneys and any other person not a practicing attorney of the State of Wyoming engaged with them as an attorney in the foreclosure proceeding, for any sharing or division of said fee.

WY220113

FURTHER AFFIANT SAYETH NAUGHT.

17 MAR 2023
Date

Brian G. Sayer
C. Morgan Lasley
Marcello G. Rojas
The Sayer Law Group, P.C.
925 E. 4th St.
Waterloo, Iowa 50703
319-234-2530
319-232-6341

This instrument was acknowledged before me on the 17 day of March, 2023 by C. morgan lasley as attorney of The Sayer Law Group, P.C.

Notary Public

SHANNON SAUL
COMMISSION NO. 779843
MY COMMISSION EXPIRES

7-12-24

WY220113

## CERTIFICATE OF PURCHASE

I, Mary L. Faulkner, being duly sworn and of legal age, hereby certify that I am the Civil Process & Warrant Specialist in the Sheriff's Office of Teton County, Wyoming, and further state:

1.  I conducted a public sale on the 16th day of March, 2023, commencing at or about the hour of 10:00 a.m. on the front steps of the Teton County Courthouse, 180 S. King Street, Jackson, Wyoming, for the property described below:

> Beginning at the southeast corner of said Lot 9, thence N00 degrees 12 minutes 14 seconds W, 149.91 feet to a point; thence N51 degrees 13 minutes 19 seconds W, 84.46 feet to a point; thence N66 degrees 53 minutes 11 seconds W, 73.0 feet to a point; thence S41 degrees 21 minutes 23 seconds W, 173.01 feet to a point; thence S67 degrees 42 minutes 35 seconds E, 267.84 feet to the point of beginning.
>
> Property commonly known as 1045 Upper Cache Creek Drive, Jackson, WY.

2.  That such sale was conducted after an Affidavit of Service of Written Notice of Intent to Foreclose Mortgage was sent by certified mail, return receipt requested, to the last known address of the record owner and the person in possession of said property at least ten days prior to commencement of the first publication of the foreclosure sale notice, as shown by the affidavit attached hereto as **Exhibit "A".**

3.  That such sale was conducted after a Notice of Foreclosure Sale was published in a newspaper of general circulation in Teton County, Wyoming, once per week for four consecutive weeks, giving the time, place and conditions of such sale as evidenced by the Attorney's Affidavit and Proof of Publication attached hereto as **Exhibit "B".**

4.  That the sum of $2969.26 is to be paid to The Sayer Law Group, P.C., the attorneys for the Mortgagee, as compensation for service actually rendered in the foreclosure proceeding, said attorneys having made an affidavit as required by the statutes of the State of Wyoming, a copy of said Affidavit of Attorney attached hereto as **Exhibit "C".**

5.  The highest bidder at such sale was John Caldwell and Joan Schank ("Purchaser"), and the amount bid for the Foreclosed Property was $825,000.00 ("Purchase Price").

6.  Pursuant to Wyo. Stat. § 1-18-102, the Purchaser is entitled to a deed for the Foreclosed Property at the expiration of the period of redemption unless the Foreclosed Property is redeemed prior to that

Exhibit 3

date as provided by law.  The period in which the Mortgagor has the right to redeem the Foreclosed
Property is three (3) months after the date of the foreclosure sale.

DATED this 23rd day of March, 2023.

Matt Carr, Sheriff in and for
Teton County, State of Wyoming

*Mary L. Faulkner*

Mary L. Faulkner
Civil Process & Warrant Specialist
Teton County Sheriff's Office

STATE OF WYOMING)
                                 ) ss.
COUNTY OF TETON)

The foregoing instrument was acknowledged before me on the 23rd day of March, 2023 by Mary L. Faulkner
as Civil Process & Warrant Specialist, in the Sheriff's Office of Teton County, Wyoming.

(Seal, if any)

```
JILL CALLAWAY
NOTARY PUBLIC
STATE OF WYOMING
COMMISSION ID: 140876
MY COMMISSION EXPIRES: 07/31/2028
```

My commission expires: 7/31/28

*Jill Callaway*
Signature of notarial officer

*Notary*
Title of notarial officer

EXHIBIT A

<u>AFFIDAVIT OF SERVICE OF WRITTEN NOTICE OF</u>

<u>INTENT TO FORECLOSE MORTGAGE</u>

STATE OF IOWA                          )
                                       )SS
COUNTY OF BLACK HAWK                   )

Brian G. Sayer of lawful age, being first duly sworn upon his oath, deposes and says:

1.      That he is an attorney admitted generally to practice law in the State of Wyoming and is a member of the law firm of The Sayer Law Group, P.C., who are the attorneys representing the Mortgagee in a procedure to foreclose a certain real estate mortgage dated 07/31/2001 (the "Mortgage"), and recorded on 08/24/2001, as Instrument No. 0549832, Book 432, Page 403 in the records of the office of the County Clerk and ex-officio Register of Deeds in and for Teton County, State of Wyoming, wherein Carol W. Garrett, married and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh, separated ("Mortgagor(s)"), the named mortgagor(s), and First Union National Bank of Delaware, a Corporation, is the named mortgagee.

2.      That written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the person in possession by certified mail, return receipt requested, mailed to the last known address of the record owner and the person in possession at least ten (10) days before commencement of the first publication of the notice of the foreclosure sale as follows and that a copy of the published Foreclosure Sale Notice was mailed, certified mail, return receipt requested, to all parties as required by Wyoming statutes, before the notice was published, as follows:

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 22
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 58
Carol W. Garrett, Terry Lee Garrett and Clara Walsh
1045 Upper Cache Creek Dr.
Jackson, WY 83001

WY220113

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 39
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 65
Carol W. Garrett, Terry Lee Garrett and Clara Walsh
830 NW 61ST TER
GAINESVILLE , FL 32605

CERTIFIED MAIL NO. NOI: 9489 0090 0027 6449 8841 46
CERTIFIED MAIL NO. FSN: 9489 0090 0027 6449 8679 72
Current Occupants
1045 Upper Cache Creek Dr.
Jackson, WY 83001

    3.    That the notice of intent to foreclose the Mortgage was sent on 12/08/2022
and the date of the first publication of the notice of foreclosure sale was 02/01/2022.

FURTHER AFFIANT SAYETH NAUGHT.

20 MAR 2023
_____
Date

_____
Brian G. Sayer
XC. Morgan Lasley
Marcello G. Rojas
The Sayer Law Group, P.C.
925 E. 4th St.
Waterloo, Iowa 50703
319-234-2530
319-232-6341

This instrument was acknowledged before me on the 20 day of March
20 23 by C Morgan Lasley as attorney of The Sayer Law Group, P.C.

_____
Notary Public

SHANNON SAUL
COMMISSION NO. 773843
MY COMMISSION EXPIRES
7-12-24

WY220113



Jacksonhole News&Guide

PROOF OF PUBLICATION

COUNTY OF TETON
THE STATE OF WYOMING

Kevin Olson

being duly sworn deposes and says that he is the Editor
of the JACKSON HOLE NEWS & GUIDE, a weekly newspaper
published and printed in said county and state, and that the
annexed Notice was published in

of said newspaper, and not in a supplement thereof,
publication thereof being on February 8, 2023

Subscribed in my presence and sworn to before me this
3rd day of March, 2023

NOTARY PUBLIC

Account No. 40341    The Conrad Law Firm, P.C.
Address: 912 E. 4th St.  Waterloo, IA 50325

## FORECLOSURE SALE NOTICE

WHEREAS, default in the payment of principal and interest has occurred under the terms of a promissory note (the "Note") dated July 31, 2001, executed and delivered by Carol W. Garrett, Terry Lee Garrett and Clara Walsh to First Union National Bank of Delaware and a real estate mortgage (the "Mortgage") of the same date securing the Note, which Mortgage was executed and delivered by Carol W. Garrett, married and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh, separated (the "Mortgagors") to First Union National Bank of Delaware and which Mortgage was recorded on August 24, 2001, as Instrument No. 0549832, Book 432, Page 403 in the records of the office of the County Clerk and ex-officio Register of Deeds in and for Teton County, State of Wyoming; and

WHEREAS, the Mortgage contains a power of sale which by reason of said default, the Mortgagee declares to have become operative, and no suit or proceeding has been instituted at law to recover the debt secured by the Mortgage, or any part thereof, nor has any such suit or proceeding been instituted and the same discontinued; and

WHEREAS, written notice of intent to foreclose the Mortgage by advertisement and sale has been served upon the record owner and the party in possession of the mortgaged premises at least ten (10) days prior to the commencement of this publication, and the amount due upon the Mortgage on the date of first publication of this notice of sale being the total sum of $76,719.18 which sum consists of the unpaid principal balance of $76,500.00 plus interest accrued to the date of the first publication of this notice in the amount of $207.18, plus attorneys' fees, costs expended, and accruing interest and late charges after the date of first publication of this notice of sale;

WHEREAS, the property being foreclosed upon may be subject to other liens and encumbrances that will not be extinguished at the sale. Any prospective purchaser should research the status of title before submitting a bid;

NOW, THEREFORE Wells Fargo Bank, N.A., successor by merger to Wachovia Bank, National Association, FKA First Union National Bank of Delaware, as the Mortgagee, will have the Mortgage foreclosed as by law provided by causing the mortgaged property to be sold at public venue by the Sheriff or Deputy Sheriff in and for Teton County, Wyoming to the highest bidder for cash at 10:00 o'clock in the forenoon on March 16, 2023, at 180 South King, Jackson, WY 83001, for application on the above-described amounts secured by the Mortgage, said mortgaged property being described as follows, to-wit:

The following described real estate, situate in the County of Teton, State of Wyoming, hereby waiving and releasing all rights under and by virtue of the home-stead exemption laws of the State of Wyoming, to-wit:

A portion of Lot 9 of the Ridge Addition to the Town of Jackson, Teton County, Wyoming, according to that plat recorded in the Office of the Teton County Clerk on February 16, 1984 as Plat No. 562, described as follows:

Beginning at the southeast corner of said Lot 9, thence N00 degrees 12 minutes 14 seconds W, 149.91 feet to a point; thence N51 degrees 13 minutes 19 seconds W, 84.46 feet to a point; thence N66 degrees 53 minutes 11 seconds W, 73.0 feet to a point; thence S41 degrees 21 minutes 23 seconds W, 173.01 feet to a point; thence S67 degrees 42 minutes 35 seconds E, 267.84 feet to the point of beginning.

With an address of: 1045 Upper Cache Creek Dr., Jackson, WY 83001.

Together with all improvements thereon situate and all fixtures and appurtenances thereto.

Date: 01/30/2023     Brian G. Sayer
                     Brian G. Sayer
                     C. Morgan Lasley
                     Marcello G. Rojas
                     THE SAYER LAW GROUP, P.C.
                     925 E. 4th St.
                     Waterloo, Iowa 50703
                     319-234-2530
                     319-232-6341

Publish: 02/08, 02/15, 02/22, 03/01/23

## EXHIBIT C

### AFFIDAVIT OF ATTORNEY

STATE OF IOWA )
)SS
COUNTY OF BLACK HAWK )

Brian G. Sayer of lawful age, being first duly sworn upon his oath, deposes and says:

1.      That he is an attorney admitted generally to practice law in the State of Wyoming and is a member of the law firm of The Sayer Law Group, P.C., who are the attorneys representing the Mortgagee in a procedure to foreclose a certain real estate mortgage.

2.      That The Sayer Law Group, P.C., as attorneys for the Mortgagee, will charge the Mortgagee fees totaling $2969.26 as compensation for services actually rendered in the foreclosure proceeding.

| | |
|---|---|
| Attorney Fees | $ 1700.00 |
| Publication | $ 990.00 |
| Certified Mail | $ 40.26 |
| Title Search | $ 0.00 |
| Conduct Sale Fee | $ 175.00 |
| Record Cert. of Sale | $ 39.00 |
| Record Sheriff's Deed | $ 15.00 |
| Sheriff's Fee- Sale | $ 10.00 |
| | |
| TOTAL | $ 2969.26 |

3.      That the above-mentioned fee for services rendered and incurred in connection with the foreclosure sale shall be retained entirely by the law firm of The Sayer Law Group, P.C. There is no agreement, express or implied, between such attorneys and their client, nor between such attorneys and any other person not a practicing attorney of the State of Wyoming engaged with them as an attorney in the foreclosure proceeding, for any sharing or division of said fee.

WY220113

FURTHER AFFIANT SAYETH NAUGHT.

17 MAR 2023
Date

Brian G. Sayer
X C. Morgan Lasley
Marcello G. Rojas
The Sayer Law Group, P.C.
925 E. 4th St.
Waterloo, Iowa 50703
319-234-2530
319-232-6341

This instrument was acknowledged before me on the 17 day of March,
20 23 by C. morgan Lasley as attorney of The Sayer Law Group, P.C.

Notary Public

SHANNON SAUL
COMMISSION NO. 773843
MY COMMISSION EXPIRES

7-12-24

WY220113

GRANTOR: TETON COUNTY SHERIFF
GRANTEE: CALDWELL, JOHN
Doc 1063792 Filed At 14:04 ON 07/20/23
Maureen Murphy Teton County Clerk  fees: 15.00
By Kellie Dickerson  Deputy Clerk

## SHERIFF'S DEED

KNOW ALL MEN BY THESE PRESENTS, that I, Mary L. Faulkner, being duly sworn and of legal age, hereby certify that I am Civil Process & Warrant Specialist for the Sheriff of Teton County, Wyoming, and that the Teton County, Wyoming Sheriff's Office conducted a public sale on the 16 day of March, 2023, commencing at or about the hour of 10:00 a.m. on the front steps of the Teton County Courthouse, 180 South King Street, Jackson, Wyoming, of the property described below that was encumbered by a Mortgage dated July 31, 2001 (the "Mortgage"), given by Carol W. Garrett, married and Terry Lee Garrett, her husband, tenants by the entirety and Clara Walsh in favor of First Union National Bank of Delaware ("Mortgagee"), recorded in the records of the Teton County, Wyoming Clerk on August 24, 2001, as Instrument No. 0549832, in Book 432, at page 403 that encumbers the property described below (the "Foreclosed Property"):

Lot 9A, The Ridge Subdivision.

Property commonly known as 1045 Upper Cache Creek Drive, Jackson, WY.

On March 23, 2023, the Teton County, Wyoming Sheriff's Office issued a Certificate of Purchase for 1045 Upper Cache Creek Drive, Jackson, WY to John Caldwell and Joan Schank, which made the highest bid for the Foreclosed Property at the foreclosure sale.  The Certificate of Purchase for the above property was recorded in the records of the Teton County, Wyoming Clerk as Document Number 1056038.

All redemption periods for the Foreclosed Property have expired without the Foreclosed Property being redeemed, and John Caldwell and Joan Schank are, therefore, entitled to a deed to the Foreclosed Property.

NOW, THEREFORE, KNOW ALL MEN BY THIS DEED, that I, Mary Faulkner, Civil Process & Warrant Specialist for the Sheriff of Teton County, Wyoming, in consideration of the premises, have granted and sold and do hereby convey to John Caldwell and Joan Schank, its successors and assigns, whose address is 1045 Upper Cache Creek Drive, Jackson, WY, the

Exhibit 4

Appellant's Appendix
Page 145 of 281

Foreclosed Property, to have and to hold the described premises, with all appurtenances, to John

Caldwell and Joan Schank, its successors and assigns, forever.

　　　　IN WITNESS WHEREOF, the undersigned has caused this Sheriff's Deed to be executed
and delivered on the 19th day of July 2023.

　　　　　　　　　　　　　　Matt Carr, Sheriff in and for
　　　　　　　　　　　　　　Teton County, State of Wyoming


　　　　　　　　　　　　　By: *Mary L. Faulkner*
　　　　　　　　　　　　　Mary L. Faulkner
　　　　　　　　　　　　　Civil Process & Warrant Specialist
　　　　　　　　　　　　　Teton County Sheriff's Office



STATE OF WYOMING　　　　　　)
　　　　　　　　　　　　　　　) ss.
COUNTY OF TETON　　　　　　　)

The above and foregoing Sheriff's Deed was acknowledged before me on the 19th day of July
2023 by Mary Faulkner as Civil Process & Warrant Specialist for the Sheriff of Teton County,
Wyoming.

(Seal, if any)

```
┌─────────────────────────────────────────┐
│ LYNDA KAYE RUDOLPH - NOTARY PUBLIC       │
│   County of          State of            │
│    Teton             Wyoming             │
│ My Commission Expires 2/2/2024           │
└─────────────────────────────────────────┘
```

　　　　　　　　　　　　　　　*Lynda Kaye Rudolph*
　　　　　　　　　　　　　　　Signature of notarial officer

　　　　　　　　　　　　　　　*Administrative Assistant*
　　　　　　　　　　　　　　　Title of notarial officer


My commission expires: __2/2/2024__

### SALIENT FACTS

1. **Physical Address:**            1045 Upper Cache Creek Dr
                                    Jackson, WY 83001

2. **Legal Description:**           Lot 9A, The Ridge
                                    Teton County, Wyoming

3. **PIDN:**                        22-41-16-34-4-02-018

4. **Property Type:**               Single-Family Residential

5. **Site Area:**                   0.75 acres

6. **Owner of Record:**             Caldwell, John & Schank, Joan

7. **Date of Value:**               August 25, 2023

8. **Inspection Date:**             August 25, 2023

9. **Signature Date:**              September 19, 2023

10. **Value:**                      Fair Market Value

11. **Estimated Value Opinion:**    $2,900,000

Exhibit 5

SUBJECT PROPERTY





**Teton Valley Appraisals**

PO Box 737 - Victor, ID 83455 - 208.399.9099

September 18, 2023

Austin Dunlap
Kearney, McWilliams & Davis, PLLC
PO Box 4803
Jackson, WY 83001

At your request, an Appraisal Report has been developed of the estimated fair market value of the home located at 1045 Upper Cache Creek Drive in Teton County, Wyoming, as of the effective date of August 25, 2023 for litigation purposes. Additional Intended Users of this report include Carol & Terry Garrett.

The research and analysis outlined in this report, resulted in an opinion of fair market value of the subject real estate, as of the effective date of the appraisal, August 25, 2023 of:

<u>Two Million Nine-Hundred Thousand Dollars</u>
($2,900,000)

The stated value opinion has been prepared in accordance with IRS Form 8283 for noncash charitable contributions, subject to the stated scope of work, purpose of the appraisal, reporting requirements of this report form, certain assumptions and limiting conditions, certifications and the definition of fair market value. The attached appraisal presents summary discussions of the data, reasoning, and analyses used in the appraisal process to develop the opinion of value.  Supporting documentation that is not provided with the report concerning the data, reasoning, and analyses is retained in the appraiser's work file.

If you should have any questions regarding the attached appraisal report, please contact our office at (208) 399-9099. Thank you and we appreciate the opportunity to provide you with our appraisal services.

Sincerely,

Gena Howald
Certified Residential Appraiser

**INTENDED USE AND INTENDED USER(S)**
The Intended Use of the appraisal is to develop a fair market value opinion of the real property located at 1045 Upper Cache Creek Drive in Jackson, Wyoming as of August 25, 2023 for litigation purposes. Additional Intended Users include Carol & Terry Garrett.

**SCOPE OF WORK**
An exhaustive volume of data is gathered and analyzed in order to derive at a supportable fair market value conclusion for the subject property. The appraiser has performed a complete visual evaluation of the property. The interior of the home is observed with the exception of attic and crawl space areas; as well as an observation of the subject exterior and yard and property boundaries, followed by reviewing the subject plat/survey map and the Teton County GIS. The subject property is measured. The measurements for the subject property comply with ANSI Standards Z765-2021. The gross living area is considered all square footage contained within the existing structure based on exterior measurements. In an effort to determine the extent of the improvements made to the home over the years and the amount of associated depreciation, I have interviewed the original builder of the subject property, Michael Melf.

The subject neighborhood is also observed in order to determine the characteristics and market appeal of the area in order to obtain the appropriate comparable sales and listing data. Comparable properties that are geographically, physically, functionally and economically similar to the subject property, reflecting current buyer and seller actions were researched and considered. If prior access to comparable properties was not obtained, an inspection of the comparable from at least the street was performed, and the listing agent, selling agent or both were contacted in order to confirm the sale and to discuss the property and any terms or concessions associated with the sale. Appropriate adjustments (if any) were applied to the sales to reflect market reactions/conditions as of the effective date of the appraisal. The appraiser relies on closed sales information to develop an opinion of current market value; however, in a declining market or a market that is not stable, active and pending sales information must also be considered as these properties portray current market activity, and indicate market trends.

All information, estimates and opinions furnished to the appraiser and contained in this report, are obtained from a variety of sources, which include the following: county records, Teton County Multiple List Service, real estate agents, colleagues, bankers, building contractors and property owners. These sources are considered reliable, and deemed to be true and correct.

There are 3 approaches to determining the market value of an improved property: 1) the Sales Comparison Approach 2) the Cost Approach and 3) the Income Approach. The Sales Comparison Approach is the most reliable methodology for determining market value in the current real estate climate. If any approach is not utilized, the reason for its exclusion is summarized in the corresponding addendum.

The appraiser is a member of the Teton MLS, which is the leading source of listed and sold properties throughout Teton County, Wyoming. The appraiser possesses the required geographic competency and extensive knowledge of the market, its varied housing segments and buyer profiles involving both the resort and non-resort properties throughout the Teton Valley market. Additionally, the appraiser has developed an extensive network of real estate professionals to include realtors, developers and builders to recognize evolving market trends and to accurately interpret and report buyer and seller behavior in the Jackson real estate market.

## HIGHEST AND BEST USE ANALYSIS

Highest and Best Use is generally defined as: The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.

- The use of the real estate existing as of the date of the value is single-family residential.
- The use of the real estate reflected in the appraisal is single-family residential.
- The subject property is located in a neighborhood that exhibits residential improvements only, which reflect extensive remaining economic life, surrounded by established residential housing and subdivisions, and void of any commercial or industrial development.
- The zoning establishes the highest and best use of the land for residential use. The land as though vacant, is most suitable for a residential property, based both on its size and location in the market.
- The highest and best use of the subject property is single-family residential.

## SUBJECT PROPERTY ANALYSIS

**Current Owner**
Caldwell, John & Schank, Joan

**3-Year Sales History/Current Listings**
Per Teton County Sheriff Deed #1063792, the subject transferred 07/20/2023 from Teton County Sheriff to Caldwell, John & Schank, Joan. A Certificate of Purchase of the subject property was documented on 03/22/2023 of the public sale of the subject property to the highest bidders John Caldwell and Joan Schank in the amount of $825,000.

**Legal Description**
Lot 9A, The Ridge

**Plat Map No.**
00562

**Year Built**
1987

**Parcel Identification No.**
22-41-16-34-4-02-018

**2022 Taxes**
$9,865.00

**Site Size**
0.75 acres

**Zoning**
NL-1

**Zoning Description**
General Intent: The intent of the Neighborhood Low Density-1 (NL-1) zone is to provide for places with enough open space and sufficient lot size to provide a predominance of landscape and yards over buildings. Buildings and development should be oriented to respect steep slopes, preserve open space, and provide for wildlife movement through the property. This zone is intended for Stable neighborhoods where increased residential density is not intended. Land Use: Single-family detached homes, accessory structures, and ARUs are the primary land uses.

### Description of the Land & Existing Site Improvements

#### • Site - Conditions or External Factors

The subject site size and characteristics are compatible with the neighborhood. The site has been through a lot split. It is irregular in shape and 0.75-acres in size. It is accessed via a shared asphalt driveway with the adjacent Lot 9B. An official easement was recorded 01/31/2020, per Easement Document #0990414. The subdivision is located on a hillside and the lot is sloping with mature, forested trees surrounding the property and a filtered view of the Teton Mountain Range to the north. The subject is connected to the City of Jackson water and sewer. There is no lawn or landscaping. The site exhibits adequate drainage. Seasonal variations may occur, and subsurface drainage conditions are unknown.

I have checked land records that are available through the Teton County Assessor's office online, for recorded adverse easements, encroachments, special assessments, environmental conditions, slide areas, etc. that may affect the value of the subject, and no adverse documents were associated with the subject. Unless otherwise noted, standard utility and right-of-way easements are insignificant to value.

The appraiser did not observe the presence of any hazardous material. The appraiser has no knowledge of the existence of such material(s) on or in the property. The appraiser, however, is not qualified to detect such substance(s).  The value estimate is predicated on the assumption that there are no adverse materials or environmental conditions associated with the property that the appraiser could not observe that would cause a loss in value.  No responsibility is assumed for such conditions, or for expertise or engineering knowledge required to discover them.

### SUBJECT PHOTOS



Kitchen



Dining Area



Living Room, Photo #1



Living Room, Photo #2



Primary Bedroom



Primary Bathroom



Hall ¾ Bathroom



Bedroom



Bedroom



Bathroom



Attic

Appellant's Appendix
Page 156 of 281



SKETCH PAGE ADDENDUM

Appellant's Appendix
Page 157 of 281

Appellate Case: 24-8013   Document: 010111048105   Date Filed: 05/13/2024   Page: 158



PLAT MAP ADDENDUM

Teton Valley Appraisals
1045 Upper Cache Creek Dr, Jackson, WY 83001
Appellant's Appendix
Page 158 of 281

AERIAL MAP ADDENDUM



**DESCRIPTION OF PROPERTY BEING APPRAISED**
The subject is a 2,490sf, 2-story home with a 783sf. built-in garage below a 330sf unfinished attic. The home was constructed in 1987 and features original finishes throughout to include: Oak hardwood floors in the living room, vaulted tongue and groove wood ceilings and walls, pellet stove, Linoleum kitchen flooring, original Oak cabinets and Formica countertops, tile hall floors, tiled showers, carpeted upstairs bedrooms, combination electric baseboard and Cadet wall heat units, wood casement windows, hollow core interior doors.

The home has been well maintained and features limited physical deprecation due to normal wear and tear. Major components associated with the home have yet to require replacement, and it appears any items of repair have been addressed in an ongoing basis. The estimated age of the home is less than its actual age.

The attic space over the garage, is not finished. (See attached photo) Therefore, it is not included in the GLA. (gross living area)

**DESCRIPTION OF IMPROVEMENTS – PROPERTY CONDITION**
The home has been very well maintained and features limited physical depreciation due to normal wear and tear. The estimated effective age is less than its actual age at approximately 18 years. The home requires staining and the front deck is in disrepair.

**DEPRECIATION**
Depreciation is a decrease or a loss in value due to any cause. The primary sources of depreciation include age, wear and tear, and/or market conditions. An appraiser determines the improvements actual age (the number of days or years that have lapsed since the completed construction of the improvement) and the effective age (the actual age minus the condition and utility of an improvement or building, which is based upon the appraiser's knowledge of market perceptions and judgement.) Effective age is relative to other properties that perform the same function.

An appraiser must also take into account:
- Curable Physical Deterioration (deferred maintenance items such as a hole in a door or cracked windows)
- Incurable Physical Depreciation (short-lived items, components that are expected to have a shorter remaining life than the actual structure, such as roof coverings, floor coverings, appliances, etc. Long-lived items are expected to have the same remaining useful life as the actual structure such as wall studs, foundation, insulation, etc.)
- Curable Functional Obsolescence is observed when a structure is deficient in something that is common throughout properties in a particular market area, or when a property possesses either a substandard item compared to other market properties or it may be defective and require an addition or modernization.
- Incurable Functional Obsolescence involves greater costs to replace an unacceptable or outdated component of the structure than the anticipated increase in value (a deficiency or superadequacy).

The subject property was originally constructed in 1987, possessing an actual age of approximately 36 years. I estimate the effective age of the home is approximately 18 years. I did not observe any signs of curable or incurable physical depreciation or any functional obsolescence.

## REPLACEMENT COST NEW-LESS-DEPRECIATION APPROACH TO VALUATION

|  | Units | Price | Cost |
|---|---|---|---|
| Montesano Builders | 2,490sf | $425/sf | $1,058,250 |
| Proctor Construction | 2,490sf | $450/sf | $1,120,500 |
| Average RCN |  |  | $1,089,375 |

Based on the lump sum depreciation rate of 18%, derived from Market Extraction and applying this rate to the average RCN ($1,089,375 x 18%-($196,088) = $893,288+$1,500,000 (Land Value) suggests a fair market value of the home of approximately $2,393,288.

### AGE-LIFE METHOD
This method estimates depreciation as a ratio between the effective age of an improvement and its total economic life, and is applied to the current cost of the improvements. Market research indicates the total economic life of properties similar to the subject can be up to 100+ years. Based upon my effective age estimate of approximately 18 years than depreciation would be as follows by dividing the estimated effective age by the estimated total economic life.

| RCN | $ 1,089,375 |
|---|---|
| Less Total Depreciation (18/65=27%) | $ -267,300 |
| **Depreciated Cost** | $ 822,075 |
| Depreciated Site Improvements | $ +10,000 |
| Land Value | $ +1,500,000 |
| **Indicated Value of Depreciated Improvement by Age-Life Method** | $ 2,332,075 |

### LAND VALUE COMMENTS
The following sales have been considered in developing an estimated value of the subject land. Per MLS 21-3068, sold 10/05/2021 (no market changes) located just below the subject property with the same NL-1 zoning, sold a 1.41-acre parcel with comparable views and mature trees for $2,495,000 or $40.62/sf to suggest a market value for the subject land of approximately $1,327,000.

Per MLS 21-3069, a 1.00-acre lot immediately north of the subject in the subject neighborhood, elevated and with Teton views, sold 09/30/2021 for an estimated $2,155,000. The sale price was not disclosed in the MLS, and the price is anecdotal. The lot was listed for sale 41 days at $2,395,000. The sale suggests a $/sf price of $49/sf to suggest a market value for the subject land of approximately $1,600,000.

Additionally considered in the land value analysis is the more recent sale of MLS 22-1792 on 08/26/2022 for $1,425,000. This 0.18-acre lot features similar zoning and build-out with Teton views. The sale price indicates a value floor for the subject vacant land.

As of the effective date of the appraisal, averaging the above sales on Upper Cache Creek Drive, the subject has a current land value of approximately $1,465,000. The land value opinion is rounded to $1.5M as not to indicate a higher degree of accuracy than should be associated with developing an estimated value opinion.

Appellant's Appendix
Page 161 of 281

## SALES COMPARISON APPROACH

| | Subject | Comp Sale #1 | | Comp Sale #2 | | Comp Listing #3 | |
|---|---|---|---|---|---|---|---|
| Address | 1045 Upper Cache Creek Jackson, WY | 730 Snow King Jackson, WY | | 510 Cache Creek Dr Jackson, WY | | 430 Henley Rd Jackson, WY | |
| Sale Price | | $2,750,000 | | $4,066,380 | | 3,495,000 | |
| Sales or Financing Concessions | | None | | None | | Active Listing | |
| Date of Sale | | 08/01/2023 | | 10/20/2022 | | Active Listing | |
| Location | Cache Creek | Snow King | | Cache Creek | | East Jackson | |
| Site | 32,670 sf | 10,890 sf | 0 | 26,136 sf | 0 | 6098 sf | 0 |
| View | Teton | Teton | | SUP Zone | -$500,000 | Teton | |
| Quality of Construction | Good | Good | | Superior | -$418,200 | Good | |
| Actual Age | 36 | 38 | | 56 | | 26 | |
| Condition | Good | Superior | -$200,000 | Good | | Upgrades | -$150,000 |
| Gross Living Area | 2,490sf | 1,449 sf | +$364,350 | 2,788sf | -$81,950 | 2,333sf | 0 |
| Rooms/Bed/Bath | 5  3  3 | 5  3  2 | | 8  2  1.1 | | 6  4  3.1 | |
| Basement GLA | 0sf | 0sf | | 1,130sf | -$310,750 | 1,553sf | -$232,950 |
| Bed/Bath | 0  0 | 0 | 0 | 2  2 | | 0  0 | |
| Garage | 3-Car Garage | None | +$25,000 | 2-Car Garage | | 2-Car Garage | |
| Adjusted Sale Price of Comps | | | $2,939,350 | | $2,755,480 | | $3,112,050 |

Comparables are obtained through the Teton County MLS service, supplemented by a search of county transfer records. An extensive search is conducted in order to obtain closed sales that are most comparable to the subject property.  Data collection parameters for acquiring a pool of properties that can be narrowed down to more accurately reflect a value for the subject include: construction type, gross living area, quality, condition, age of the improvement and its location in the subject market area. The selected comparables were carefully evaluated, considering the aforementioned similarities, and represent the best available sales in the current market to result in a value opinion for the subject property. Condition adjustments are percentage adjustments based on realtor interviews, inspections and appraiser opinion.

Quality of construction adjustments in the Jackson real estate market are difficult to quantify due to the unique, custom nature of the housing market, varying degree of amenities and upgrades in competition with location in the market and views. The range can vary between $250-$400/sf for additional square footage in the subject price point. The appraiser makes every attempt to obtain sales with similar quality ratings. Quality adjustments are made based on the difference in value per square foot, based on extracting the improvement value from the sale price after site, garage and basement values and considering depreciation, if any.

Excessive Amenity Adjustments

- Age adjustments are derived from paired sales in sub-markets due to the severe lack of sales; thus paired sales data.
- Typically, no adjustment for 10 years +/- age differences
- No adjustments are made for the difference in the number of total rooms, bedrooms or bathrooms because the data is not adequate to support a responsible adjustment, and rather GLA adjustments are made instead. A custom housing market with a broad range of property types, purchasing decisions are centered primarily on square footage and location, and amenity types and amounts can vary greatly, having less effect on buyer purchasing decisions.
- No adjustments are made for the difference garage bays or size because the data is not adequate to support a responsible adjustment.

- No adjustments are made based on differences in kitchen appliances, heating/cooling, fireplace/woodstove amenity, or deck amenity. All comparables are evaluated to be relatively similar in these items. This overall similarity between the comparables and the subject did not support any data based adjustments.
- No adjustment is made for a square footage difference of +/- 200sf due to the inaccuracies of the reporting sources, and most MLS reports include the square footage of multiple staircases.

RECONCILIATION OF SALES COMPARISON APPROACH

Comp #1 is the most recent sale to occur in the neighborhood real estate market. It is located in the adjacent Snow King Estates. The site is smaller, but features identical utility and a Teton view. The home is comparable in age but has received upgrades throughout to include a remodeled kitchen and bathrooms. However, it features much less GLA and is adjusted at a higher $/sf, and no garage. It is my opinion the subject would sell for more than comp #1.

Comp #2 is included because the home is older, but in excellent condition and brackets the age of the subject and is equally dated. However, the overall construction of this home is superior to the subject regardless of age or datedness. Additionally, the land is superior as it offers greater build-out opportunity.

Comp #3 is currently listed for sale. It features a smaller site with a Teton view, and requires no site adjustment. The home is identical with regard to age and quality, but has received updates; thus the superior condition adjustment.

I have given full consideration to comp sale #1, which is the most recent sale, located in a similar setting among mature forest with Teton views in East Jackson. Based on the Sales Comparison Approach to value, as of the effective date of the appraisal, the subject has a current market value of approximately $2,900,000, based on a 4-6 month exposure time.

Marketing & Exposure Time

Critical to determining market values, is the level of exposure that any given property receives to the open market prior to the sale of the property. In a stable market, an average marketing time is 4-6 months.

Exposure Time

Exposure time is the amount of time a property would be offered for sale, prior to its sale on the date of value. Exposure time refers to the past.

Marketing Time

Marketing time is similar yet instead of being retrospective; it is prospective in that it is the amount of time necessary to market the property starting today to sell it at some future date.

This is the average number of days a property is typically offered for sale and offers a sufficient amount of time to gain the attention of prospective buyers in the market place. Complex or unique properties, which often attract fewer buyers, will often witness longer marketing times. Properties that may be listed too high to attract buyer, based on the real estate climate as of the effective date of an appraisal, may also witness much higher marketing times. Real estate that is priced too low will exhibit faster marketing times, attracting a plethora of buyers.

RECONCILIATION OF VALUE

Typically, in appraising residential properties, there are 3 approaches to value: 1) Sales Comparison Approach 2) Cost Approach and 3) Income Approach.

*Teton Valley Appraisals*                    *1045 Upper Cache Creek Dr, Jackson, WY 83001*

Appellant's Appendix
Page 163 of 281

The Income Approach relates to the development of the gross rent multiplier (GRM) which is the sales price divided by the gross monthly rent.  The GRM is mostly used in the evaluation of commercial properties and apartment buildings.  It assumes that the value of a property is related to the income it will produce.  Due to the limited quantity of sales and a lack of available data to establish a reliable GRM, the Income Approach to value is not reliable and is not developed.

The Cost Approach is based on the understanding that market participants relate value to cost. However, costs are related to value only in that they establish a value ceiling, since a prudent Buyer would not typically pay more for a property than the cost of producing an equivalent improvement. This approach is particularly useful when valuing new or nearly new improvements since the value of a property may be equal to its costs if the improvement represents the highest and best use of the land. The Cost Approach establishes a minimum value for the subject property, but is less relevant given the age of the home and is not given consideration in the final determination of value.

The Sales Comparison Approach is the most reliable methodology in this market for developing an estimated opinion of value and is given full consideration.

FINAL VALUE OPINION
As of the effective date of the appraisal, August 25, 2023, the subject has a fair market value of approximately $2,900,000.

ASSUMPTIONS AND LIMITING CONDITIONS
The following assumptions and limiting conditions, are made with regard to the stated value opinion:
-The appraiser is not a home inspector and the visual inspection of the home is not technically exhaustive. However, upon inspection I did not observe any health or safety violations associated with either the interior or exterior of the home or any functional defects or obsolescence.
-This appraisal assumes all structural, plumbing and electrical components being transferred with the home, are in proper working order.
- The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice, and any applicable federal, state or local laws.
- If this appraisal is indicated as subject to satisfactory completion, repairs, or alterations, the appraiser has based his or her appraisal report and valuation conclusion on the assumption that completion of the improvements will be performed in a workmanlike manner.
- An appraiser's client is the party (or parties) who engage an appraiser in a specific assignment. Any other party acquiring this report from the client does not become a party to the appraiser-client relationship. Any persons receiving this appraisal report because of disclosure requirements applicable to the appraiser's client do not become intended users of this report unless specifically identified by the client at the time of the assignment. -The appraiser's written consent and approval must be obtained before this appraisal report can be conveyed by anyone to the public, through advertising, public relations, news, sales, or by means of any other media, or by its inclusion in a private or public database.
-If the appraiser is required to appear in court, the Client will pay all associated travel and stay fees. The court appearance rate is $200/hr.

CERTIFICATIONS
I certify that, to the best of my knowledge and belief:
- The statements of fact contained in this report are true and correct.
- The credibility of this report, for the stated use by the stated user(s), of the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

18 | P a g e

Teton Valley Appraisals                1045 Upper Cache Creek Dr, Jackson, WY 83001

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- I did not base, either partially or completely, my analysis and/or the opinion of value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property, or of the present owners or occupants of the properties in the vicinity of the subject property.
- I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant appraisal assistance to the person(s) signing this certification.

## DEFINITION OF FAIR MARKET VALUE

The most probable price, as of a specified date, in cash, or in terms equivalent to cash or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably and for self-interest, and assuming that neither is under undue duress.

## APPRAISER CERTIFICATION

**I certify that to the best of my knowledge:**

1) The statements of fact contained in this report are true and correct.
2) The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, unbiased and professional analyses, opinions and conclusions.
3) I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved with this assignment.
4) My engagement in this assignment is not contingent upon developing or reporting predetermined results.
5) My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client; the amount of value estimate; the attainment of a stipulated result, or the occurrence of a subsequent event.
6) My analyses, opinions and conclusions are developed, and this report is prepared in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.
7) No supplemental professional assistance is provided to the signer of this report.
8) I personally inspected the property, which is the subject of this report.

*Gena I Howald*

**Appraiser Signature**

Gena I. Howald
**Appraiser Name**

Date: September 19, 2023

**Current State of the Real Estate Market, January 2023: SINGLE-FAMILY RESIDENTIAL MARKET**
Year 2022 witnessed a stable market, following the steady rise in interest rates with fewer Buyers entering the real estate market combined with a sharp decline in inventory. This resulted in a decrease of nearly 50% fewer transactions over 2021. Despite slowing sales activity, listings witnessed minimal price reductions and the average and median sale prices remain stable.

6-Month Year-Over Comparison
The following chart offers the most recent snapshot of current market activity, based on 6-months year-over activity between 2021 and present. The number of sales has continued to decline down 50%, combined with the total sales volume decrease of 34% over last year. However, both the average and median sale prices reveal slight 3%-5% increases.

Non-Disclosure State
Wyoming is considered a non-disclosure state and sale prices are not made public. Real estate professionals rely on sales to be reported by listing/selling parties within the local MLS. In the last 6 months, 9 luxury home properties sold at an undisclosed price, and were listed between $4.8M and $48M for a total listed inventory volume of $158,000,000.
When considering the average list to sale price ratio, an error margin of approximately 4-5% should be taken into consideration in the chart below.

### 6-Month Year-Over-Comparison: Teton County, WY, Single-Family Housing Market
Jan.01, 2023 - July 01, 2023

| Property Type/Area | Units | Volume | Average Sale Price | Median Sale Price | Avg. ADOM |
|---|---|---|---|---|---|
| 01 - Teton Village | 1 | $6,050,000 | $6,050,000 | $6,050,000 | 267 |
| 02 - Racquet Club/Teton Pines | 1 | $6,250,000 | $6,250,000 | $6,250,000 | 324 |
| 03 - W Snake N of Wilson | 1 | $1,017,500 | $1,017,500 | $1,017,500 | 140 |
| 04 - W Snake S of Wilson | 11 | $32,242,500 | $4,030,312 | $5,000,000 | 160 |
| 05 - Skyline Ranch to Sagebrush Dr | 5 | $11,100,000 | $5,550,000 | $0 | 222 |
| 06 - East Gros Ventre Butte | 0 | $0 | $0 | $0 | NA |
| 07 - N of Gros Ventre Jct | 5 | $18,044,750 | $3,608,950 | $3,844,750 | 87 |
| 08 - Town of Jackson | 11 | $40,446,842 | $3,676,986 | $2,750,000 | 183 |
| 09 - South of Jackson to Snake River Bridge | 17 | $44,175,250 | $3,155,375 | $3,200,000 | 146 |
| 10 - South of Snake River Bridge to County Line | 4 | $11,171,163 | $2,792,791 | $2,550,000 | 167 |
| **TOTAL** | 56 | $170,498,005 | $3,613,191 | $3,000,000 | 188 |

**Jan.01, 2022 - July 01, 2022**

| Property Type/Area | Units | Volume | Average Sale Price | Median Sale Price | Avg. ADOM |
|---|---|---|---|---|---|
| 01 - Teton Village | 1 | $6,850,000 | $6,850,000 | $6,850,000 | 111 |
| 02 - Racquet Club/Teton Pines | 0 | $0 | $0 | $0 | NA |
| 03 - W Snake N of Wilson | 5 | $18,407,000 | $3,681,400 | $2,730,000 | 102 |
| 04 - W Snake S of Wilson | 7 | $30,138,875 | $6,027,775 | $5,575,000 | 186 |
| 05 - Skyline Ranch to Sagebrush Dr | 11 | $66,888,525 | $6,688,652 | $5,350,000 | 151 |
| 06 - East Gros Ventre Butte | 0 | $0 | $0 | $0 | NA |
| 07 - N of Gros Ventre Jct | 6 | $12,125,000 | $3,031,250 | $3,875,000 | 159 |
| 08 - Town of Jackson | 22 | $68,038,300 | $3,401,915 | $2,830,000 | 96 |
| 09 - South of Jackson to Snake River Bridge | 8 | $20,425,000 | $2,553,125 | $2,322,500 | 70 |
| 10 - South of Snake River Bridge to County Line | 10 | $28,126,000 | $2,812,600 | $2,300,000 | 164 |
| TOTAL | 70 | $250,998,700 | $3,504,692 | $2,800,000 | 130 |

**Jan.01, 2021 - July 01, 2021**

| Property Type/Area | Units | Volume | Average Sale Price | Median Sale Price | Avg. ADOM |
|---|---|---|---|---|---|
| 01 - Teton Village | 6 | $38,950,000 | $12,983,333 | $7,700,000 | 108 |
| 02 - Racquet Club/Teton Pines | 4 | $11,575,000 | $3,858,333 | $3,987,500 | 70 |
| 03 - W Snake N of Wilson | 10 | $27,941,000 | $2,794,100 | $2,045,000 | 84 |
| 04 - W Snake S of Wilson | 5 | $8,385,000 | $2,096,250 | $2,375,000 | 169 |
| 05 - Skyline Ranch to Sagebrush Dr | 7 | $26,675,222 | $5,335,044 | $6,975,000 | 127 |
| 06 - East Gros Ventre Butte | 2 | $19,875,000 | $9,937,500 | $9,937,500 | 127 |
| 07 - N of Gros Ventre Jct | 25 | $99,595,000 | $4,330,217 | $3,995,000 | 228 |
| 08 - Town of Jackson | 26 | $43,760,500 | $2,083,833 | $1,869,000 | 122 |
| 09 - South of Jackson to Snake River Bridge | 20 | $53,976,000 | $2,998,667 | $2,447,500 | 69 |
| 10 - South of Snake River Bridge to County Line | 8 | $27,725,000 | $3,465,625 | $3,597,500 | 155 |
| TOTAL | 113 | $358,457,722 | $4,988,290 | $3,800,000 | 126 |

Teton Valley Appraisals     1045 Upper Cache Creek Dr, Jackson, WY 83001

### 2022 Single-Family Home Sales

The following chart reveals a decrease in the number of sales and total sales volume in single-family home sales. Compared to 2021, as interest rates began to rise in the 2nd quarter 2022, there brought a period of "wait and see" Buyers. The market witnessed a 43% drop in the number of sales, combined with a decrease in sold volume of 34%. However, despite economic concerns, the demand for housing persisted and the median price point has continued to rise, up from 2021 approximately 11% from $2.8M to $3.0M.





*(Data Source: Teton Board of Realtors MLS: June 2023)*

*Teton Valley Appraisals*    1045 Upper Cache Creek Dr, Jackson, WY 83001

## Condominium/Townhome Market Sales
*(Last Updated July 2023)*

Similar to the housing market, the condo/townhome market witnessed fewer sales, a significant decrease in sold volume yet the median price point had increased. This is likely due to new construction, high-end inventory that came onto the market, and sold at a higher price point.



*Teton Valley Appraisals*          *1045 Upper Cache Creek Dr, Jackson, WY 83001*



# of Sales

*(Data Source: Teton Board of Realtors MLS)*

### LUXURY HOUSING MARKET
Finally, the luxury housing market has surged significantly upward since the Covid-19 Pandemic began, and city buyers migrated to the area in search of more rural, mountainous, recreational communities. Luxury homes are defined as properties valued at over $3.0M. This market currently represents 80% of market sales. The luxury home market doubled in 2021.

### Housing Supply
The lack of supply for single-family housing is at a record low, and with continued demand, is placing significant upward pressure on prices with an overall 40% increase in the median list price over last year. Inventory is down by nearly 50%.

### Current Workforce Housing Situation
The number of local working-class Buyers continues to decline as inventory in their price range becomes nonexistent, spurred by the migration of a new market participant, referred to by the Jackson Hole Real Estate Report as the "Zoom Town Telecommuters", second home Buyers and early retirees continues to increase. The median price point for a single-family home in the town of Jackson is $3.0M and severe rent hikes, has resulted in a housing crisis for the critical infrastructure workforce with no long-term solutions on the horizon.

### REO/Short Sales
There are no distressed sales occurring in the Jackson Hole Real Estate market. At the collapse of the housing market, which was not realized by the Jackson real estate market until the end of 3rd quarter 2008, the condominium market took the largest hit, experiencing a 60-75% decline in property values. At the height of the market, the median SFR sales price was just over $1M, the condo/townhome market offered a price point at which buyers could afford to get into the housing market; thus, these property types were experiencing significantly high appreciation rates and witnessed a greater decline in property values during the housing collapse.

## APPRAISER CERTIFICATION

### WYOMING REAL ESTATE
COMMISSION & CERTIFIED APPRAISER BOARD

License Number 882                                    NON TRANSFERABLE

## CERTIFIED REAL ESTATE APPRAISER PERMIT

Issued : 04/11/2022
Expires: 04/10/2024

**Gena J. Howald**
Certified Residential Appraiser Permit
AS PROVIDED FOR BY THE LAWS OF WYOMING.

Gena Howald, Appraiser                  AUTHORIZED BY THE WYOMING CERTIFIED
5320 Fox Creek Dr                       REAL ESTATE APPRAISER BOARD
Victor ID 83455                         WITNESS MY HAND AND THE
                                        OFFICIAL SEAL AT CHEYENNE, WYOMING.

                                        Rebecca J Zieb
                                        Rebecca J. Zieb, Executive Director





25 | P a g e

File Number: NTT-126981

**Rock Springs/Green River Offices:**
2620 Commercial Way, Suite 101
Rock Springs, WY 82901
26 North 1st East
Green River, WY 82935
307-362-0022/307-875-4422
Fax: 307-362-8833

**Evanston Office:**
848 Front Street
Evanston, WY 82930
307-789-8850
Fax: 307-789-2017

**Jackson Office:**
25 South Gros Ventre Street
PO Box 4242
Jackson, WY 83001
307-739-3944
Fax: 307-886-2626

NORTHERN **TITLE**

*"Good Deeds Done Daily!"*

**Thayne Office:**
501 North Main, Suite 1
Thayne, WY 83127
307-883-1400
Fax: 307-883-1402

**Afton Office:**
350 South Washington,
Suite 1
Afton, WY 83110
307-885-1400
Fax: 307-885-1402

**Pinedale Office:**
240 East Pine Street,
Suite A
Pinedale, WY 82941
307-367-3740
Fax: 307-367-3742

## COMMITMENT FOR TITLE INSURANCE

**Old Republic National Title Insurance Company**, a Minnesota corporation ("Company"), for a valuable consideration, commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the Proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest in the land described or referred to in Schedule A, upon payment of the premiums and charges and compliance with the Requirements; all subject to the provisions of Schedules A and B and to the Conditions of this Commitment. This Commitment shall be effective only when the identity of the Proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A by the Company.

All liability and obligation under this Commitment shall cease and terminate six (6) months after the Effective Date or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue the policy or policies is not the fault of the Company.

The Company will provide a sample of the policy form upon request.

| BUYER/BORROWER: | SELLER/OWNER: |
|---|---|
| Terry Lee Garrett<br>Carol W. Garrett | |
| **SELLING AGENT:** | **LISTING AGENT:** |
| **LENDER:** | **BROKER:** |

Exhibit 6

# ALTA COMMITMENT FOR TITLE INSURANCE



Issued by OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

## NOTICE

**IMPORTANT—READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

## COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I—Requirements; Schedule B, Part II—Exceptions; and the Commitment Conditions, Old Republic National Title Insurance Company, (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured.

If all of the Schedule B, Part I—Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

NTT-126981

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
*A Stock Company*
*1408 North Westshore Blvd., Suite 900, Tampa, Florida 33607*
*(612) 371-1111*                           *www.oldrepublictitle.com*

By *C Monroe*                              President

Attest *David Wold*                        Secretary

_____
Authorized Officer or Agent

*This page is only a part of a 2021 ALTA Commitment for Title Insurance  Issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

ORT Form 4757 DA
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021

## COMMITMENT CONDITIONS

1.  DEFINITIONS

    a.  "Discriminatory Covenant": Any covenant, condition, restriction, or limitation that is unenforceable under applicable law because it illegally discriminates against a class of individuals based on personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or other legally protected class.

    b.  "Knowledge" or "Known": Actual knowledge or actual notice, but not constructive notice imparted by the Public Records.

    c.  "Land": The land described in Item 5 of Schedule A and improvements located on that land that by State law constitute real property. The term "Land" does not include any property beyond that described in Schedule A, nor any right, title, interest, estate, or easement in any abutting street, road, avenue, alley, lane, right-of-way, body of water, or waterway, but does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

    d.  "Mortgage": A mortgage, deed of trust, trust deed, security deed, or other real property security instrument, including one evidenced by electronic means authorized by law.

    e.  "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

    f.  "Proposed Amount of Insurance": Each dollar amount specified in Schedule A as the Proposed Amount of Insurance of each Policy to be issued pursuant to this Commitment.

    g.  "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

    h.  "Public Records": The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.

    i.  "State": The state or commonwealth of the United States within whose exterior boundaries the Land is located. The term "State" also includes the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and Guam.

    j.  "Title": The estate or interest in the Land identified in Item 3 of Schedule A.

2.  If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3.  The Company's liability and obligation is limited by and this Commitment is not valid without:

    a.  the Notice;

    b.  the Commitment to Issue Policy;

    c.  the Commitment Conditions;

    d.  Schedule A;

    e.  Schedule B, Part I—Requirements;[ and]

    f.  Schedule B, Part II—Exceptions[; and

    g.  a counter-signature by the Company or its issuing agent that may be in electronic form].

4.  COMPANY'S RIGHT TO AMEND

    The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company is not liable for any other amendment to this Commitment.

---

*This page is only a part of a 2021 ALTA Commitment for Title Insurance  issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

ORT Form 4757 DA
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021

5.   LIMITATIONS OF LIABILITY

    a.  The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

        i.  comply with the Schedule B, Part I—Requirements;

        ii.  eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or

        iii.  acquire the Title or create the Mortgage covered by this Commitment.

    b.  The Company is not liable under Commitment Condition 5.a. if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

    c.  The Company is only liable under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

    d.  The Company's liability does not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Condition 5.a. or the Proposed Amount of Insurance.

    e.  The Company is not liable for the content of the Transaction Identification Data, if any.

    f.  The Company is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.

    g.  The Company's liability is further limited by the terms and provisions of the Policy to be issued to the Proposed Insured.

6.   LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT; CHOICE OF LAW AND CHOICE OF FORUM

    a.  Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

    b.  Any claim must be based in contract under the State law of the State where the Land is located and is restricted to the terms and provisions of this Commitment. Any litigation or other proceeding brought by the Proposed Insured against the Company must be filed only in a State or federal court having jurisdiction.

    c.  This Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

    d.  The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

    e.  Any amendment or endorsement to this Commitment must be in writing[ and authenticated by a person authorized by the Company].

    f.  When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7.   IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT

The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for closing, settlement, escrow, or any other purpose.

8.   PRO-FORMA POLICY

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9.   CLAIMS PROCEDURES

This Commitment incorporates by reference all Conditions for making a claim in the Policy to be issued to the Proposed Insured. Commitment Condition 9 does not modify the limitations of liability in Commitment Conditions 5 and 6.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance  issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

ORT Form 4757 DA
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021

10. CLASS ACTION

ALL CLAIMS AND DISPUTES ARISING OUT OF OR RELATING TO THIS COMMITMENT, INCLUDING ANY SERVICE OR OTHER MATTER IN CONNECTION WITH ISSUING THIS COMMITMENT, ANY BREACH OF A COMMITMENT PROVISION, OR ANY OTHER CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTION GIVING RISE TO THIS COMMITMENT, MUST BE BROUGHT IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY CLASS OR REPRESENTATIVE PROCEEDING. ANY POLICY ISSUED PURSUANT TO THIS COMMITMENT WILL CONTAIN A CLASS ACTION CONDITION.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

ORT Form 4757 DA
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021

ALTA COMMITMENT FOR TITLE INSURANCE (07-01-2021)

**Closing/Escrow inquiries to:**

**25 South Gros Ventre Street, PO Box 4242
Jackson, Wyoming  83001**

**Title inquiries to:
Susan Pearce
(435) 752-3600 x107
susanp@northerntitle.net**

# SCHEDULE A

Order No.  NTT-126981

1. Effective Date: September 18, 2023 9:00AM

2. Policy or policies to be issued:

    A. 2021 ALTA Owner's                      Standard Coverage

        Proposed Insured:  **Terry Lee Garrett and Carol W. Garrett**

        **Amount:
        Premium:  $0.00**

    B. 2021 ALTA Loan                       Extended Coverage

        Proposed Insured:

        **Amount:
        Premium:  $0.00**

    C. Endorsements:

                Endorsement Fee **Included** in Premium:

3. The estate or interest in the land described in the Commitment and covered herein is:

     FEE SIMPLE

4. Title to the estate or interest referred to herein is at the effective date hereof vested in:

     **John Caldwell and Joan Schank**

5. The land referred to in this Commitment is in the State of WY, County of **Teton** and is described as follows:

     See Attached Exhibit "A"

PROPERTY ADDRESS:     **1045 Upper Cache Creek Drive, Jackson, WY 83001**

NTT-126981

# EXHIBIT "A"

A PORTION OF LOT 9 OF THE RIDGE ADDITION TO THE TOWN OF JACKSON, TETON COUNTY, WYOMING, ACCORDING TO THAT PLAT RECORDED IN THE OFFICE OF THE TETON COUNTY CLERK ON FEBRUARY 16, 1984 AS PLAT NO. 562, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SAID LOT 9; THENCE N00°12'14"W, 149.91 FEET TO A POINT; THENCE N51°13'19"W, 84.46 FEET TO A POINT; THENCE N66°53'11"W, 73.0 FEET TO A POINT; THENCE S41°21'23"W, 173.01 FEET TO A POINT; THENCE S67°42'35"E, 267.84 FEET TO THE POINT OF BEGINNING.

(22-41-16-34-4-02-018)

NTT-126981

## SCHEDULE B - SECTION 1

### REQUIREMENTS

All of the following Requirements must be met:

1.   The proposed insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the land.  The Company may then make additional Requirements or Exceptions.

2.   Pay the agreed amount for the estate or interest to be insured.

3.   Pay the premiums, fees, and charges for the Policy to the Company.

4.   Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered and recorded in the Public Records.

In addition to the foregoing, the following requirements must be complied with, to-wit:

NTT-126981

# SCHEDULE B - PART II

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company.

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This Commitment and the Policy treat any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document will be excepted from coverage.**

The policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. Any defect, lien, encumbrance, adverse claim or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I- Requirements are met.

2. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by public record.*

3. Any facts, rights, interest, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.*

4. Easements, liens, or encumbrances, or claims thereof, which are not shown by the public records.*

5. Discrepancies, conflicts in boundary lines, shortages in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the Public Records.

6. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.*

7. Any liens, or rights to a lien, for services, labor, equipment or material heretofore or hereafter furnished, imposed by law and not shown by public records.*

8. Rights of the state or federal government and/or public in and to any portion of the Land for right of way (whether or not such rights are shown by recordings of easements and/or maps in the Public Records by the State of Wyoming showing the general location of these rights of way).

9. Minerals of whatsoever kind, subsurface and surface substance, including but not limited to coal, lignite, oil, gas, uranium, clay, rock, sand and gravel in, on, under and that may be produced from the Land, together with all rights, privileges, and immunities relating thereto, whether or not appearing in the Public Records or listed in Schedule B. Stewart makes no representation as to the present ownership of any such interests. There may be leases, grants, exceptions or reservations of interests that are not listed.

10. Any water or well rights, or rights or title to water or claims thereof, in, on or under the land.

*Paragraphs 1 through 10 will not appear as printed exceptions on extended coverage policies, except as to such parts thereof which may be typed as a Special Exception in Schedule B-Section II.

(See Special exceptions beginning on the next page.)

NTT-126981

# SCHEDULE B – SECTION II

SPECIAL EXCEPTIONS:

1. Taxes for the year 2023 have been assessed in the amount of $11,470.72. Taxes for the first half of 2023 are due and payable in the amount of $5,735.36 but will not become delinquent until November 10, 2023. Taxes for the second half of 2023 will become due and payable in the amount of $5,735.36 on March 1, 2024 but will not become delinquent until May 10, 2024. Taxes for the year 2022 have been paid in full.  Tax Serial No. OJ-002471

2. Said property may be included within the taxing assessment district of 0150, TOWN OF JACKSON, TETON COUNTY, WYOMING and may be subject to the charges and assessments thereof. (Charges are current according to the information available from the county records.)

3. Minerals of whatsoever kind, subsurface and surface substances, including but not limited to coal, lignite, oil, gas, uranium, clay, rock, sand and gravel in, on, under and that may be produced from the Land, together with all rights, privileges, and immunities relating thereto, whether or not appearing in the Public Records or listed in Schedule B. The Company makes no representation as to the present ownership of any such interests. There may be leases, grants, exceptions or reservations of interests that are not listed.

4. (a)   Unpatented mining claims: (b) Reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) or shown by the public records.

5. Subject to all existing roads, streets, alleys, fences, ditches, reservoirs, utilities, canals, pipelines, power, telephone, cable, fiber optic, sewer, gas, or water lines, and right of way and easements thereof.

6. Easements/Right of Ways, Covenants & Restrictions, Reservations, Warnings, Roadways, Building Setback Lines, Notes, Common Area(s) etc. as delineated and/or dedicated on the recorded plat(s).

7. Access to subject property is via a private road as disclosed by recorded subdivision plat.
Any unpaid charges or assessments for the maintenance of the private road which services the property described herein.

8. Any fees, assessments, transfer fees, reinvestment fees, dues and other amounts that may be or become due to the homeowners association.

9. All matters, not limited to easements and right of ways as set out on Lot Division recorded in Teton Recorder's office on April 26, 1983, under instrument number 243547.

10. Terms and Conditions of that certain Easement Dated September 6, 1980, recorded December 18, 1980, Entry Number 219528, in Book 106, at Page 747 in the Office of the Recorder of Teton County, Wyoming.

11. All matters, not limited to easements and right of ways as set out on Plat recorded in Teton Recorder's office on August 25, 1986, under instrument number 267403.

12. Covenants, conditions, and restrictions in the declaration of restrictions but omitting any covenants or restrictions, if any, including, but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.
Book/Page:          158/448

13. Terms and Conditions of that certain Roadway and Utility Easement Dated August 21, 1986, recorded August 26, 1986, Entry Number 267440, in Book 180, at Page 577 in the Office of the Recorder of Teton County, Wyoming.

(continued)

NTT-126981

14. UTILITY EASEMENT
| | |
|---|---|
| Grantor: | Cache Creek Associates, a Wyoming Partnership |
| Grantee: | Terry Lee Garrett and Carol w. Garrett, husband and wife |
| Dated: | August 21, 1986 |
| Recorded: | August 26, 1986 |
| Entry No.: | 267442 |
| Book/Page: | 180/587 |

15. Terms and Conditions of that certain Roadway and Utility Easement Dated November 20, 1987, recorded November 23, 1987, Entry Number 276361, in Book 195, at Page 646 in the Office of the Recorder of Teton County, Wyoming.

16. Terms and Conditions of that certain Roadway and Utility Easement Dated October 27, 1987, recorded November 23, 1987, Entry Number 276362, in Book 195, at Page 653 in the Office of the Recorder of Teton County, Wyoming.

17. SEWER LINE EASEMENT
| | |
|---|---|
| Grantor: | Cache Creek Associates, a Wyoming Partnership |
| Grantee: | Terry Lee Garrett and Carol w. Garrett, husband and wife |
| Dated: | April 27, 1988 |
| Recorded: | April 27, 1988 |
| Entry No.: | 278705 |
| Book/Page: | 199/523 |

18. An Easement for the purpose shown below and right incidental thereto as set forth in a document
| | |
|---|---|
| Granted To: | Lower Valley Power and Light Company |
| Purpose: | Public Utilities Easement |
| Dated: | August 4, 1987 |
| Recorded: | March 29, 1989 |
| Entry No.: | 286285 |
| Book/Page: | 209/490 |

19. Terms and Conditions of that certain Agreement for Relocation of Easement and Covenant Effecting Land Dated July 31, 1995, recorded August 1, 1995, Entry Number 400875, in Book 308, at Page 113 in the Office of the Recorder of Teton County, Wyoming.

20. MORTGAGE
| | |
|---|---|
| Mortgagor: | Terry Lee Garrett and Carol W. Garrett, husband and wife, as tenants by the entireties |
| Mortgagee: | First Union National Bank |
| Amount: | $200,000.00 |
| Dated: | February 2, 2021 |
| Recorded: | February 2, 2021 |
| Entry No.: | 536564 |
| Book/Page: | 417/180 |

ASSIGNMENT OF MORTGAGE
| | |
|---|---|
| Assignor: | Wachovia Bank of Delaware, NA F?K?A First Union National Bank of Delaware |
| Assignee: | Wells Fargo Bank, N.A. |
| Dated: | December 6, 2009 |
| Recorded: | December 21, 2009 |
| Entry No.: | 765202 |
| Book/Page: | 746/919 |

RELEASE OF REAL ESTATE MORTGAGE
| | |
|---|---|
| Dated: | July 18, 2023 |
| Recorded: | July 18, 2023 |
| Entry No.: | 1063565 |

(continued)

NTT-126981

21. MORTGAGE
| | |
|---|---|
| Mortgagor: | Terry Lee Garrett and Carol W. Garrett, husband and wife, as tenants by the entirety |
| Mortgagee: | First Union National Bank of Delaware |
| Amount: | $100,000.00 |
| Dated: | March 29, 2001 |
| Recorded: | April 6, 2001 |
| Entry No.: | 538561 |
| Book/Page: | 419/217 |

RELEASE OF REAL ESTATE MORTGAGE
| | |
|---|---|
| Dated: | July 18, 2023 |
| Recorded: | July 18, 2023 |
| Entry No.: | 1063566 |

22. MORTGAGE
| | |
|---|---|
| Mortgagor: | Carol W. Garrett, married and Terry Lee Garrett, her husband as tenants by the entirety and Clara Walsh, separated |
| Mortgagee: | First Union National Bank of Delaware |
| Amount: | $75,000.00 |
| Dated: | July 31, 2001 |
| Recorded: | August 20, 2001 |
| Entry No.: | 549832 |
| Book/Page: | 432/403 |

CERTIFICATE OF PURCHASE
| | |
|---|---|
| Dated: | March 23, 2023 |
| Recorded: | March 22, 2023 |
| Entry No.: | 1056038 |

SHERIFF'S DEED
| | |
|---|---|
| Grantor: | Mary L. Faulkner, Teton County Sheriff Office |
| Grantee: | John Caldwell and Joan Schank |
| Dated: | July 14, 2023 |
| Recorded: | July 14, 2023 |
| Entry No.: | 1063397 |

Note: Document contains incomplete legal description.

23. Any rights, claims or interest of (the mortgagor) in the land or any claim the foreclosure by (lender) is invalid.

24. The right of any interested party to sue or to petition to set aside or modify or to contest the foreclosure sale and deed pursuant thereto, through which title to the land described herein is derived.

25. Any attempt by an interested party to set aside the deed under which title is vested in a bankruptcy or state insolvency action.

26. Rights of tenant(s) in the land, if any, and rights of all parties claiming by, through or under said tenant(s).

(continued)

NTT-126981

# SCHEDULE B - PART II

SPECIAL EXCEPTIONS:

Note: The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than the certain dollar amount set forth in any applicable arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. If you desire to review the terms of the policy, including any arbitration clause that may be included, contact the office that issued this Commitment or Report to obtain a sample of the policy jacket for the policy that is to be issued in connection with your transaction.

**** 

NOTE: Judgments, State and Federal Tax Liens were checked on the following names, and if any were found, are disclosed herein:

      Terry Lee Garrett and Carol W. Garrett
      John Caldwell
      Joan Schank

NOTE: In the event this transaction fails to close, a cancellation fee may be charged for services rendered in accordance with the rates that are on file with the Commissioner of Insurance of the State of Wyoming.

Examiner

**Chain of Title including all Vesting Deeds recorded in the past 24 months:**

ACCORDING TO THE OFFICIAL RECORDS, THERE HAVE BEEN NO DOCUMENTS CONVEYING THE LAND DESCRIBED HEREIN WITH A PERIOD OF 24 MONTHS PRIOR TO THE DATE OF THIS COMMITMENT EXCEPT AS FOLLOWS:

SHERIFFS DEED
    Grantor:        Mary L. Faulkner, Teton County Sheriff Office
    Grantee:        John Caldwell and Joan Schank
    Recorded:     July 20, 2023
    Entry No.:     1063792
    Note: Document contains incomplete legal description.

CERTIFICATE OF SURVEYOR

CERTIFICATE OF OWNERS

KNOW ALL MEN BY THESE PRESENTS:

CERTIFICATE OF MORTGAGEE

SIGNATURES BY SEPARATE AFFIDAVIT

CERTIFICATE OF ENGINEER

CERTIFICATE OF PLANNING COMMISSION

CERTIFICATE OF APPROVAL

THE RIDGE ADDITION
TO THE TOWN OF JACKSON

BEING A PORTION OF LOT 23—FERRIN ADDITION
TO THE TOWN OF JACKSON—PLAT NO. 401
PREPARED OCTOBER 1983

Appellate Case: 24-8013   Document: 010111048105   Date Filed: 05/13/2024   Page: 186







# EXHIBIT B

**FILED** 333pm

DEC 07 2023

DISTRICT COURT
9TH JUDICIAL DISTRICT
TETON COUNTY WYOMING

Isaac N. Sutphin, P.C. (Wyo. State Bar # 6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile: 307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

| | | |
|---|---|---|
| STATE OF WYOMING | ) | IN THE DISTRICT COURT |
| | ) ss | |
| COUNTY OF TETON | ) | NINTH JUDICIAL DISTRICT |

CAROL W. GARRETT AND TERRY LEE
GARRETT,

        Plaintiffs,

    v.

WELLS FARGO BANK, N.A.,

        Defendant.

Civil Action No. 2023-CV-18974

---

### DEFENDANT WELLS FARGO BANK, N.A.'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' COMPLAINT

---

Defendant Wells Fargo Bank, N.A., ("Wells Fargo"), by and through their undersigned counsel, respectfully files this Unopposed Motion for an Extension of Time to Respond to Plaintiffs' Complaint.

As grounds for this Motion, Wells Fargo states the following:

1. On October 10, 2023, Plaintiffs initiated this action by filing their Complaint.

2. On November 17, 2023, Plaintiffs served their Complaint upon Wells Fargo.

3. Wells Fargo's current deadline to respond is December 7, 2023.

4. The Complaint contains voluminous and detailed allegations. Wells Fargo requires additional time to investigate the allegations stated in Plaintiffs' Complaint, and to

prepare the appropriate responsive pleadings and/or motions. Wells Fargo therefore seeks an extension to serve its answer, motion to dismiss, or other responsive pleading as permitted by Wyo. R. Civ. P. 6(b).

5.      This Motion is timely filed, as Wells Fargo's Answer to Plaintiffs' Complaint is due on December 7, 2023. This requested extension will not conflict with any scheduling or other order of the Court, as no such orders have been entered.

6.      There have been no prior extensions of time requested by Wells Fargo or granted with respect to Plaintiffs' Complaint.

7.      Wells Fargo has conferred with Plaintiffs' counsel, who has consented to a thirty (30) day extension to respond to Plaintiffs' Complaint, thereby making Wells Fargo's deadline to respond January 8, 2024.

**WHEREFORE**, Defendant, Wells Fargo Bank, N.A., respectfully requests the Court enter an Order granting this Motion for Extension of Time, for thirty (30) days, up to and including Monday, January 8, 2024, to answer, move to dismiss, or otherwise respond to Plaintiffs' Complaint.

Dated this 7th day of December 2023.

Isaac N. Sutphin, P.C. (Wyo. State Bar #6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile: 307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

2

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2023, I served the foregoing by sending a true and

correct copy thereof via electronic mail and United States mail, postage prepaid and properly

addressed to the following:

> J. Austin Dunlap
> Austin Dunlap Law
> P.O. Box 4803
> Jackson, WY 83001
> austindunlap@gmail.com

3

# EXHIBIT C

|  |  |  |
|---|---|---|
| STATE OF WYOMING | ) | IN THE DISTRICT COURT |
| COUNTY OF TETON | ) ss | NINTH JUDICIAL DISTRICT |

**FILED**

DEC 08 2023

DISTRICT COURT
9TH JUDICIAL DISTRICT
TETON COUNTY WYOMING

CAROL W. GARRETT AND TERRY LEE GARRETT,

Plaintiffs,

v.

Civil Action No. 2023-CV-18974

WELLS FARGO BANK, N.A.,

Defendant.

## ORDER GRANTING DEFENDANT WELLS FARGO BANK, N.A.'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' COMPLAINT

THIS MATTER having come before the Court on Defendant Wells Fargo Bank, N.A.'s Unopposed Motion for Extension of Time to Respond to Plaintiffs' Complaint, and the Court having considered the Motion and the information presented therein, HEREBY ORDERS that the Motion for Extension of Time is GRANTED.

Wells Fargo shall file its answer, motion or other responsive pleading to Plaintiffs' Complaint on or before Monday, January 8, 2024.

DATED this _8th_ day of December 2023.

_____
Ninth Judicial District Court Judge
Melissa M-Owens

Copies to:
Isaac Sutphin
J. Austin Dunlap

**CERTIFICATE OF SERVICE**
This is to certify that a copy of the foregoing was served by mail/fax upon the following persons at their last known address this _8_ day of DEC 20_23_
J. Austin Dunlap _fax_
I. Sutphin
By _Dep Jill Smith_

# EXHIBIT D

Isaac N. Sutphin, P.C. (Wyo. State Bar # 6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile: 307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

| | | |
|---|---|---|
| STATE OF WYOMING | ) | IN THE DISTRICT COURT |
| | ) ss | |
| COUNTY OF TETON | ) | NINTH JUDICIAL DISTRICT |

CAROL W. GARRETT AND TERRY LEE
GARRETT,

      Plaintiffs,

    v.

WELLS FARGO BANK, N.A.,

      Defendant.

Civil Action No. 2023-CV-18974

---

## NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE that in the above-entitled action, Defendant Wells Fargo Bank,

N.A. (Wells Fargo), by and through undersigned counsel, Holland & Hart LLP, hereby files this

Notice of Filing of Notice Removal pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, and

U.S.D.C.L.R. 81.1. Wells Fargo filed a Notice of Removal in the United States District Court for

the District of Wyoming on January 8, 2024. A true and correct copy of the Notice of Removal

filed in the United States District Court is attached as **Exhibit A**. This filing serves as written

notice to all adverse parties and effects removal in accordance with 28 U.S.C. § 1446(d).

Dated this 8th day of January 2024.


Isaac N. Sutphin, P.C. (Wyo. State Bar #6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 8, 2024, I served the foregoing by file and servexpress

and by placing a true and correct copy thereof in the United States mail, postage prepaid and

properly addressed to the following:

> J. Austin Dunlap
> Austin Dunlap Law
> P.O. Box 4803
> Jackson, WY 83001
> austindunlap@gmail.com

3

ECF Doc 3

# Order of Removal

Page: 200

Date Filed: 05/13/2024

Document: 01011048105

Appellate Case: 24-8013

**FILED**



**1:39 pm, 1/9/24**

**Margaret Botkins**
**Clerk of Court**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

CAROL W. GARRETT and TERRY LEE
GARRETT,

        Plaintiffs,

    v.

WELLS FARGO BANK, N.A.,

        Defendant.

Case No. 24-CV-7-SWS

---

**ORDER OF REMOVAL**

---

On January 8, 2024, a notice of removal of this case was filed with the Clerk of the United States District Court, District of Wyoming, pursuant to 28 U.S.C. § 1446. It is therefore

ORDERED that, under Local Civil Rule 81.1, the removing party shall immediately notify the state court of the removal by filing a copy of the notice of removal with the clerk of the state court (if such has not already been done). It is

FURTHER ORDERED that the clerk of the state court is hereby advised that jurisdiction over the parties and subject matter of this action is deemed removed from the state court to the United States District Court for the District of Wyoming at the time the notice of removal is filed with the clerk of the state court, and the state court should proceed no further on this case unless it is later remanded back to the state court. It is

FURTHER ORDERED that if any hearing is pending in the state court when the notice of removal is filed with the clerk of state court, the removing parties shall immediately notify the state court clerk of the removal of this action. It is

Appellate Case: 24-8013   Document: 01011048105   Date Filed: 05/13/2024   Page: 201

FURTHER ORDERED that the removing party shall file a copy of the state court complaint (or other case-initiating document) as a separate document in this federal case (if not already done).  It is

FINALLY ORDERED that the removing party shall file a copy of the entire state court record and proceedings including the docket sheet (if not already done) with the Clerk of this Court within fourteen (14) days of the date of this Order of Removal.

DATED: January ___9___<sup>TH</sup>, 2024.

Scott W. Skavdahl
United States District Judge

ECF Doc 4

# Motion to Dismiss

Isaac N. Sutphin, P.C. (Wyo. State Bar # 6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CAROL W. GARRETT and TERRY LEE GARRETT,  Plaintiffs,  v.  WELLS FARGO BANK, N.A.,  Defendant. | Civil Action No. 1:24-cv-00007-SWS |

## DEFENDANT WELLS FARGO'S MOTION TO DISMISS

Defendant Wells Fargo Bank, N.A. (Wells Fargo), pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, respectfully moves this Court to dismiss Plaintiffs' Complaint

for failure to state a claim upon which relief may be granted. The basis for Wells Fargo's Motion

to Dismiss is set forth in greater detail in the accompanying Memorandum of Law in Support of

its Motion to Dismiss.

Dated this 16th day of January 2024.

/s/ Isaac N. Sutphin

Isaac N. Sutphin, P.C. (Wyo. State Bar #6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

31249672_v1

2

Isaac N. Sutphin, P.C. (Wyo. State Bar # 6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CAROL W. GARRETT and TERRY LEE GARRETT, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:24-cv-00007-SWS |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

## DEFENDANT WELLS FARGO'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

Defendant Wells Fargo Bank, N.A. (Wells Fargo) submits this Memorandum of Law in support of its Motion to Dismiss the Complaint filed by Plaintiffs Carol and Terry Garrett (Plaintiffs) for failure to state a claim upon which relief may be granted and states as follows pursuant to Federal Rule of Civil Procedure 12(b)(6):

## I.    INTRODUCTION

Plaintiffs Carol Garrett and Terry Garrett are residents of Florida who also owned real property at 1045 Upper Cache Creek Drive (the "Property") in Jackson, Teton County, Wyoming. Plaintiffs owned the Property subject to a mortgage agreement (the "Mortgage") with Wells Fargo. In December 2022, Wells Fargo notified Plaintiffs of its intent to foreclose on the Mortgage due to nonpayment. In March 2023, the Property was sold at a public sale. Plaintiffs

failed to redeem the Property during the three-month redemption period following the sale. In July 2023, following the expiration of the redemption period, a Sheriff's Deed was executed and delivered to the purchaser of the Property.

In their Complaint, Plaintiffs allege three claims against Wells Fargo. Each of these claims is fatally flawed and fails to state a claim upon which relief may granted. Accordingly, each of Plaintiffs' claims must be dismissed, as set forth in more detail below.

## II.   SUMMARY OF COMPLAINT

Plaintiffs' Complaint alleges three claims against Wells Fargo. The first two claims assert technical violations of W.S. § 34-4-103, which sets forth prerequisites to foreclosure under Wyoming law. In particular, Count I of the Complaint alleges that Wells Fargo failed to record an assignment of the Mortgage. (Complaint at ¶¶ 29-33.) Count II alleges that Wells Fargo failed to satisfy their obligation to notify the occupant of the Property. (*Id.* at ¶¶ 34-46.)

Count III alleges that Wells Fargo breached their implied covenant of good faith and fair dealing based on breaches of community standards of decency, fairness, and reasonableness. (*Id.* at ¶¶ 47-51.) Finally, Plaintiffs set forth a separate claim for punitive damages. (*Id.* at ¶¶ 52-57.)

## III.   LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a claim may be dismissed for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). In assessing a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in the light most favorable to plaintiff and accept all well-pled factual allegations as true. *Streetmediagroup, Ltd. Liab. Co. v. Stockinger*, 79 F.4th 1243, 1248 (10th Cir. 2023).

A plaintiff can support a claim "by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 563, (2007). This

standard requires more than bare assertions of legal conclusions. *Wright v. City of Ponca City*, No. 22-6137, 2023 U.S. App. LEXIS 23735, at *6 n.4 (10th Cir. Sep. 7, 2023). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Any claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Id.* (citing *Twombly,* 550 U.S. at 555).

Nonetheless, a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face" in order to survive a motion to dismiss. *Twombly,* 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009) (citing *Twombly,* 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). A plaintiff with no facts and "armed with nothing more than conclusions" cannot "unlock the doors of discovery." *Id.* at 678–79.

## IV.     MEMORANDUM OF LAW

### A.     Plaintiffs Fail to State Plausible Causes of Action Under Rule 12(b)(6)

#### 1.     *Wells Fargo Did Not Violate W.S. § 34-4-103(a)(iii)*

Plaintiffs' first count is based on the assertion that "[t]he Garretts entered into a mortgage agreement with First Union National Bank of Delaware and not Defendant." (Complaint at ¶ 31.)

While Plaintiffs are correct that their mortgage agreement (the "Mortgage") was initially with First Union National Bank of Delaware (First Union), their claim is based on the demonstrably false assumption that Wells Fargo could only acquire the Mortgage through an

assignment from First Union. (*Id.* at ¶ 32 ("The assignment from First Union National Bank of Delaware to Defendant is not recorded in the Teton County Records as evidenced by the Title Commitment provided by Northern Title.").)

To the contrary, Wells Fargo acquired the Mortgage through a merger, which transferred the Mortgage automatically by operation of federal law, without the need for assignment. More specifically, in April 2002 First Union changed its name to Wachovia Bank of Delaware, National Association. (*See* Exhibit 1, Letter from Office of Comptroller of the Currency, dated April 4, 2002 (confirming title change).[1]) Then, in 2010, Wachovia Bank of Delaware and another bank merged with and into Wells Fargo Bank, National Association, Sioux Falls, South Dakota. (*See* Exhibit 2, Letter from Office of Comptroller of the Currency, dated March 20, 2010.) The result of the merger was Wells Fargo Bank, N.A., the Defendant in this lawsuit and the entity which foreclosed on Plaintiffs' Mortgage. (*Id.*)

It is well-established that, as a result of First Union's name change and subsequent merger, the Mortgage was acquired by Wells Fargo without need for assignment. Indeed, 12 U.S.C. § 215a(e) governs such mergers and provides that:

---

[1] Defendant respectfully requests this Court take judicial notice of the letters attached hereto as Exhibits 1 and 2 as adjudicative facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court in *Buczek v. Seterus* permitted judicial notice of information retrieved from official government websites. *See, e.g., Buczek v. Seterus LLC*, No. 16-CV-268S, 2021 U.S. Dist. LEXIS 128815, at *1 n.1 (W.D.N.Y. July 11, 2021) (taking judicial notice of the FDIC website reflecting HSBC Bank's acquisition of Republic Bank For Savings). Likewise, another court judicially noticed as true, "public records from the Internet are 'generally considered not to be subject to reasonable dispute.'" *In re Quaker Oats Maple & Brown Sugar Instant Oatmeal Litig.*, No. CV 16-1442 PSG (MRWx), 2017 U.S. Dist. LEXIS 174394, at *6 (C.D. Cal. Oct. 10, 2017) (quoting *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015)). Furthermore, the court may take judicial note of adjudicative facts that "[concern] matters that bear directly upon the disposition of the case at hand." *Griffith v. W. Oilfields Supply Co.*, No. 20-CV-144-F, 2020 U.S. Dist. LEXIS 262227, at *7 (D. Wyo. NO. 3, 2020) (quoting *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007)).

> The corporate existence of each of the merging banks or banking associations participating in such merger shall be merged into and continued in the receiving association and **such receiving association shall be deemed to be the same corporation as each bank or banking association participating in the merger. All rights, franchises, and interests** of the individual merging banks or banking associations in and to every type of property (real, personal, and mixed) and choses in action **shall be transferred to and vested in the receiving association by virtue of such merger without any deed or other transfer.**

12 U.S.C. § 215a(e) (emphasis added).

Courts have uniformly interpreted 12 U.S.C. § 215(a) and, more generally, bank mergers to eliminate the need for assignment of mortgages. *See White v. Bank of Am., N.A.*, 597 F. App'x 1015, 1019-20 (11th Cir. 2014) (rejecting challenge to assignment of mortgage and affirming bank's right to foreclose). Under similar circumstances, the United State District Court for the District of Massachusetts set forth the applicable analysis in concise terms:

> [T]he fact that there is no recorded assignment of Plaintiffs' mortgage is inapposite. As discussed above, Defendant is the successor by merger to World Savings. Under federal law, Defendant automatically acquired all World Savings' assets at the time of merger. Pursuant to 12 U.S.C. § 215a, when a National Bank, such as Defendant, merges with another banking entity, the "receiving association shall be deemed to be the same corporation as each bank or banking association participating in the merger." As a result, "all rights, franchises, and interests . . . in and to every type of property . . . shall be transferred to and vested in the receiving association . . . without any deed or other transfer." No court order or other legal action is required. Accordingly, Defendant automatically acquired ownership of Plaintiffs' mortgage at the time of the merger, so long as World Savings owned it at that time. The lack of any recorded assignment actually undermines Plaintiffs' claim to the extent that it suggests the mortgage was not transferred to anyone other than Defendant.

*Rice v. Wells Fargo Bank, N.A.*, 2 F. Supp. 3d 25, 35 (D. Mass. 2014) (quoting 12 U.S.C. § 215a).

Accordingly, Wells Fargo acquired the Mortgage automatically via merger in 2010, without the need for assignment or any other form of transfer. Because the Mortgage was never assigned, Plaintiffs cannot allege a violation of the requirement in W.S. §34-4-103(a)(iii) that "if

[the Mortgage] has been assigned, that all assignments have been recorded." (Complaint at ¶ 30

(*quoting* W.S. §34-4-103(a)(iii)).)

Thus, Plaintiffs' claim that Wells Fargo violated W.S. §34-4-103(a)(iii) must fail as a

matter of law.

### 2.    *Wells Fargo Did Not Violate W.S. § 34-4-103(a)(iv)*

Plaintiffs' second count is based on the assertion that the occupant of the Property "did

not receive notice of intent to foreclose as required by W.S. § 34-4-103(a)(iv)." (Complaint at ¶

39.)

As an initial matter, Plaintiffs aver facts that are clearly contradicted by the same

documents upon which they rely. In particular, Plaintiffs allege that:

> Defendant made no effort to distinguish addresses between the owner and
> the occupant as set forth in his affidavit below. The notice for the occupant
> was sent to the address of record of the owner.

(Complaint at ¶ 37.)

However, Exhibit 3 to Plaintiffs' Complaint shows that Wells Fargo sent notice to both

Florida, where Plaintiffs live, and the Property itself, which was occupied by a tenant. (ECF No.

1, Complaint, Exhibit 3.)

More significantly, Plaintiffs cannot allege an actual violation of the notice requirements

in W.S. § 34-4-103(a)(iv). First, Plaintiffs do not allege that Wells Fargo failed to provide notice

to them. Instead, Plaintiffs attempt to manufacture a cause of action based on the purported

failure to notify someone else. As a matter of law, Plaintiffs cannot sustain such a claim.

Under W.S. § 34-4-103(a)(iv), Wells Fargo was required to provide notice to Plaintiffs

and the occupant "by certified mail with return receipt…at least (10) days before commencement

of publication of notice of sale." W.S. § 34-4-103(a)(iv). The statute further provides that

"[p]roof of compliance with this subsection shall be by affidavit." *Id.* Wells Fargo did precisely

that.

Exhibit 3 of Plaintiffs' Complaint includes the affidavit of attorney Brian Sayer, who averred that the notice of intent to foreclose the Mortgage was sent to both Plaintiffs' Florida address and the occupant at the Property via certified mail with return receipt. (ECF No. 1, Complaint, Exhibit 3.) Moreover, the notice was sent nearly two months before the commencement of publication of notice of sale, a significantly longer notice period than the 10 days required by the statute.[2] (*Id.*)

By sending the required notices and establishing compliance via affidavit, Wells Fargo satisfied the requirements of the statute, which does not require additional proof that the occupant of the Property received and accepted service of Wells Fargo's notice of intent to foreclose. (*Id.*) In fact, the Wyoming Supreme Court has explained that the statute's requirements should be applied liberally, particularly when the owner has actual notice of the intent to foreclose. *ORO Mgmt., LLC v. R.C. Mineral & Rock, LLC*, 304 P.3d 925, 930 (Wyo. 2013) ("Strict compliance with the notice requirement of W.S. 34-4-103 is unnecessary when a party has actual notice of intent to foreclose.") (affirming district court's grant of summary judgment and dismissal of lawsuit to set aside foreclosure sale).

Significantly, the Wyoming Supreme Court further explained that "the purpose of providing notice 'is to afford [the] mortgagee an opportunity to bring the indebtedness current or take other appropriate action to avoid foreclosure.'" *Id.* (quoting *Walker v. McAnnany*, 802 P.2d 876, 879 (Wyo. 1990)). In the case before this Court, Plaintiffs do not allege that they lacked notice. Accordingly, the purpose of the statute's notice requirement was accomplished, and the

---

[2] The notice of intent to foreclose the Mortgage was sent on December 8, 2022. The date of the first publication of the notice of foreclosure sale was February 1, 2023. (ECF No. 1, Complaint, Exhibit 3.)

mortgagees (Plaintiffs) had "an opportunity to bring their indebtedness current or take other appropriate action to avoid foreclosure." *Id.*

Wyoming law does not allow Plaintiffs to conjure a violation of the statute based on allegedly defective service to an occupant with no ownership interest in the Property. *See Walker v. McAnnany*, 802 P.2d 876, 879 (Wyo. 1990) ("[D]efendants, having knowledge of…claims, will not be heard to raise an imperfect recordation of certificates of location as a defect of which they can take advantage."). The Wyoming Supreme Court instructs that such technical issues are unavailing even when they prevent service of the notice to <u>an owner</u> of the property, as long as the owner has actual notice. *Id.* ("[A]ppellant has not shown prejudice by his having actual notice rather than receiving a notice by certified mail.").

Here, there are no issues regarding service of notice to the owners. Instead, there is merely an allegation that, despite compliance with the requirements of the statute, <u>an occupant</u> did not receive the notice served by Wells Fargo. Wyoming law does not provide a cause of action based on such an allegation. *Id.* ("There is no provision in W.S. 34-4-103(iv), supra, that prohibits actual notice of intent to foreclose… there was no penalty for failure to abide by the statute."). Interestingly, despite the owners (Plaintiffs) having received actual notice in Florida well before the foreclosure sale, there's no allegation that they ever bothered to communicate with their tenant to make him/her aware of the foreclosure process or upcoming foreclosure sale (notwithstanding that they would have been in the best position to know whether mail would have been deliverable at the Property address). From the Complaint, it appears that Plaintiffs simply kept their tenant in the dark about everything.

Finally, even if it could be established that the occupant of the Property was harmed in some manner by the United States Postal Service's inability to deliver the notice, Plaintiffs lack

standing to bring a claim on the occupant's behalf. *Ribbens Int'l, S.A. de C.V. v. Transp. Int'l Pool, Inc.*, 45 F. Supp. 2d 982, 984 (C.D. Cal. 1999) ("[U]nder prudential standing guidelines…'third party' standing is permissible only where there [exists] some hindrance to the third party's ability to protect his or her own interests.") (internal quotations omitted); *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488-9 (9th Cir. 1996) (a party lacks standing to assert a third party's rights unless there exists a "genuine obstacle" to the third party asserting its own interests, noting that one purpose of the prudential standing rule barring assertion of third party rights is "to avoid adjudicating rights a third party may not wish to assert.").

Thus, in accordance with Wyoming law and established principles of standing, Plaintiffs' claim that Wells Fargo violated W.S. §34-4-103(a)(iv) must fail as a matter of law.

### 3. *Plaintiffs Fail to Plead a Breach of the Implied Covenant of Good Faith and Fair Dealing*

Plaintiffs' third count is similarly without merit. Plaintiffs conclusorily assert that:

> Defendant's failure to record the assignment of the mortgage and failure to notify the current occupant of the intent to foreclose as statutorily required are breaches of community standards of decency, fairness, and reasonableness.

(Complaint at ¶ 50.)

As discussed above, Plaintiffs' first two claims are based on purported technical violations of assignment and notification requirements. As further set forth above, neither of those claims is sustainable as a matter of law. Yet, Plaintiffs allege that these claims also constitute the sole bases for a breach of the implied covenant of good faith and fair dealing.

Plaintiffs appear to allege that the technical violations pled in Count I and Count II are breaches of community standards of decency, fairness, and reasonableness. However, Plaintiffs fail to identify any specific standards of decency, fairness, or reasonableness that are breached by the allegations against Wells Fargo. Moreover, Plaintiffs fail to allege how the allegations in

Count I and Count II are even relevant to the unspecified community standards.

Under Wyoming law, these allegations are insufficient to plead a claim for breach of the implied covenant of good faith and fair dealing. First, the implied covenant of good faith and fair dealing cannot be used to manufacture new obligations for Wells Fargo or new rights for Plaintiffs. *Woodie v. Berkshire Hathaway Homestate Ins. Co.*, 806 F. App'x 658, 672-73 (10th Cir. 2020) ("Wyoming law prohibits the use of the covenant to establish new, independent rights or duties not agreed upon by the parties.") (internal quotations omitted); *Wilcox v. Sec. State Bank*, 523 P.3d 277, 290-91 (Wyo. 2023) (a plaintiff cannot use the covenant of good faith and fair dealing to establish a new, independent duty).

Accordingly, Plaintiffs' claim for breach of the implied covenant must be based on the clear language of the mortgage agreement between Wells Fargo and Plaintiffs. *Id.* (District court properly dismissed the breach of implied covenant claim because plaintiff did not plausibly plead that any action taken by defendant was not in conformity with the clear contract language.). Plaintiffs do not cite the mortgage agreement, much less specify how Wells Fargo's alleged conduct failed to conform to the agreement.

Thus, Plaintiffs have failed to plead a breach of the implied covenant of good faith and fair dealing under Wyoming law. Consequently, Count III of Plaintiffs' Complaint fails as a matter of law and must be dismissed.

### 4.     *Plaintiffs Improperly Plead a Separate Claim for Punitive Damages*

Plaintiffs' Complaint sets forth a separate claim for punitive damages. (Complaint at ¶¶ 52-57.) Under Wyoming law, Plaintiffs' claim for punitive damages is improperly pled and should be dismissed.

First, punitive damages cannot be awarded when compensatory damages are not recoverable. *Alexander v. Meduna*, 47 P.3d 206, 218 (Wyo. 2002) (citing *Bear v. Volunteers of*

Appellant's Appendix
Page 214 of 281

*America, Wyoming, Inc.*, 964 P.2d 1245, 1255 (Wyo. 1998). As set forth above, Plaintiffs'

Complaint fails to state a claim upon which relief can be granted. Consequently, Plaintiffs cannot

recover compensatory damages and, thus, punitive damages are not available.

 Moreover, under Wyoming law, "punitive damages are not favored and are to be allowed

cautiously within narrow limits." *Id.* (citing *Sheridan Commercial Park, Inc. v. Briggs*, 848 P.2d

811, 817 (Wyo. 1993)). Even if Plaintiffs could establish a right to recover compensatory

damages, the claims in this case do not support an award of punitive damages. *Id.* ("Such

damages are to be awarded only for conduct involving some element of outrage similar to that

usually found in a crime.").

 More fundamentally, punitive damages cannot be pled as a separate claim under

Wyoming law. *Errington v. Zolessi*, 9 P.3d 966, 969 (Wyo. 2000) ("[A] claim for punitive

damages is a particular element of a cause of action, and it does not constitute a separate claim or

cause of action."). Instead, punitive damages are an element of a claim or cause of action. *Id.*

("[I]n Wyoming, punitive damages are an element of a claim or cause of action and are not a

separate claim.").

 Therefore, Plaintiffs claim for punitive damages should be dismissed as well.

## V.   CONCLUSION

 Plaintiffs' Complaint fails to state a claim upon which relief can be granted. Moreover,

the deficiencies in the claims set forth cannot be cured by amendment of the Complaint.

Consequently, the Complaint should be dismissed with prejudice.

Dated this 16th day of January 2024.

/s/ Isaac N. Sutphin
Isaac N. Sutphin, P.C. (Wyo. State Bar #6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

31249674_v1

12

ECF Doc 8

# Response to Opposition

J. Austin Dunlap
WSB 7-4586
PO Box 4803
Jackson, WY 83001
Tel. 307-690-8568
Fax 307-316-8101
austindunlap@gmail.com
*Attorney for the Garretts*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| CAROL W. GARRETT AND | ) | |
| TERRY LEE GARRETT | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:24-CV-00007-SWS |
| | ) | |
| WELLS FARGO BANK, N.A. | ) | |
| | ) | |
| Defendant. | ) | |

## THE GARRETTS' RESPONSE TO MOTION TO DISMISS

The Garretts, Carol W. Garrett and Terry Lee Garrett, by and through their

attorney, J. Austin Dunlap, respond to Defendant Wells Fargo Bank, N.A.'s *Motion

to Dismiss*, and state and allege as follows:

### INTRODUCTION

The Defendant, Wells Fargo Bank, N.A., ("Wells Fargo") has filed a *Motion to

Dismiss* contending that the Garretts' claims fail to state a claim upon which relief

can be granted.  Wells Fargo contends that they did not violate W.S.§ 34-4-

103(a)(iii) and (iv) as supported by citation to federal case law, but Wells Fargo fails

to cite to Wyoming case law in support of their *Motion*.  Wells Fargo further

contends denying the Garretts $2.1 Million in equity to recover their $76,000

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page 1 of 17

Appellant's Appendix
Page 218 of 281

mortgage was not a violation of community standards of decency, fairness, and reasonableness.  Wells Fargo continues by arguing that the Garretts have not made a viable claim for a breach of the implied covenant of good faith and fair dealing and wrongfully claimed punitive damages.

The Garretts respond that federal case law does not preempt Wyoming statutes or Wyoming interpretation of their statutes.  For purposes of W.S.§ 34-4-103, a merger is an assignment because it meets the common law definition of assignment.  Wyoming case law is strictly construed as to W.S. §34-4-103(a)(iii) and (iv).  Further, the Garretts' have pleaded sufficiently to put Wells Fargo on notice of the claims against them regarding breach of the implied covenant of good faith and fair dealing.  The Garretts' claim for punitive damages is sufficiently associated with the compensatory damages alleged in Counts I-III.  Generally, the *Complaint* adequately notifies Wells Fargo of the claims, and the facts alleged makes the claim plausible on the face of the *Complaint*. Wells Fargo's *Motion* should be denied.

## STATEMENT OF FACTS

In 2001, Carol and Terry Garret built a single-family residence at 1045 Upper Cache Creek Drive, Jackson, Wyoming. (ECF Doc. 2, ¶9).  The home was partially financed through a mortgage dated July 31, 2001, from First Union National Bank of Delaware ("Mortgagor" or "Lender"). (ECF Doc. 2, ¶12).  The Garretts had a tenant, Michael Melf, living in the house in July 2023. (ECF Doc. 2, ¶13).  The neighbors contacted the Garretts to inform them that a stranger had been at the Garrett residence earlier in the day, and the stranger stated that he had

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page **2** of 17

Appellant's Appendix
Page 219 of 281

purchased the home at 1045 Upper Cache Creek Drive. (ECF Doc. 2, ¶15). This is how the Garretts and Mr. Melf, the legal tenant, found out about the foreclosure sale. *Id.* The Teton County Sheriff's Office conducted a foreclosure sale for 1045 Upper Cache Creek Drive on March 16, 2023. (ECF Doc. 2, ¶18). The Teton County Sheriff's Office received an Affidavit of Service of Written Notice of Intent to Foreclose Mortgage from Wells Fargo's representative C. Morgan Lasley, Esquire of the Sayer Law Group, P.C. C. Morgan Lasley affirmed that written notice of intent to foreclose by advertisement and sale had been served upon the record owner and the person in possession by certified mail, return receipt requested. (ECF Doc. 2, ¶19).  After the tolling of the redemption period, a Sheriff's Deed was issued on July 19, 2023.  (ECF Doc. 2, ¶22).  Upon information and belief, the Garrett's outstanding balance on the Mortgage was approximately $76,500.00.  (ECF Doc. 2, ¶24). The home at 1045 Upper Cache Creek Drive appraised for $2,900,000.00. (ECF Doc. 2, ¶25). The highest bid at public auction was $825,000.00 by John Caldwell and Joan Schank. (ECF Doc. 2, ¶26).

### FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Rule 12(b)(6) authorizes the court to dismiss a complaint for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 US. 544, 570, 127 S.Ct. 1955.  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the Wells Fargo is liable for the misconduct alleged."

Appellant's Appendix
Page 220 of 281

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (citing *Bell Atl. Corp v. Twombly*, 550 U.S. at

556).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations
> in a complaint: if they are so general that they encompass a wide swath
> of conduct, much of it innocent, then the the Garretts "have not nudged
> their claims across the line from conceivable to plausible."   The
> allegations must be enough that, if assumed to be true, the plaintiff
> plausibly (not just speculatively) has a claim for relief.

*Robbins v. Oklahoma*, 519 F3d 1242, 1247 (10th Cir. 2008)(quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S, at 570)(citations omitted).  "Again, for purposes of resolving a

Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a

complaint and view these allegations in the light most favorable to the plaintiff."

*Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006).

When sitting in diversity, a federal court applies federal procedural law and

state substantive law.  *E.g., Racher v. Westlake Nursing Home Limited*

*partnership,* 871 F.3d 1152, 1162 (10ᵗʰ Cir. 201&).  "Where no controlling state

decision exists, [a] federal court must attempt to predict what the state's highest

court would do."" *Wade v. EMASCO Ins. Co.,* 483 F.3d 657, 665-66 (10ᵗʰ Cir. 2007)

(quoting *Wankier v. Crown Equip, Corp,* 353 F.3d 862, 866 (10ᵗʰ Cir. 2003)).

## ARGUMENT

Wells Fargo argues that Plaintiff has failed to state claims upon which relief

can be granted.  In support of their argument, they allege that federal case law

controls and is sufficient to dismiss the Garretts' stated claim.

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page 4 of 17

Appellant's Appendix
Page 221 of 281

## W.S. §34-4-103(a)(iii) – failure to record assignment

The Wyoming Statute requires that any assignment of the mortgage has been recorded. The Garretts contend that their mortgage was with First Union National bank of Delaware and not with Wells Fargo, the foreclosing bank. (ECF Doc. 2 Exhibit 1). The Garretts further assert that there was no evidence of the transfer from First Union National Bank of Delaware to Wells Fargo as to the mortgage recorded at Book 483, Page 403, Document No. 0549832 – the foreclosed mortgage.

Wells Fargo provides a proposed factual history of First Union National Bank of Delaware's interest through a series of mesne conveyances to arrive at Wells Fargo. (ECF Doc. 4-1 p. 4)[1]. This raises two issues: 1) is a merger an assignment for purposes of W.S. §34-4-103(a)(iii); and 2) if a merger is an assignment, was it recorded in Teton County records. The answer to issue No. 1 remains outstanding and has been argued by Wells Fargo that a mortgage assignment is not necessary due to merger. (ECF Doc. 4-1 p. 4)("Wells Fargo acquired the Mortgage through a merger, which transferred the Mortgage automatically by operation of federal law, without the need for assignment."). The answer to No. 2 has been proven by the title report provided by the Garretts with their Complaint. (ECF Doc 2, Exhibit 6)(No recorded assignment of the mortgage at Book 483, Page 402, No. 0549832).

---

[1] In contradiction to the Exhibits Defendant has asked this Court to take judicial notice of, and to capture the full history and accurate dates of the devolution of interests, the Garretts offer Exhibit 1 (Noting p. 10: Wells Fargo-Wachovia Merger – "On January 1, 2009, Wells Fargo announced that the merger had been completed effective December 31, 2008."). This document is found at https://www.federalreserve.gov/newsevents/testimony/files/alvarez20100901a.pdf

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page 5 of 17

Appellant's Appendix
Page 222 of 281

**Federal preemption**

The United States Congress has not evidenced the intent to occupy the field of mortgages and foreclosures, and Federal law has not preempted Wyoming's ability to pass and interpret law regarding mortgages and foreclosures. *Union Telephone Company, v. Wyoming Public Service Commission*, 2022 WY 55, ¶59, 508 P.3d 1078, 1096, (Wyo. 2022). Although Congress has not entirely displaced state regulation, state law that conflicts with federal law can still be preempted. *Id.* The consideration is when state law interferes with the full intent of the federal law. *Id.* The state law does not interfere with the federal law in this scenario.

A series of cases in Delaware have dealt with assignments as they relate to mergers that is persuasive here. Their focus was on assignment by operation of law as a result of a merger in the context of anti-assignment clauses. *See MTA Canada Royalty Corp. v. Compania Minera Pangea, S.A. de C. V.*, 2020 WL 5554161 (Superior Court of Delaware 2020); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH,* 62 A. 3d 62, 83 (Del. Ch. Feb 22, 2013)*; Tenneco Auto,. Inc. v. El Paso Corp.,* 2002 WL 453930, at 2 (Del. Ch. Mar 20, 2002); *Star Cellular Telephone Co., Inc. v. Baton Rouge CGSA, Inc.,* 1993 WL 394847, at 7 (Del. Ch. Aug. 2, 1993). Specifically, that Court has analyzed whether a merger constitutes an assignment in contradiction to an anti-assignment provision. *MTA Canada* at 3, (Under Delaware law, the phrase "assignment by operation of law" within an anti-

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page 6 of 17

Appellant's Appendix
Page 223 of 281

assignment provision commonly is understood to include a merger.)  Similarly, in another case, the Delaware court stated:

> El Paso argues that a merger is an "assignment ... by operation of law" and that the language of the first sentence of Section 8.6 of the Insurance Agreement makes clear that any such transfer must first receive its consent. As a general matter in the corporate context, the phrase "assignment by operation of law" would be commonly understood to include a merger. Indeed, the Delaware Supreme Court has equated an "assignment by operation of law" with a merger. Furthermore, this Court has suggested that the phrase "transfer by operation of law" would, again in the corporate context, be understood to include a merger.

*Tenneco Auto. Inc. v. El Paso Corp.* 2002 WL 453930, 2 (Del. Ch. March 20, 2002).  In a similar conclusion, the *MTA Canada* Court ruled the anti-assignment clause was effective to prohibit transfer, even transfer by operation of law resulting from a merger.  *MTA Canada* at 6.  These cases highlight that transfer of assets through a merger is prohibited by anti-assignment clauses – suggesting they are assignments.

The Garretts assert that the Wyoming Statute requires assignments of interest in mortgages to be recorded in the jurisdiction where the property is located as a prerequisite to foreclosure.  W.S. §34-4-103 (a)(iii).  The Wyoming Supreme Court has defined "assignment" as "a contractual undertaking by one party of the rights and obligations of another such that the second steps into the shoes of the first." *Prancing Antelope I, LLC v. Saratoga Inn Overlook HOA, Inc.* 2021 WY 3, ¶19, 478 P. 3d 1171 (Wyo. 2021)(citation omitted).  Black's Law Dictionary 2nd Ed. defines "merger" as the fusion or absorption of one thing or right into another.  It

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page **7** of 17

Appellant's Appendix
Page 224 of 281

continues: "[a] merger of corporations consists in the uniting of two or more corporations by the transfer of property of all to one of them, which continues in existence, the others being swallowed up or merged therein." *Id.* The surviving entity in a merger "steps into the shoes of the first" thus satisfying the common law definition of "assignment" in *Prancing Antelope I.*

Just as Delaware has done, it is appropriate for Wyoming to set forth its laws and interpret the meaning of those laws. Wells Fargo stated that "Wells Fargo acquired the Mortgage through a merger, which transferred the Mortgage automatically by operation of federal law…" (ECF Doc. 4-1 p. 4). The Garretts argue that a merger, transfer by operation of law / assignment by operation of law, fits the Wyoming definition of an assignment similar to Delaware's conclusions. *Prancing Antelope I* at ¶19. Wyoming Statute requires an assignment of mortgage to be recorded. W.S. §34-4-103(a)(iii). The cited federal law states that national banks can merge and transfer assets by operation of law. (ECF Doc. 4-1 p. 4). The Wyoming State statute requires recordation of assignments of mortgages. This does not conflict with federal law, and W.S. §34-4-103(a)(iii) is not preempted.

### Other Assignment of Mortgage by Wells Fargo

A successive obstacle to Wells Fargo's argument is that Wells Fargo's predecessor in interest assigned a mortgage to Wells Fargo in Teton County. Exhibit 6 of the Complaint at No. 20 is evidence of a recorded Mortgage with an associated Assignment of Mortgage from Wachovia Bank of Delaware, F/K/A First

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page 8 of 17

Appellant's Appendix
Page 225 of 281

Union National Bank of Delaware, as Assignor, to Wells Fargo Bank, N.A. as

Assignee as follows[2]:

20. MORTGAGE
Mortgagor:        Terry Lee Garrett and Carol W. Garrett, husband and wife, as tenants by the entireties
Mortgagee:        First Union National Bank
Amount:           $200,000.00
Dated:            February 2, 2021
Recorded:         February 2, 2021
Entry No.:        536564
Book/Page:        417/180

ASSIGNMENT OF MORTGAGE
Assignor:         Wachovia Bank of Delaware, NA F?K?A First Union National Bank of Delaware
Assignee:         Wells Fargo Bank, N.A.
Dated:            December 6, 2009
Recorded:         December 21, 2009
Entry No.:        765202
Book/Page:        746/919

RELEASE OF REAL ESTATE MORTGAGE
Dated:            July 18, 2023
Recorded:         July 18, 2023
Entry No.:        1063565

This represents a different mortgage between the same Parties herein.  Wells

Fargo, by and through its predecessor in interest Wachovia Bank of Delaware F/K/A

First Union National Bank of Delaware, recorded an assignment of mortgage in the

Teton County records between the same Parties, as represented above.  Now, in

their *Motion*, Wells Fargo contradicts by arguing that mortgages do not need

assignments from the predecessor in interest to Wells Fargo, and the Wyoming

statute is preempted by 12 U.S.C. §215.

    The purpose of recording documents relating to real property, and the

resulting public record is to give all interested parties constructive notice that a

---

[2] A scrivener's error exists in the date of the mortgage at No. 20.  It should read February 2, 2001, instead of February 2, 2021.  A copy of the recorded Mortgage is included as Exhibit 2.

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page **9** of 17

Appellant's Appendix
Page 226 of 281

document has been filed and for all to take notice of the effects of the document.

Wyoming's recording statutes reads:

> §34-1-121.  Recorded instrument as notice to subsequent purchasers; recordation of instruments issued by United States or state of Wyoming.
>
> (a)  Each and every deed, mortgage, instrument or conveyance touching any interest in lands, made and recorded, according to the provisions of this chapter, shall be notice to and take precedence of any subsequent purchaser or purchasers from the time of the delivery of any instrument at the office of the county clerk, for record.

The constructive notice that results from the filing of the Assignment of Mortgage from Wachovia to Wells Fargo, as evidenced *supra*, is that a mortgage originated by First Union National Bank of Maryland vested in Wachovia National Bank, and then was assigned to Wells Fargo.  If the intent of the legislature in passing W.S.§ 34-4-103(a)(iii) is to give mortgagors notice of assignment of their mortgage from one institution to another, this calls into question Wells Fargo and its predecessor's actions.  The constructive notice that the Garretts received based on record title, would have been that one of their mortgages was assigned, and the subject mortgage that was foreclosed, was not assigned.

The intent of the legislature can be inferred by reading the statutes together. Reading W.S. §34-1-121(a) and W.S. §34-4-103(a)(iii) together implies that assignments should be recorded to give constructive notice of the transfer of mortgages. *See Id*.  Wells Fargo and their predecessor in interest's actions are either an admission that a merger is effectively an assignment, or confusion against constructive notice.  Either way, Wells Fargo's argument that a federal statute

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page **10** of 17

Appellant's Appendix
Page 227 of 281

preempts the Wyoming statutes is undermined by its own actions of recording the Assignment of Mortgage between the parties after the merger[3].

The Garretts argue that Wyoming is not preempted from making and interpreting its own statutes in the area of mortgages and foreclosures.  The Garretts have also provided evidence addressing issue No. 1, that conveyance of assets through merger, as an assignment by operation of law, should qualify as an assignment for purposes of W.S. §34-4-103(a)(iii).  Wells Fargo and their predecessor's action further support this interpretation. As previously stated, the Garretts assert that the answer to issue No. 2 has been established, and the assignment of the mortgage was not recorded in the Teton County records.  The Garretts have met their burden to "state a claim to relief that is plausible on its face" *Twombly* at 550 U.S. at 570.  This *Motion* should be denied as to the Garretts first claim.

## W.S. § 34-4-103(a)(iv) – failure to notify occupant

Wells Fargo argues that sending notice by certified mail "checks the box" of statutory requirements.  Wells Fargo argues[4] that they provided notice to the Garretts and the occupant by certified mail with return receipt at least ten days

---

[3] The Garrets offer Exhibit 2 to set forth the dates of the merger between Wachovia and Wells Fargo.
[4] Wells Fargo mistakenly argues that "the Garretts do not allege that Wells Fargo failed to provide notice to them." (ECF Doc. 4-1 p. 6).  The Garretts recognize that Wells Fargo sent the notices, but the Garretts repeat that they never received notice.  None of the certified mailings show that they were delivered.  The *Complaint* sets forth facts that the Garretts became aware of the public sale in July 2023.  (ECF Doc. 2, ¶15).

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page **11** of 17

Appellant's Appendix
Page 228 of 281

prior to publication. (ECF Doc. 4-1 p. 6). Wells Fargo next asserts they provided an affidavit of compliance. *Id.* The remainder of Wells Fargo's argument asserts that the owners/occupant had actual notice, which is false.

The Garretts' contention in response is twofold: 1) there is a distinction between notifying the owner versus notifying the occupant; and 2) absent within Wells Fargo's argument is any confirmation that the owners or occupant actually received certified notices. It is well established that a mortgagee does not have duty to track down mortgagor, and mortgagee can rely on the address set out in the security instrument as a proper address for notice. *Walker v. McAnnany,* 803 P.3d 876, 879 (Wyo. 1990). As Wells Fargo argues, they sent the notice to the address and that fulfills the requirement as it pertains to the owner. The occupant's address is not set out in the security instrument. Wells Fargo's return receipt showed "insufficient address" in its attempt to contact the occupant.

Wells Fargo may be excused from pursuing diligent service on the owner because the owner had a duty to update the security instrument with a valid address. *Id.* However, if the legislature requires the occupant to be notified and the return receipt shows "insufficient address", then Wells Fargo has not strictly complied with the statute. *ORO Management, LLC v. R.C. Mineral & Rock, LLC,* 2013 WY 77, ¶14, 304 P.3d 925, 928 (Wyo. 2013)(citation omitted). The *ORO Management* Court stated:

> In an encyclopedia and in another text, the necessity of strict compliance
> with a notice requirement is emphasized.

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page **12** of 17

Appellant's Appendix
Page 229 of 281

> "Whenever notice is necessary, it must appear that it was served on the proper person, and there must be strict compliance with a statute requiring service on a particular person, so that service on another person is not sufficient." 66 C.J.S. *Notice,* § 18 at 658 (1950).

> "It is clear, of course, that there must be strict compliance with a statutory provision designating persons to whom notification is to be given." 1 M. Merrill, Merrill on Notice § 554 at 582 (1952).

*Id.* The Garretts are not manufacturing a cause of action, but rather seek for compliance with Wyoming Statute §34-4-103 – Prerequisites to foreclosure. The Wyoming Supreme Court in addressing the nature of compliance with this exact statute has stated:

> On appeal, this Court indicated that Wyo. Stat. Ann. § 34–4–103 requires strict compliance:

>> It is the rule in Wyoming that "[m]andatory statutes must be obeyed, and courts have no right to make law contrary to that prescribed by the legislature. *In re Hartt's Estate,* 75 Wyo. 305, 295 P.2d 985 (1956)." *Thomson v. Wyoming In–Stream Flow Committee,* Wyo., 651 P.2d 778, 787 (1982). On their face, the provisions of § 34–4–103, W.S.1977, are mandatory. The nature of a mandatory statute is described appropriately by one text writer in this way:

>>> "... [B]ut where [the statute] directs acts or proceedings to be done in a certain way and indicates that a compliance with such provisions is essential to the validity of the act or proceeding, or requires some antecedent and prerequisite conditions to exist prior to the exercise of the power, or be performed before certain other powers can be exercised, the statute may be regarded as mandatory." E. Crawford, The Construction of Statutes § 261 at 515 (1940).

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page 13 of 17

Appellant's Appendix
Page 230 of 281

*ORO Management, LLC v. R.C. Mineral & Rock, LLC*, 2013 WY 77, ¶14, 304 P.3d 925, 928 (Wyo. 2013) (quoting *Ulery-Williams, Inc. v. First Wyo. Bank, N.A – Laramie,* 748 P.3d 740, 741-742(Wyo.1988)).  Wells Fargo mailed certified notices for the occupant to the physical address of the property at 1045 Upper Cache Creek Drive, Jackson, Wyoming 83001. Like most residences in Teton County, the Garretts' residence does not receive mail at the physical address.  Further, it is reasonable that an occupant and an owner may have different mailing addresses. Therefore, if Wells Fargo is required to notify the occupant pursuant to W.S. §34-4-103(a)(iv), then a return receipt showing "insufficient address" should require Wells Fargo to do more.  In order to strictly comply with the statutory requirement to give notice to the occupant, Wells Fargo has a greater duty. Wells Fargo has failed to provide any evidence that the occupant actually received notice.

There is no evidence that the Garretts or occupant had actual notice of the foreclosure and public sale.  As laid out in the facts in the *Complaint*, the owners and occupant found out about the sale in late July 2023 as a result of the buyer being on the property.  (ECF Doc. 2 ¶15). The public sale occurred on March 16, 2023. (ECF Doc. 2 ¶ 18).  These facts, in light most favorable to plaintiff, establish that the Garretts had no actual notice of the foreclosure and public sale.  This combats Wells Fargo's reference to liberal application of the statute's requirements. (ECF Doc. 4-1 p. 7).  It further combats Wells Fargo's claim that "Plaintiffs do not allege that they lacked notice." *Id.*  Wells Fargo repeatedly relies on unfounded facts

that the Garretts and occupant had actual notice.  (ECF Doc. 4-1 pp. 7-8).  The

Garretts' argument is that Wells Fargo failed to strictly comply with the statute

that states:

> That written notice of intent to foreclose the mortgage by advertisement
> and sale has been served upon the record owner, **and the person in
> possession of the mortgaged premises if different than the record owner**,
> by certified mail with return receipt, mailed to the last known address
> of the record owner **and the person in possession** at least ten (10) days
> before commencement of publication of notice of sale.

W.S. §34-4-103(a)(iv)(emphasis added). Wells Fargo has a duty to strictly comply

with the statute, and a claim that Wells Fargo failed to comply has been sufficiently

stated to defeat this *Motion*.

## Breach of implied covenant of good faith and fair dealing

The Garretts have met the requirements for pleading a claim for breach of

the implied covenant of good faith and fair dealing. The Garretts have alleged that

Wells Fargo failed to follow statutory procedure and foreclosed the mortgage

without proper recordation of the assignment and without proper notice to the

occupant. The result was a transfer of $2.1 Million in equity from the Garretts to a

purchaser at public auction, in Wells Fargo's effort to recover approximately

$76,000 under the mortgage. (ECF Doc. 2 ¶¶47-51).  The Wyoming Supreme Court

recently reiterated:

> We have held that while a party's exercise of its contractual rights may
> not serve as a basis for breach of the covenant, a party nonetheless may
> not exercise its contractual rights in a manner that amounts to self-
> dealing or a violation of community standards of decency, fairness, or
> reasonableness.

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page **15** of 17

Appellant's Appendix
Page 232 of 281

*Jontra Holdings Pty Ltd v. Gas Sensing Tech. Corp.*, 2021 WY 17, ¶ 87, 479 P.3d 1222, 1246 (Wyo. 2021).  The Garretts are required to show their claim is supported by "any set of facts consistent with the allegations in the complaint".  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 563 (2007).   The Garretts have satisfied this by alleging facts, that should be interpreted in light most favorable to Plaintiffs, that Wells Fargo failed to follow statutory requirements resulting in the breach alleged.  Further, the Wyoming Supreme Court has established "whether the implied covenant of good faith and fair dealing was breached is ordinarily one of fact, focusing on the conduct alleged as constituting the breach within the context of the contract language, the parties' course of conduct and industry standards." *Wilcox v. Security State Bank*, 2023 WY 2, ¶50, 523 P.3d 277, 290 (Wyo. 2023)(citations omitted).  Having met their initial burden in their *Complaint*, the matter becomes a question of fact and not law.  Wells Fargo's *Motion* should be denied as to this aspect of the *Complaint*.

**<u>Punitive damages</u>**

Wells Fargo has interpreted the Garretts *Complaint* to assert a separate cause of action for punitive damages.  The Garretts have made claims that could result in compensatory damages.  (ECF Doc. 2 Count I, Count II and Count III). As pleaded, the Garretts reference the claims in their *Complaint* that are suitable for compensatory damages and set forth the elements of punitive damages as they relate to their claims for compensatory damages. (ECF Doc. 2 ¶¶ 54-56.)  The

*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page 16 of 17

Appellant's Appendix
Page 233 of 281

punitive damages claim is in association with compensatory damages and not a separate cause of action.

## RESPONSE IN THE ALTERANATIVE

If this Court were to determine the *Complaint* is insufficient as plead, Plaintiffs would respectfully seek leave of the Court to amend their claims and to further plead their claims.

WHEREFORE, the Garretts respectfully requests this Honorable Court deny Wells Fargo's *Motion to Dismiss.*

RESPECTFULLY SUBMITTED this 30th day of January 2024.


 /s/ J. Austin Dunlap
J. Austin Dunlap
WSB 7-4586
P.O. Box 4803
Jackson, WY 83001
*Counsel for the Garretts*


## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January 2024, I filed the foregoing document electronically, which cause these parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Isaac N. Sutphin
Holland & Hart LLP
2020 Carey Avenue, STE 800
PO Box 1347
Cheyenne, WY 82003-1347
INSutphin@hollandhart.com


 /s/ J. Austin Dunlap
J. Austin Dunlap


*Garrett v. Wells Fargo Bank*
Garretts' Response to Motion to Dismiss
1:24-CV-0007-SWS
Page 17 of 17

Appellant's Appendix
Page 234 of 281

# EXHIBIT 1

For release on delivery
9:00 a.m. EDT
September 1, 2010

The Acquisition of Wachovia Corporation by Wells Fargo & Company

Scott G. Alvarez

General Counsel

Board of Governors of the Federal Reserve System

before the

Financial Crisis Inquiry Commission

September 1, 2010

Chairman Angelides, Vice Chairman Thomas, and members of the Commission, I am
pleased to appear today to provide the Commission with information on the events leading up to
the acquisition of Wachovia Corporation and its banking and nonbanking subsidiaries by Wells
Fargo & Company in the fall of 2008.  The purpose of my testimony is to summarize the events,
with a focus on the Federal Reserve's involvement.  I will also address the lending and
supervisory questions raised in the Commission's invitation letter.

**Wachovia**

Wachovia was a financial holding company headquartered in Charlotte, North Carolina,
that provided commercial and retail banking services and other financial services in the United
States and internationally.  At the end of the second quarter of 2008, Wachovia had assets of
$812 billion, making it the fourth largest banking organization in the United States in asset
terms.  Wachovia's principal subsidiary was Wachovia Bank, which had assets of $671 billion.
Wachovia also had two insured thrift subsidiaries with total assets of $105 billion.  Thus, the
assets of the lead national bank and two insured thrift subsidiaries comprised about 95 percent of
the assets of the holding company.  Wachovia's insured depository institution subsidiaries had a
very large retail presence--serving more than 27 million deposit accounts totaling more than
$400 billion--and operated a large mortgage business.  These subsidiaries were supervised,
examined, and regulated by the Office of the Comptroller of the Currency (OCC) and the Office
of Thrift Supervision (OTS), respectively.  Wachovia also operated a large retail-oriented
securities broker-dealer network through its subsidiaries, Wachovia Securities and AG Edwards,
Inc., and provided a wide range of investment banking, private banking, and asset management
services.  These subsidiaries were supervised and regulated by the Securities and Exchange
Commission (SEC).

The Federal Reserve supervised Wachovia in a manner similar to other very large bank holding companies.  The Federal Reserve routinely conducts inspections of bank holding companies and their nonbank subsidiaries under authority granted by the Bank Holding Company Act (BHC Act).  These statutory provisions require that we rely to the fullest extent possible on the examinations of the bank, thrift, and other functionally regulated subsidiaries, such as the securities broker-dealer, conducted by the primary regulator of the entity.  Consequently, the Federal Reserve worked closely with the OCC, the OTS, and the SEC in examining and supervising the various subsidiaries of Wachovia.

The examinations conducted by the Federal Reserve are designed to review the organization's systems for managing risk across the organization and to evaluate the organization's overall financial strength.  The Federal Reserve also establishes consolidated capital, liquidity, risk management, and other prudential requirements for bank holding companies.  In addition, federal law gives the Federal Reserve authority to review merger and expansion proposals by bank holding companies and enforcement authority over bank holding companies and their nonbank subsidiaries, including the ability to stop or prevent a bank holding company or nonbank subsidiary from engaging in an unsafe or unsound practice.

Wachovia had been profitable continuously for more than a decade through year-end 2007.  During the first half of 2008, Wachovia posted losses totaling $9.6 billion, reflecting write-downs on securities and high provisions for loan losses.  In part, the provisions reflected significant expected losses on option adjustable-rate mortgages (ARMs), which Wachovia acquired in the 2006 purchase of Golden West Financial Corporation, a $125 billion federal thrift holding company based in California.  The losses also reflected, to a lesser extent, declines in the value of commercial real estate mortgages originated and held by Wachovia.

With encouragement from the Federal Reserve, Wachovia raised $8 billion in capital in April 2008 to partially offset those losses.  On August 19, 2008, the Federal Reserve Bank of Richmond entered into a Memorandum of Understanding (MOU) with Wachovia.  This MOU was the culmination of efforts by the Federal Reserve that had been initiated earlier through our inspection process to ensure that Wachovia completed a number of steps to improve corporate governance, risk management, liquidity, capital management, and strategic planning.

The troubles at Wachovia occurred during a period of extreme financial turbulence and distress.  The nation's economy was in recession, with declining housing prices and stalled economic growth.  The financial system was also deteriorating quickly.  On September 7, 2008, the Federal Housing Finance Agency had placed Fannie Mae and Freddie Mac into conservatorship and the Treasury had used its authority, granted by Congress in July 2008, to make financial support available to these two government-sponsored entities.  On September 15, Lehman Brothers had filed for bankruptcy after efforts had failed to organize private-sector assistance or arrange an acquisition by another company.  The failure of Lehman Brothers ended efforts by private investors to provide liquidity to American International Group, Inc. (AIG), which faced its own mounting financial difficulties.  On September 16, the Board acted to provide temporary liquidity to AIG under the emergency lending authority of section 13(3) of the Federal Reserve Act.  Losses at a prominent money market mutual fund caused by the failure of Lehman Brothers sparked extensive withdrawals from a number of similar funds.  These events caused extraordinary turbulence in financial markets: equity prices dropped sharply, the costs of short-term credit spiked upward, and liquidity dried up in many markets.

On September 25, 2008, the Federal Deposit Insurance Corporation (FDIC) seized and sold Washington Mutual Bank (WaMu), then the largest thrift in the United States.  WaMu was

the second largest holder of option ARMs at the time, and Wachovia was the largest holder of these assets. The failure of WaMu thus raised creditor concern about the health of Wachovia. Wachovia's stock price declined sharply and credit default swap spreads on its debt surged.

The day after the failure of WaMu, Wachovia Bank depositors accelerated the withdrawal of significant amounts from their accounts. In addition, wholesale funds providers withdrew liquidity support from Wachovia. It appeared likely that Wachovia would soon become unable to fund its operations. That week, Wachovia management, which had engaged in tentative discussions with potential merger partners earlier in the month, began discussions in earnest to sell the company. On September 27 and 28, both Citigroup and Wells Fargo, the second and fifth largest banking organizations in the United States, respectively, conducted due diligence investigations of Wachovia. Both Citigroup and Wells Fargo also contacted federal regulators indicating that government assistance would be needed in connection with each of their proposed bids to acquire Wachovia.

**Systemic Risk Exception**

The FDIC judged that an assisted bid from either Citigroup or Wells Fargo could be more expensive than a liquidation of Wachovia Bank and the two insured thrifts. The Federal Deposit Insurance Act (FDI Act) requires the FDIC, as a general matter, to exercise its resolution authority over insured depository institutions in the method least costly to the deposit insurance fund. The act also provides that the FDIC may take other actions or provide assistance that would not meet the least-cost test if the Secretary of the Treasury, in consultation with the President, and based on the recommendation of both the board of directors of the FDIC and the Board of Governors of the Federal Reserve (each by a vote of two-thirds of its members), determine that compliance with the least-cost requirement would have adverse effects on

economic conditions or financial stability and other action or assistance would avoid or mitigate those adverse effects.

The Board of Governors and the FDIC were concerned about the systemic complications of the failure of the fourth largest bank in the United States during this fragile economic period. The Board believed that a full or partial default by Wachovia and its subsidiaries on their debt would intensify liquidity pressures on other U.S. banking organizations. At the time, U.S. banking organizations were extremely vulnerable to a loss of confidence by wholesale suppliers of funds. Markets were already under considerable strain after the events involving Lehman Brothers, AIG, and WaMu. Investors were becoming increasingly concerned about the outlook for a number of U.S. banking organizations, putting downward pressure on their stock prices and upward pressure on their credit default swap spreads.

At the time, Wachovia was considered "well capitalized" by regulatory standards and until very recently had not generally been thought to be in danger of failure, so there were fears that the failure of Wachovia would lead investors to doubt the financial strength of other organizations in similar situations, making it harder for those institutions to raise capital and other funding. In addition, if a least-cost resolution did not support foreign depositors, the resolution would endanger what was a significant source of funding for several other major U.S. financial institutions.

Creditors would also be concerned about direct exposures of other financial firms to Wachovia or Wachovia Bank, since these firms would face losses in the event of a default. In particular, losses on debt issued by Wachovia and Wachovia Bank could lead more money market mutual funds to "break the buck," accelerating runs on these and other money funds. The resulting liquidations of fund assets--along with the further loss of confidence in financial

institutions--could lead short-term funding markets to virtually shut down; these markets were already under extreme pressure in the fall of 2008.

The consequences of an insolvency and unwinding of Wachovia under the least-cost resolution test would also have disastrous effects for an already weakened economy.  Business and household confidence would be undermined by the worsening financial market turmoil, and banking organizations would be less willing to lend due to their increased funding costs and decreased liquidity.  These effects could contribute to materially weaker economic performance, higher unemployment, and reduced wealth.

For these reasons, on September 28, 2008, the Board by unanimous vote determined that compliance by the FDIC with the least-cost requirements of the FDI Act with respect to Wachovia Bank and its insured depository institution affiliates would have serious adverse effects on economic conditions and financial stability, and that action or assistance by the FDIC permitted under the systemic risk exception within the act would avoid or mitigate these adverse effects.  Similar determinations were made by the board of directors of the FDIC and the Secretary of the Treasury, in consultation with the President, which allowed the FDIC to consider measures outside the least-cost resolution requirement to resolve Wachovia, including the provision of so-called "open bank" assistance.

**Citigroup Proposal**

On September 29, 2008, Citigroup proposed to acquire most of Wachovia's assets and liabilities, including Wachovia Bank, and assume senior and subordinated Wachovia debt, in exchange for approximately $2.1 billion in Citigroup stock.  Citigroup proposed that the FDIC enter into a loss sharing arrangement with Citigroup with respect to a pre-identified pool of Wachovia loans totaling about $312 billion.  Under the arrangement, Citigroup would absorb the

first $42 billion of losses on the pool, and the FDIC would absorb any additional losses.

Citigroup would grant the FDIC $12 billion in preferred stock and warrants to compensate the

FDIC for bearing this risk.

Around the same time, Wells Fargo submitted a bid for Wachovia that the FDIC judged

would require a greater amount of FDIC assistance. Consequently, the FDIC accepted the

Citigroup bid as the prevailing bid.

The FDIC and the Federal Reserve each publicly announced that the Citigroup bid had

been received after completion of an FDIC-supervised bidding process and that the parties would

proceed to negotiate final details. This restored some confidence in Wachovia and the liquidity

pressures on Wachovia stabilized.

To allow Citigroup and Wachovia to finalize their agreement in principal and complete

due diligence, the two firms entered into an exclusive dealing agreement for the period from

September 29 to October 6. During this period, Citigroup filed an application with the Federal

Reserve seeking expedited approval of its proposed acquisition of Wachovia.

**Wells Fargo's Second Proposal**

On October 2, during the period Citigroup and Wachovia were negotiating a final merger

agreement, the board of directors of Wachovia received a communication from Wells Fargo that

included an offer from Wells Fargo to acquire all of Wachovia's stock by merger. Contrary to its

original communication days before that FDIC assistance would be needed as part of a Wells

Fargo bid, the new Wells Fargo proposal did not involve any direct financial assistance from the

FDIC. Based on an IRS notice issued September 30, Wells Fargo had determined that certain

U.S. federal income tax benefits resulting from the proposed Wachovia transaction would allow

it to acquire Wachovia without FDIC assistance.

On October 3, 2008, Wachovia's board of directors voted to accept the Wells Fargo offer, and the parties signed a binding merger agreement.  Upon becoming aware of this, Citigroup informed Wachovia and Wells Fargo that Citigroup considered the merger agreement to be a violation of the exclusive dealing agreement between Citigroup and Wachovia.  Citigroup demanded that Wachovia and Wells Fargo terminate their proposed transaction.  Citigroup on the same date sent a separate letter to the Federal Reserve protesting any Wells Fargo application to the Federal Reserve to acquire Wachovia on a number of grounds.

The Federal Reserve issued a public statement on October 3 noting the new Wells Fargo proposal.  The statement indicated that the Wells Fargo proposal had not yet been reviewed and that regulators would be working to achieve an outcome that protected all Wachovia creditors and promoted market stability.  The statement also noted that the Citigroup proposal was under review by the Federal Reserve and the OCC.

**Litigation and Standstill**

On October 4, Citigroup filed suit against Wachovia and Wells Fargo, seeking a temporary restraining order, preliminary and permanent injunctive relief, specific performance of the exclusivity agreement, and punitive damages.  On October 5, Wachovia filed its own motion for a temporary restraining order preventing Citigroup from taking any steps to interfere with the implementation of the Wachovia-Wells Fargo merger agreement.

Due to concerns that the competing legal claims of Citigroup and Wells Fargo could themselves become a destabilizing influence on those institutions, Wachovia, and the banking system generally, representatives of the Federal Reserve attempted to facilitate negotiations among Wachovia, Citigroup, and Wells Fargo to resolve their disagreements.  To allow these discussions time to proceed, Federal Reserve officials became involved in facilitating

negotiations for a cease-fire or standstill to the litigation among the three firms.  A standstill agreement was finalized on October 6, under which Wachovia, Citigroup, and Wells Fargo agreed to suspend for two days all formal litigation activity, including discovery, and to otherwise cooperate to preserve the status quo with regard to any litigation.  This agreement was extended until October 10.

During this period, the three firms attempted to renegotiate a transaction that would be mutually agreeable.  The negotiations focused on a joint acquisition of Wachovia by the two bidders, with each bidder acquiring a different geographic portion of Wachovia.  The parties were unable to reach an agreement on a joint acquisition of Wachovia, but did agree on October 9 not to seek injunctive relief to stop a Wachovia acquisition transaction from occurring.  Citigroup determined to proceed with its claims, but to limit those claims to seeking monetary damages.  Wells Fargo announced its intention to complete its merger with Wachovia and indicated that it had submitted an application to the Federal Reserve seeking expedited approval of the transaction.

**Wells Fargo Application**

On October 12, the Board announced its approval of the application and notice under sections 3 and 4 of the BHC Act by Wells Fargo to acquire Wachovia and its banking and nonbanking subsidiaries.  In light of the emergency affecting the financial markets, and as permitted by the BHC Act and Federal Reserve regulations, the Board waived public notice of the proposal and shortened the notice period to the primary regulators of the banks and thrifts involved.   These agencies, and the Department of Justice, indicated that they had no objection to approval of the proposal.

On October 21, the Board released a statement explaining in more detail the reasons for its approval.  This statement included a discussion of the various relevant factors for applications and notices under sections 3 and 4 of the BHC Act, including competitive effects, financial and managerial performance, the convenience and needs of the communities to be served, and performance under the Community Reinvestment Act.  The statement also addressed a number of comments received on the proposal, including comments from Citigroup objecting to the proposal.

**Wells Fargo-Wachovia Merger**

On December 23, 2008, Wachovia announced that its shareholders had approved the Wells Fargo merger proposal.  On January 1, 2009, Wells Fargo announced that the merger had been completed effective December 31, 2008.

**Federal Reserve Assistance**

The Federal Reserve did not provide any emergency financial assistance in connection with the Wells Fargo-Wachovia merger, nor was any financial assistance sought from the Federal Reserve as part of the Citigroup bid or either of the Wells Fargo bids.  This Commission has asked nonetheless for information explaining the Federal Reserve's authority to provide assistance under section 13(3) of the Federal Reserve Act.  Prior to the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which was signed into law earlier this year, section 13(3) of the Federal Reserve Act authorized the Federal Reserve to extend credit to any individual, partnership, or corporation in unusual and exigent circumstances and upon a vote of five members of the Board of Governors of the Federal Reserve.  This provision authorized only the extension of credit and required that the credit be secured to the satisfaction of the

lending Reserve Bank.  It also required that the lending Reserve Bank obtain evidence that the borrower could not obtain adequate credit accommodations from other banking organizations.

The Dodd-Frank Act has since substantially modified section 13(3) to remove authority to extend credit to single identified non-banking companies or to make a loan to remove assets from the balance sheet of a particular institution.  Now, credit under section 13(3) may only be offered through broad-based credit facilities that are offered to multiple borrowers.

While emergency credit was not sought or given in connection with the Wachovia transaction,  Wachovia's depository institutions accessed the Federal Reserve's discount window at various times throughout 2008.  The discount window comprises several credit facilities open to insured depository institutions on a regular basis and is not limited to emergency credit like section 13(3).  The Wachovia depository institutions accessed these facilities on the same terms and conditions applicable to other depository institutions, including the completion of required documentation and the pledging of collateral to the Federal Reserve.  Many other depository institutions accessed the discount window during this period as well.

**Improvements in Supervisory Approach**

This Commission has asked whether the Federal Reserve has made any changes to the way it supervises institutions under its jurisdiction in light of the financial crisis.  Indeed, the Federal Reserve has identified a number of ways to improve its supervisory approach based on lessons learned during that time.  We have already made substantial changes to our supervisory framework to improve both our consolidated supervision and our ability to identify potential risks to the financial system.  So that we can better understand linkages among firms and markets that have the potential to undermine the stability of the financial system, we have adopted a more

explicitly multidisciplinary approach, making use of the Federal Reserve's broad expertise in economics, financial markets, payment systems, and bank supervision.

We are also augmenting our traditional supervisory approach that focuses on firm-by-firm examinations with greater use of horizontal reviews that look across a group of firms to identify common sources of risks and best practices for managing those risks. To supplement information from examiners in the field, we are developing an enhanced quantitative surveillance program for large bank holding companies that will use data analysis and formal modeling to help identify vulnerabilities at both the firm level and for the financial sector as a whole.  This analysis will be supported by the collection of more timely, detailed, and consistent data from regulated firms.  Many of these changes draw on the successful experience of the Supervisory Capital Assessment Program, also known as the banking stress test, which the Federal Reserve led last year.

We are also working actively to implement the provisions of the Dodd-Frank Act, which addressed a number of gaps in the statutory framework for supervision.  In particular, the Federal Reserve is working to develop enhanced capital, risk management, liquidity, and other requirements that would be applicable to large systemically important financial organizations. We are also working with the other banking and prudential supervisors to develop resolution plans, incentive compensation guidelines, and other tools to better address the risks posed by and to financial firms.

**Conclusion**

I appreciate the opportunity to describe these events, and the Federal Reserve's role in them, to this Commission and am happy to answer any questions.

# EXHIBIT 2

Grantor: GARRETT, TERRY LEE ET UX
Grantee: FIRST UNION NATIONAL BANK OF
Doc #536564 bk 417 pg 180-186 Filed at 3:11 on 03/07/01
Sherry L Daigle, Teton County Clerk fees: 18.00
By WENDY R SELL   Deputy

**After Recording, Mail To:**
First Union National Bank of Delaware
C/O Service Center
Internet Sales Support, NC5510
8740 Research Drive
Charlotte, NC 28262

**Prepared By:**
First Union National Bank of Delaware
C/O Service Center
Internet Sales Support, NC5510
8740 Research Drive
Charlotte, NC 28262

| RELEASED | |
|---|---|
| INDEXED | |
| ABSTRACTED | |
| SCANNED | |

**Account Number:** 963  8881256040/0006686221        **Parcel Number:** 03-2471

# MORTGAGE

THIS MORTGAGE is made this day February 02, 2001, between the Mortgagor, **TERRY LEE GARRETT, and CAROL W GARRETT,   HUSBAND AND WIFE AS TENANTS BY THE ENTIRETIES**   whose mailing address is the property address (herein "Borrower"), and the Mortgagee, First Union National Bank of Delaware, a national banking association organized and existing under the laws of the United States of America, whose address is One Rodney Square, 920 King Street, Wilmington, DE 19801 (herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. **$200,000.00**, which indebtedness is evidenced by Borrower's Note dated February 02, 2001 and extensions, modifications and renewals thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of indebtedness, if not sooner paid, due and payable on **February 07, 2031**.

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in the County of **TETON**, State of **WYOMING**:

SEE ATTACHED SCHEDULE A.

which has the address of **1045 UPPER CACHE CREEK DR, JACKSON, WY 83001** and **Parcel No.** _____ (herein "Property Address");

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property."

**Any Rider ("Rider") attached hereto and executed of even date is incorporated herein and the covenant and agreements of the Rider shall amend and supplement the covenants and agreements of this Mortgage, as if the Rider were a part hereof.**

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

 1. **Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note. This Mortgage secures payment of said Note according to its terms, which are incorporated herein by reference.

 2. **Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations, under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

 3. **Hazard Insurance.** a) Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and any other hazards, including floods or flood, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower

WY Mortgage                                        Page 1                    Loan Number: 963  8881256040/0006686221
231336 wymtg (Rev 06, 11-00)

fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 5.

b) All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause.  Lender shall have the right to hold the policies and renewals.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly to Borrower.

c)  Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower.  If Borrower abandons the Property or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds.  Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due.  The 30-day period will begin when the notice is given.

d)  Except as provided in subparagraph 3(e) below, should partial or complete destruction or damage occur to the Property, Borrower hereby agrees that any and all instruments evidencing insurance proceeds received by Lender as a result of said damage or destruction, shall be placed in a non-interest bearing escrow account with Lender.  At Lender's discretion, Lender may release some or all of the proceeds from escrow after Borrower presents Lender with a receipt(s), invoice(s), written estimates(s) or other document(s) acceptable to Lender which relates to the repair and/or improvements of the Property necessary as a result of said damage and/or destruction.  Absent an agreement to the contrary, Lender shall not be required to pay Borrower any interest on the proceeds held in the escrow account.  Any amounts remaining in the account after all repairs and/or improvements have been made to the Lender's satisfaction, shall be applied to the sums secured by this Deed of Trust, Deed to Secure Debt, or Mortgage.  Borrower further agrees to cooperate with Lender by endorsing all, checks, drafts and/or other instruments evidencing insurance proceeds; and any necessary documents.  Should Borrower fail to provide any required endorsement and/or execution within thirty (30) days after Lender sends borrower notice that Lender has received an instrument evidencing insurance proceeds, or document(s) requiring Borrower's signature, Borrower hereby authorizes Lender to endorse said instrument and/or document(s) on Borrowers behalf, and collect and apply said proceeds at Lender's option, either to restoration or repair of the Property or to sums secured by this Deed of Trust, Deed to Secure Debt, or Mortgage.  It is not the intention of either party that this escrow provision, and/or Lender's endorsement or execution of an instrument(s) and/or document(s) on behalf of Borrower create a fiduciary or agency relationship between Lender and Borrower.

e)  Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraph 1 or change the amount of the payments.  If under paragraph 15 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument.

**4.    Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.**  Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold.  If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**5. Protection of Lender's Security.**  If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such actions as is necessary to protect Lender's interest.

Any amounts disbursed by Lender pursuant to this paragraph 5, with interest thereon from the date of disbursal, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage.  Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof.  Nothing contained in this paragraph 5 shall require Lender to incur any expense or take any action hereunder.

**6. Inspection.**  Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefore related to Lender's interest in the Property.

**7. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**8. Borrower Not Released; Forbearance By Lender Not a Waiver.** The Borrower shall remain liable for full payment of the principal and interest on the Note (or any advancement or obligation) secured hereby, notwithstanding any of the following: (a) the sale of all or a part of the premises, (b) the assumption by another party of the Borrower's obligations hereunder, (c) the forbearance or extension of time for payment or performance of any obligation hereunder, whether granted to Borrower or a subsequent owner of the property, and (d) the release of all or any part of the premises securing said obligations or the release of any party who assumes payment of the same. None of the foregoing shall in any way affect the full force and effect of the lien of this Mortgage or impair Lender's right to a deficiency judgment (in the event of foreclosure) against Borrower or any party assuming the obligations hereunder, to the extent permitted by applicable law.

Any forbearance by Lender in exercising any right or remedy hereunder or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**9. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 14, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender.

**10. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by first class mail addressed to Borrower or the current owner at the Property Address or at such other address as Borrower may designate in writing by notice to Lender as provided herein, and any other person personally liable on this Note as these person's names and addresses appear in the Lender's records at the time of giving notice and (b) any notice to Lender shall be given by first class mail to Lender's address stated herein or to such other address as lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**11. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of Federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflicts shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein "costs", "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**12. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note, this Mortgage and Rider(s) at the time of execution or after recordation hereof.

**13. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**14. Transfer of the Property or a Beneficial Interest in Borrower, Assumption.** As used in this Section 14, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 10 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies by this Security Instrument without further notice or demand on Borrower.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**15. Default; Acceleration; Remedies.** Upon Borrower's breach of any covenant or agreement of Borrower in this entire Mortgage, including the covenants to pay when due any sums under the Note secured by this Mortgage, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without demand or notice, notice of the exercise of such option being hereby expressly waived. Lender may invoke the power of sale hereby granted. Lender shall have the right to enter upon and take possession of the property hereby conveyed and after or without taking such possession shall have the right to sell the same at public auction for cash, after first giving notice of the time, place and terms of such sale by publication once a week for three consecutive weeks prior to said sale, in some newspaper published in said county, and upon payment of the purchase money, the Lender, or owner of the debt and Mortgage, or auctioneer, shall execute to the purchaser for and in the name of the Mortgagors, a good and sufficient deed to the property sold; the Lender shall apply the proceeds of said sale: first, to the expense of advertising, selling and conveying said property, including a reasonable attorney's fee; second, to the payment of any amounts that may have been expended or that may then be necessary to expend in paying insurance, taxes and other encumbrances, with interest thereon; third, to the payment in full of the principal indebtedness and interest thereon, whether the same shall or shall not have fully matured at the date of said sale, but no interest shall be collected beyond the date of said sale; and fourth, the balance if any, shall be paid over to the said Borrowers or to whom ever then appears of record to be the owner of said property. The Lender may bid and become the purchaser of the mortgaged property at any foreclosure sale hereunder.

**16. Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Mortgage, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued if:  (a) Borrower pays Lender all sums which would be then due under this Mortgage, this Note and Notes securing Future Advances, if any, had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in Paragraph 15 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action, as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

**17. Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that so long as Borrower is not in default hereunder, Borrower shall, prior to acceleration under paragraph 15 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration and/or foreclosure under paragraph 15 hereof, or abandonment of the Property, Lender, in person or by agent, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the property including those past due. The Lender shall be liable to account only for those rents actually received prior to foreclosure sale as provided in paragraph 15. Lender shall not be liable to account to Borrower or to any other person claiming any interest in the Property for any rents received after foreclosure.

**18. Loan Charges.** If the loan secured by this Mortgage is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then:  (1) any such loan charges shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (2) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by mailing a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment under the Note.

**19. Legislation.** If, after the date hereof, enactment or expiration of applicable laws have the effect either of rendering the provisions of the Note, the Mortgage or any Rider, unenforceable according to their terms,

or all or any part of the sums secured hereby uncollectible, as otherwise provided in this Mortgage or the Note, or of diminishing the value of Lender's security, then Lender, at Lender's option, may declare all sums secured by the Mortgage to be immediately due and payable.

**20.  Satisfaction.**  Upon payment of all sums secured by this Mortgage, the conveyance of the property pursuant to this Mortgage shall become null and void and Lender shall release this Mortgage.  Borrower shall pay all costs of recordation, if any.  Lender, at Lender's option, may allow a partial release of the Property on terms acceptable to Lender and Lender may charge a release fee.

**21.  Waiver of Homestead.**  Borrower hereby releasing and waiving all rights under and by virtue of the homestead exemption laws of this State, and relinquishes all rights of dower and courtesy in the Property.

**22. Hazardous Substances.**  Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property.  Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge.  If Borrower learns, or is notified by any governmental or regulatory authority, that any removal, or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 22, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials.  As used in this paragraph 22, "Environmental law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection.

### REQUEST FOR NOTICE OF DEFAULT AND FORECLOSURE
### UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

**IN WITNESS WHEREOF,** Borrower has executed this Mortgage and adopted as his seal the word ("SEAL") appearing beside his name.

Signed, sealed and delivered in the presence of:

*Terry Lee Garrett* [SEAL]

**TERRY LEE GARRETT**

*Carol W. Garrett* [SEAL]

**CAROL W GARRETT**

---

**[Space Below This Line For Acknowledging]**

STATE OF **WYOMING**

COUNTY OF ‾TETON‾

The foregoing instrument was acknowledged before me by **TERRY LEE  GARRETT  and CAROL W GARRETT** , this 2ᴺᴰ day of *February* , *2001* .

WITNESS my hand and official seal

Signature: *Leonard R. Carlman*         (SEAL)

My Commission Expires: 07·31·04

LEONARD R. CARLMAN - NOTARY PUBLIC
County of                    State of
Teton                        Wyoming
My Commission Expires July 31, 2004

## EXHIBIT "A"

SITUATED IN THE COUNTY OF TETON, STATE OF
WYOMING;

A PORTION OF LOT 9 OF THE RIDGE ADDITION TO THE
TOWN OF JACKSON, TETON COUNTY, WYOMING,
ACCORDING TO THE PLAT RECORDED IN THE OFFICE OF
THE TETON COUNTY CLERK ON FEBRUARY 16, 1984 AS
PLAT NO. 562, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF SAID LOT
9, THENCE NO. 0° 12' 14" W., 149.91 FEET TO A
POINT; THENCE N 51° 13' 19" W., 84.46 FEET TO A
POINT; THENCE N 66° 53' 11" W. 73.0 FEET TO A
POINT; THENCE S 41° 21' 23" W., 173.01 FEET TO
A POINT; THENCE S 67° 42' 35" E., 267.84 FEET
TO THE POINT OF BEGINNING.

END OF SCHEDULE A

ECF Doc 9

# Reply

Isaac N. Sutphin, P.C. (Wyo. State Bar # 6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CAROL W. GARRETT AND TERRY LEE GARRETT, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:24-cv-00007-SWS |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

## DEFENDANT WELLS FARGO'S REPLY IN SUPPORT OF MOTION TO DISMISS

Defendant Wells Fargo Bank, N.A. (Wells Fargo) submits this Reply in support of its

Motion to Dismiss the Complaint filed by Plaintiffs Carol and Terry Garrett (Plaintiffs) for

failure to state a claim upon which relief may be granted and states as follows pursuant to

Federal Rule of Civil Procedure 12(b)(6):

**I.     INTRODUCTION**

In response to Wells Fargo's Motion to Dismiss, Plaintiffs filed a Response to Motion to

Dismiss (Response) which sets forth arguments in opposition. ECF No. 8. As set forth below,

each of these arguments is unavailing, and Wells Fargo's Motion to Dismiss should be granted.

## II. MEMORANDUM OF LAW

### A. Plaintiffs Fail to Provide Any Legal Authority in Support of Their Interpretation of W.S. § 34-4-103(a)(iii).

Plaintiffs' first count is based on the assertion that "[t]he Garretts entered into a mortgage agreement with First Union National Bank of Delaware and not Defendant."[1] Complaint at ¶ 31. Based on that assertion, Plaintiffs claim that Wells Fargo could only acquire the Mortgage through an assignment from First Union. *Id*. at ¶ 32 ("The assignment from First Union National Bank of Delaware to Defendant is not recorded in the Teton County Records as evidenced by the Title Commitment provided by Northern Title."). As set forth in the Motion to Dismiss, Wells Fargo acquired the Mortgage through a merger, which transferred the Mortgage automatically by operation of federal law, without the need for assignment.

In their Response, Plaintiffs attempt to salvage Count One by citing to Delaware state courts interpreting Delaware state law. ECF No. 8, Response at 6-11. As set forth in more detail below, these cases are irrelevant to the claims before this Court. Moreover, Plaintiffs' Response mischaracterizes the holdings of the Delaware cases.

In particular, the Delaware courts merely concluded that, under certain circumstances, an anti-transfer clause could prevent the transfer of certain property rights:

> [W]here an antitransfer clause in a contract does not explicitly prohibit a transfer of property rights to a new entity by a merger, and where performance by the original contracting party is not a material condition and the transfer itself creates no unreasonable risks for the other contracting parties, the court should not presume that the parties intended to prohibit the merger.

*MTA Can. Royalty Corp. v. Compania Minera Pangea, S.A. De C.V.*, No.: N19C-11-228 AML CCLD, 2020 Del. Super. LEXIS 2780, at *9 (Super. Ct. Sep. 16, 2020).

---

[1] Plaintiffs owned property at 1045 Upper Cache Creek Drive (the "Property") in Jackson, Teton County, Wyoming. Plaintiffs owned the Property subject to a mortgage agreement (the "Mortgage") with Wells Fargo.

Appellant's Appendix
Page 259 of 281

More significantly, the cases are irrelevant because the merged entities in those cases were not banks. Consequently, the mergers in those cases were not governed by 12 U.S.C. § 215(a). *See* ECF No. 8, Response at 6-7.

This is a critical distinction because federal banking law expressly provides that the relevant mergers occurred without any assignment of rights or property contrary to Plaintiffs' contention. Other courts ruling on precisely this issue have unequivocally rejected the argument urged by Plaintiffs:

> In this case, there is no question that the foreclosing party—PNC Bank—was not the original mortgagee. Likewise, it is undisputed that the chain of title did not identify PNC Bank as having any interest in the property before the foreclosure. However, **plaintiffs have failed to rebut that PNC Bank derived its interest in the property through a series of mergers involving the original assignee, whose interest was duly recorded. This fact is dispositive.** Indeed, in finding that Chase acquired its interest voluntarily, the *Kim* Court expressly distinguished the acquisition of a mortgage by a Purchase and Assignment Agreement from an acquisition by merger because **during a merger, the asset transfer "occur[s] without any voluntary or affirmative action by defendant . . . .".**

> This is exactly what happened here. PNC Bank acquired its interest through a series of mergers, and as a result, acquired the mortgage by operation of law in accordance with federal statute—specifically, the National Banking Act, 12 USC 1 *et seq*. Indeed, on this very point, 12 USC 215a(e) provides that (subject to certain conditions not pertinent here), in the event of a merger, the assets of the old bank transfer to the new entity solely by virtue of the merger itself. As § 215a(e) sets forth in relevant part:

>> The corporate existence of each of the merging banks or banking associations participating in such merger shall be merged into and continued in the receiving association and such receiving association shall be deemed to be the same corporation as each bank or banking association [*11] participating in the merger. All rights, franchises, and interest of the individual merging banks or banking associations in and to every type or property . . . *shall be transferred to and vested in the receiving association by virtue of such merger without any deed or other transfer.* The receiving association, upon the merger and without any order or other action on the part of any court or otherwise, shall hold and enjoy all rights of property, franchises, and interests . . . in the same manner and to the same extent as such rights, franchises, and interests were held or enjoyed by any one of the merging banks or banking associations at the time of the merger . . . . [Emphasis added.]

3

The plain language of this statute could not more clearly provide that a merger results in the automatic transfer of assets under the circumstances involved here.

*Angela Sinacola Living Trst. v. PNC Bank, N.A.*, No. 317481, 2014 Mich. App. LEXIS 2191, at *9 (Ct. App. Nov. 13, 2014) (emphasis added) (citing *Kim v. JPMorgan Chase Bank, N.A.*, 493 Mich. 98, 825 N.W.2d 329 (2012)).

Other courts have uniformly interpreted 12 U.S.C. § 215(a) and, more generally, bank mergers to eliminate the need for assignment of mortgages. *See White v. Bank of Am., N.A.*, 597 F. App'x 1015, 1019-20 (11th Cir. 2014) (rejecting challenge to assignment of mortgage and affirming bank's right to foreclose). The United State District Court for the District of Massachusetts decided a similar claim in merger under 12 U.S.C. § 215a:

> [T]he fact that there is no recorded assignment of Plaintiffs' mortgage is inapposite. As discussed above, Defendant is the successor by merger to World Savings. Under federal law, Defendant automatically acquired all World Savings' assets at the time of merger. Pursuant to 12 U.S.C. § 215a, when a National Bank, such as Defendant, merges with another banking entity, the "receiving association shall be deemed to be the same corporation as each bank or banking association participating in the merger." As a result, "all rights, franchises, and interests . . . in and to every type of property . . . shall be transferred to and vested in the receiving association . . . without any deed or other transfer." No court order or other legal action is required. Accordingly, Defendant automatically acquired ownership of Plaintiffs' mortgage at the time of the merger, so long as World Savings owned it at that time. The lack of any recorded assignment actually undermines Plaintiffs' claim to the extent that it suggests the mortgage was not transferred to anyone other than Defendant.

*Rice v. Wells Fargo Bank, N.A.*, 2 F. Supp. 3d 25, 35 (D. Mass. 2014) (quoting 12 U.S.C. § 215a).

Accordingly, Wells Fargo acquired the Mortgage automatically via merger in 2010, without the need for assignment or any other form of transfer. Because the Mortgage was never assigned, Plaintiffs cannot allege a violation of the statutory requirement that "if [the Mortgage] has been assigned, that all assignments have been recorded." ECF No. 1, Complaint at ¶ 30 (quoting W.S. §34-4-103(a)(iii)).

4

Thus, Plaintiffs' response is irrelevant to the analysis of whether Wells Fargo violated W.S. §34-4-103(a)(iii), and Plaintiffs' Count One must fail as a matter of law.

**B.**   ***Wells Fargo Satisfied the Requirements of W.S. § 34-4-103(a)(iv).***

Plaintiffs' second count is based on the assertion that the occupant of the Property "did not receive notice of intent to foreclose as required by W.S. § 34-4-103(a)(iv)." ECF No. 1, Complaint at ¶ 39. As set forth in the Motion to Dismiss, Wells Fargo satisfied each of the prerequisites to foreclosure, including the notice requirements.

In Plaintiffs' Response, they argue that Wells Fargo had an obligation to somehow ensure that the occupant of the Property actually received and accepted the certified mailing, despite the lack of any such requirement in the statute and case law directly to the contrary. *See* ECF No. 8, Response at 12. Plaintiffs conclusorily assert that Wells Fargo should be required "to do more." *Id*. at 14. However, Plaintiffs do not identify what additional steps Wells Fargo could or should have taken. Nor do they identify any legal authority for imposing additional obligations on Wells Fargo. *Id*.

Plaintiffs further argue that they did not receive notice in Florida, despite the fact that Exhibit 3 to the Complaint shows tracking numbers for the mailings and the United States Post Office confirms delivery to and signature by a recipient at Plaintiffs' address. *See* Exhibit 1, Proof of Delivery.[2] In light of this, it is clear that Plaintiffs had an opportunity to notify the

---

[2] Defendant respectfully requests this Court take judicial notice of the proof of delivery attached hereto as Exhibit 1 as an adjudicative fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Plaintiffs have placed delivery and receipt of notice at issue in their Response, and the court may take judicial note of adjudicative facts that "[concern] matters that bear directly upon the disposition of the case at hand." *Griffith v. W. Oilfields Supply Co.*, No. 20-CV-144-F, 2020 U.S. Dist. LEXIS 262227, at *7 (D. Wyo. No. 3, 2020) (quoting *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007)). Because Exhibit 1 is publicly available from the United States Post Office's website, it is appropriate for judicial notice as a document "generally considered not to be subject to reasonable dispute." *In re Quaker Oats Maple & Brown Sugar Instant Oatmeal Litig.*, No. CV 16-1442 PSG (MRWx), 2017 U.S. Dist. LEXIS 174394, at *6 (C.D. Cal. Oct. 10, 2017) (quoting *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015)).

occupant but failed to do so.

Under W.S. § 34-4-103(a)(iv), Wells Fargo was required to provide notice to Plaintiffs and the occupant "by certified mail with return receipt…at least (10) days before commencement of publication of notice of sale." W.S. § 34-4-103(a)(iv). The statute further provides that "[p]roof of compliance with this subsection shall be by affidavit." *Id*. Wells Fargo did precisely that.

As discussed in the Motion to Dismiss, the Wyoming Supreme Court has explained that the statute's requirements should be applied liberally, particularly when the owner has actual notice of the intent to foreclose. *ORO Mgmt., LLC v. R.C. Mineral & Rock, LLC*, 304 P.3d 925, 930 (Wyo. 2013) ("Strict compliance with the notice requirement of W.S. 34-4-103 is unnecessary when a party has actual notice of intent to foreclose.") (affirming district court's grant of summary judgment and dismissal of lawsuit to set aside foreclosure sale). As Exhibit 1 shows, Plaintiffs received notice of Wells Fargo's intent to foreclose, which is the primary purpose of the statutory prerequisites. *Id*. ("[T]he purpose of providing notice 'is to afford [the] mortgagee an opportunity to bring the indebtedness current or take other appropriate action to avoid foreclosure.'") (quoting *Walker v. McAnnany*, 802 P.2d 876, 879 (Wyo. 1990)).

Finally, Plaintiffs fail to even address the issue of standing. The occupant of the Property is not a party to this lawsuit, and Plaintiffs lack standing to raise claims on his behalf based on lack of notice. See ECF No. 4 at 8-9. Even if Plaintiffs could establish that the occupant of the Property was harmed in some manner by the United States Postal Service's inability to deliver the notice, Plaintiffs lack standing to bring such a claim on the occupant's behalf. *Ribbens Int'l, S.A. de C.V. v. Transp. Int'l Pool, Inc.*, 45 F. Supp. 2d 982, 984 (C.D. Cal. 1999) ("[U]nder prudential standing guidelines…'third party' standing is permissible only where there [exists]

6

some hindrance to the third party's ability to protect his or her own interests.") (internal quotations omitted); *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488-9 (9th Cir. 1996) (a party lacks standing to assert a third party's rights unless there exists a "genuine obstacle" to the third party asserting its own interests, noting that one purpose of the prudential standing rule barring assertion of third party rights is "to avoid adjudicating rights a third-party may not wish to assert").

Thus, in accordance with Wyoming law and established principles of standing, Plaintiffs' Count Two must fail as a matter of law.

C.       ***Plaintiffs Fail to Plead a Breach of the Implied Covenant of Good Faith and Fair Dealing.***

In Plaintiffs' Response, they argue that their claim for breach of the implied covenant of good faith and fair dealing is based on the allegation "that Wells Fargo failed to follow statutory procedure and foreclosed the mortgage without proper recordation of the assignment and without proper notice to the occupant." ECF No. 8 at 15. In doing so, Plaintiffs continue to rely upon an unsupported interpretation of Wyoming law.

Plaintiffs Response fails to identify any specific standards of decency, fairness, or reasonableness that Wells Fargo breached. Although Plaintiffs claim that $2.1 million in equity was transferred to the purchaser of the Property at auction, there is no allegation that Wells Fargo was enriched by the foreclosure or subsequent sale. *Id*.

Instead, Wells Fargo simply exercised the primary option available to a lender when a borrower refuses to pay in accordance with the mortgage agreement. *See* Mortgage at ¶ 15, ECF No. 1, Exhibit 1. Wells Fargo's exercise of this contractual right cannot sustain a claim for breach of the implied covenant of good faith and fair dealing. *Zahmoul v. NBH Bank*, No. 22-CV-221-ABJ, 2023 U.S. Dist. LEXIS 164635, at *21 (D. Wyo. June 2, 2023) ("Under Wyoming

7

law, a claim for breach of the implied covenant of good faith and fair dealing cannot exist where a party is simply exercising those rights that they are contractually entitled to exercise.") (citing *Harper v. Fidelity and Guar. Life Ins. Co.*, 2010 WY 89, 234 P.3d 1211, 1221 (Wyo. 2010)).

Ultimately, Plaintiffs' Response relies on an assertion that claims for breach of the implied covenant of good faith and fair dealing typically require determination of factual issues and, therefore, should survive a motion to dismiss. ECF No. 8 at 16 ("whether the implied covenant of good faith and fair dealing was breached is ordinarily one of fact"). However, "[a] claim can be properly dismissed as a matter of law 'where the actions alleged to have breached the covenant were in conformity with the clear contract language.'" *Woodie v. Berkshire Hathaway Homestate Ins. Co.*, 806 F. App'x 658, 672 (10th Cir. 2020) (quoting *City of Gillette v. Hladky Constr., Inc.*, 2008 WY 134, 196 P.3d 184, 197 (Wyo. 2008)).

In this case, there is no legitimate question as to whether Wells Fargo's actions were in conformity with the clear language of the Mortgage. Mortgage at ¶ 15, ECF No. 1, Exhibit 1 ("Lender shall have the right to enter upon and take possession of the property hereby conveyed and after or without taking such possession shall have the right to sell the same at public auction for cash…."). Wells Fargo simply exercised its contractual right to foreclose on the Property in response to Plaintiffs' nonpayment of the Mortgage.

Under Wyoming law, this is insufficient to plead a claim for breach of the implied covenant of good faith and fair dealing. Consequently, Count Three of Plaintiffs' Complaint fails as a matter of law and must be dismissed.

Appellant's Appendix
Page 265 of 281

III.     CONCLUSION

Plaintiffs' Complaint fails to state a claim upon which relief can be granted. Moreover,

the deficiencies in the claims set forth cannot be cured by amendment of the Complaint.

Consequently, the Complaint should be dismissed with prejudice.

DATED this 6th day of February 2024.

/s/ Isaac N. Sutphin
Isaac N. Sutphin, P.C. (Wyo. State Bar # 6-3711)
HOLLAND & HART LLP
2020 Carey Avenue, Suite 800
P.O. Box 1347
Cheyenne, WY 82003-1347
Telephone: 307.778.4200
Facsimile:  307.778.8175
INSutphin@hollandhart.com

ATTORNEYS FOR DEFENDANT
WELLS FARGO BANK, N.A.

31387312_v1

9

# EXHIBIT 1


**UNITED STATES POSTAL SERVICE**

December 21, 2023

Dear Heather Dexter:

The following is in response to your request for proof of delivery on your item with the tracking number:
**9489 0090 0027 6449 8841 39**.

| Item Details | |
|---|---|
| **Status:** | Delivered to Agent for Final Delivery |
| **Status Date / Time:** | December 12, 2022, 5:10 pm |
| **Location:** | GAINESVILLE, FL 32605 |
| **Postal Product:** | First-Class Mail® |
| **Extra Services:** | Certified Mail™ |
| | Return Receipt Electronic |

| Shipment Details | |
|---|---|
| **Weight:** | 1lb, 3.7oz |

| Recipient Signature |
|---|

Signature of Recipient:
(Authorized Agent)

Address of Recipient:

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

ECF Doc 10

# Order

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2024 FEB -7 PM 4:00

MARGARET BOTKINS CLERK
CASPER

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

CAROL W. GARRETT and TERRY LEE
GARRETT,

        Plaintiffs,

    v.

WELLS FARGO BANK, N.A.,

        Defendant.

Case No. 24-CV-7-SWS

---

**ORDER GRANTING DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS**

---

    This matter comes before the Court on Defendant Wells Fargo's Motion to Dismiss (ECF 4) and supporting memorandum (ECF 4-1), in which Wells Fargo seeks dismissal of Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs Carol and Terry Garrett filed an opposition to the motion (ECF 8), and Wells Fargo replied (ECF 9). Having considered the parties' arguments, reviewed the record herein, and being otherwise fully advised, the Court concludes the motion must be granted and this lawsuit dismissed.

**STANDARD OF ANALYSIS FOR RULE 12(b)(6) MOTIONS TO DISMISS**

    Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal of a claim or complaint that fails "to state a claim upon which can be granted." The Court's function when considering a Rule 12(b)(6) motion "is not to weigh potential evidence that the parties might present at trial." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). To overcome a Rule 12(b)(6) motion, a complaint's factual allegations, assumed to be true, must "raise a right to

Appellant's Appendix
Page 270 of 281

relief above the speculative level" and must contain "enough facts to state a claim to relief that is

plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]he complaint

must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering

factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177

(10th Cir. 2007) (emphases in original). "Thus, mere 'labels and conclusions,' and 'a formulaic

recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual

allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214

(10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). The Court accepts the nonmoving party's

well-pled factual allegations as true, but it is not bound to accept an asserted legal conclusion as

true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

## COMPLAINT'S ALLEGATIONS

Consistent with the applicable standard, the Garretts' complaint sets forth the following

relevant allegations:

The Garretts are currently residents of Florida and previously owned a single-family

residence in Jackson, Teton County, Wyoming. (Compl. ¶ 1.) In 2001, the Garretts built the

Jackson property, partially financed by a mortgage from First Union National Bank of Delaware.

(*Id.* ¶¶ 9, 12.) Starting around 2011, the Garretts rented the Jackson property to a tenant. (*See id.*

¶¶ 13, 35.) Upon the Garretts' information and belief, Defendant Wells Fargo later acquired the

mortgage covering the Jackson property. (*Id.* ¶ 3.)

In July 2023, the tenant's neighbors informed the tenant that a stranger had been at the

Jackson property earlier in the day and had told the neighbors that the stranger had recently

purchased the property through a foreclosure sale. (*Id.* ¶¶ 14, 15.) The neighbors also contacted

the Garretts directly by phone to share the same information. (*Id.* ¶ 16.)

Appellant's Appendix
Page 271 of 281

In late 2022, Wells Fargo had commenced nonjudicial foreclosure proceedings on the mortgage.  (*See* ECF 2 pp. 21-22.)  In a December 2022 affidavit, Wells Fargo's legal counsel affirmed that it had sent to the record owner (the Garretts) and the occupant, via certified mail with return receipt, written notice of the intent to foreclose the mortgage and sell the property at public auction.  (Compl. ¶¶ 19-20; ECF 2 pp. 21-22.)  Accordingly, the Teton County Sheriff's Office held a public auction on the courthouse steps on March 16, 2023, and sold the Jackson property.  (Compl. ¶¶ 18, 21; ECF 2 p. 28.)  The redemption period passed without the Garretts redeeming the property, and a Sheriff's Deed issued to the auction winners on July 19, 2023.  (Compl. ¶ 22; ECF 2 pp. 37-38.)

The Garretts assert they owed only about $76,500 on the mortgage, the Jackson property sold for $825,000 at public auction, and the property appraised in 2023 for $2.9 million.  (Compl. ¶¶ 24-26.)  Thus, they conclude they have been monetarily damaged in excess of $2.1 million.  (*Id.* ¶ 27.)

The Garretts set forth three causes of action.  In Count I, they contend Wells Fargo violated Wyoming Statute § 34-4-103(a)(iii) by failing to duly record the assignment of their mortgage upon receipt from the original lender.  (Compl. ¶¶ 29-33.)  They assert, "Defendant has failed to follow the statutory requirements in W.S. § 34-4-103 and Plaintiffs have suffered substantial economic damages as a result."  (*Id.* ¶ 33.)

They next contend in Count II that Wells Fargo violated Wyoming Statute § 34-4-103(a)(iv) by failing to provide written notice of its intent to foreclose to the occupant/tenant of the Jackson property.  (*Id.* ¶¶ 34-46.)  They again assert, "Defendant has failed to follow the statutory requirements in W.S. § 34-4-103 and Plaintiffs have suffered substantial economic damages as a result."  (*Id.* ¶ 46.)

Appellant's Appendix
Page 272 of 281

In Count III, the Garretts say that Wells Fargo's statutory failures recounted in the first two claims also amount to breaches of the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 47-51.) For their remedy, the Garretts seek to rescind the foreclosure sale or, alternatively, the recovery of compensatory and punitive damages. (*Id.* ¶¶ 52-57, ¶¶ A-F.)[1]

## ANALYSIS

Wells Fargo seeks dismissal of the Garretts' entire complaint under Rule 12(b)(6), arguing it fails to state any cause of action on which relief can be granted. (ECF 4.) As the parties did, the Court will examine each claim separately. Because this lawsuit depends on diversity jurisdiction, the Court applies Wyoming substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965).

## Count I – Failure to Record Mortgage Assignment

Wyoming Statute § 34-4-103 identifies necessary prerequisites to foreclosure of a mortgage by advertisement. Subsection (a)(iii) requires a mortgagee to record any assignments of the mortgage before the mortgage may be foreclosed upon. Wyo. Stat. § 34-4-103(a)(iii). The Garretts assert the assignment of their mortgage to Wells Fargo was never duly recorded.

Wells Fargo contends this cause of action must be dismissed because the mortgage was never assigned, and thus there was no associated recording failure. Instead, asserts Wells Fargo, the mortgage was originally issued by First Union National Bank of Delaware, which changed its name to Wachovia Bank of Delaware in 2002, and which then merged with and into Wells Fargo in 2010.[2] (ECF 4-1 p. 4.) This name change and merger are not alleged in the complaint, but they

---

[1] All citations in the foregoing recitation of allegations are to the complaint or to exhibits referenced in and attached to the complaint. (*See* ECF 2.)

[2] In the Garretts' opposition to dismissal, they point out Wachovia's merger with and into Wells Fargo may have occurred earlier than 2010, as early as late 2008. (ECF 8 p. 5 n.1; ECF 8-1.) The Garretts do not dispute that Wachovia merged into and with Wells Fargo, and the Court does not consider the dispute over the date of the merger to be material to the question of 12(b)(6) dismissal.

Appellant's Appendix
Page 273 of 281

will be considered as part of this Rule 12(b)(6) analysis without converting the motion to one for

summary judgment because they are matters subject to judicial notice. *See Tal v. Hogan*, 453 F.3d

1244, 1265 n.24 (10th Cir. 2006) ("facts subject to judicial notice may be considered in a Rule

12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment").

Additionally, both parties have supplied the Court with the information necessary to take judicial

notice of the fact that the original mortgagee subsequently changed its name to Wachovia Bank

and then later merged into and with Wells Fargo. (*See* ECF 4-2, 4-3, 8-1.) *See also* Fed. R. Evid.

201(b)(2), (c)(2); (ECF 4-1 p. 4 n.1).

The real dispute concerning Count I is whether the merger by Wachovia Bank with and

into Wells Fargo constituted an "assignment" of the mortgage that had to be recorded under

Wyoming Statute § 34-4-103(a)(iii).  Wells Fargo argues it did not take over the mortgage by

assignment but rather by operation of federal statute, specifically 12 U.S.C. § 215a, which states

in relevant part:

> The corporate existence of each of the merging banks or banking associations
> participating in such merger shall be merged into and continued in the receiving
> association and such receiving association shall be deemed to be the same
> corporation as each bank or banking association participating in the merger.  All
> rights, franchises, and interests of the individual merging banks or banking
> associations in and to every type of property (real, personal, and mixed) and choses
> in action shall be transferred to and vested in the receiving association by virtue of
> such merger without any deed or other transfer.  The receiving association, upon
> the merger and without any order or other action on the part of any court or
> otherwise, shall hold and enjoy all rights of property, franchises, and interests,
> including appointments, designations, and nominations, and all other rights and
> interests as trustee, executor, administrator, registrar of stocks and bonds, guardian
> of estates, assignee, and receiver, and in every other fiduciary capacity, in the same
> manner and to the same extent as such rights, franchises, and interests were held or
> enjoyed by any one of the merging banks or banking associations at the time of the
> merger, subject to the conditions hereinafter provided.

12 U.S.C. § 215a(e).  Based on this federal statute, Wells Fargo asserts it "acquired the Mortgage

automatically via merger in 2010, without the need for assignment or any other form of transfer.

Appellant's Appendix
Page 274 of 281

Because the Mortgage was never assigned, Plaintiffs cannot allege a violation" of Wyoming Statute § 34-4-103(a)(iii) for failing to record an assignment.  (ECF 4-1 p. 5.)

The Garretts disagree, arguing 12 U.S.C. § 215a(e) does not preempt Wyo. Stat. § 34-4-103(a)(iii).  (ECF 8 pp. 6-8.)  The Garretts also rely on some Delaware state court caselaw, which interpreted the phrase "assignment by operation of law" to include mergers.  (*See* ECF 8 pp. 6-7.)

The Court does not find the principle of federal preemption to control this issue.  Instead, it is simply a question of whether the Wyoming Supreme Court would construe Wyo. Stat. § 34-4-103(a)(iii), which expressly requires "that all assignments [of the mortgage] have been recorded" before the mortgage may be foreclosed upon, as applying to acquisition of mortgages by bank mergers.  Because it appears the Wyoming Supreme Court has not answered this question, the Court "must … attempt to predict how [Wyoming's] highest court would interpret [the issue]." *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 852 (10th Cir. 2015) (alterations in original) (quoting *Squires v. Breckenridge Outdoor Educ. Ctr.,* 715 F.3d 867, 875 (10th Cir. 2013)).

For two reasons, this Court predicts the Wyoming Supreme Court would not construe § 34-4-103(a)(iii) as requiring the acquisition of a mortgage via bank merger be recorded in the county records.  First, a different Wyoming Statute, § 13-4-111, governs the effect of a state bank merger and largely tracks 12 U.S.C. § 215a(e).  That state statute provides in relevant part:

> (a)   A resulting bank shall be considered the same entity as each merging bank or as the converting bank with all the property, rights, powers, duties and obligations of each merging bank or the converting bank, except as provided by state law in the case of a resulting state bank or federal law in the case of a resulting national bank and by the charter and bylaws of the resulting bank.
> …
> (c)   Any reference to a merging or converting bank in writing is a reference to the resulting bank if not inconsistent with the other provisions of the writing.

Wyo. Stat. § 13-4-111(a), (c).  This statute demonstrates the Wyoming Legislature's intent to

Appellant's Appendix
Page 275 of 281

embody the same principles as 12 U.S.C. § 215a(e), specifically the principle that the successor

bank resulting from a merger automatically assumes the ownership interests, rights, and

obligations of the merging banks without the need for further action, unless other laws or bylaws

preclude such effect.  Here, not only does 12 U.S.C. § 215a(e) not preclude such effect, it supports

such a result.

Second, the Court's own research on the matter revealed a number of courts around the

country have held acquisition of a mortgage through a bank merger does not constitute an

assignment that needs to be recorded.[3]  Moreover, the Court was unable to locate a single holding

to the contrary.  The Court finds the Garretts' reliance on the Delaware state courts' decisions to

carry little persuasive value because they were interpreting the phrase "assignment by operation

of law" as it was used in an anti-assignment contractual provision, which is inapposite to the instant

Wyoming statutory construction issue.  (*See* ECF 8 pp. 6-7.)

Considering the language of Wyoming Statute § 13-4-111 and the decisions of other courts

that examined the issue, this Court concludes the Wyoming Supreme Court is most likely to concur

with what is at least the majority view and hold that acquisition of a mortgage through a bank

---

[3]  As a non-exhaustive sampling, s*ee, e.g., Arzamendi v. Wells Fargo Bank, N.A.*, No. 117CV01485LJOSKO, 2018 WL 1210978, at *5 (E.D. Cal. Mar. 8, 2018) (where World Saving Bank held the mortgage before merging into and with Wells Fargo, "Wells Fargo assumed the status of beneficiary under the mortgage at issue" upon the merger without further need for conveyance or recording); *Walker v. NDeX W. LLC*, No. CV142940FMOJCGX, 2015 WL 12732460, at *3 (C.D. Cal. Feb. 20, 2015) (statutory requirement that an assignment be recorded did not apply where the deed of trust was acquired by the successor bank via merger); *Gregory v. CitiMortgage, Inc.*, 890 F. Supp. 2d 791, 799 (E.D. Mich. 2012) (noting that other courts considering the matter "have found that where a mortgage is transferred through merger, there is no need to record the assignment in order for the surviving entity to have authority to foreclose") (collecting Michigan cases); *Ewo v. Citi Fin. Mortg.*, No. 112CV00902RWSJFK, 2012 WL 13065041, at *9 (N.D. Ga. Sept. 17, 2012) ("Formal transfer or assignment [of the mortgage at issue] upon the merger of Citi Financial Mortgage with and into CitiMortgage was not required."), *report and recommendation adopted*, No. 1:12-CV-0902-RWS, 2012 WL 13065074 (N.D. Ga. Oct. 31, 2012); *Standard Federal Bank, N.A. v. M/Y PLEASURES*, No. 03-60925-CIV., 2003 WL 22722077, at *4 (S.D. Fla. July 24, 2003) (the merging bank's "rights under the duly recorded mortgage automatically vested upon the merger" into the successor bank without any need to obtain or record an assignment); *PNC Bank, Nat'l Ass'n v. Valdez*, No. A-1-CA-35755, 2018 WL 4381004, at *3 (N.M. Ct. App. Aug. 7, 2018) ("no assignments occurred during the name change and merger transactions from which PNC emerged"); *Graham v. Nat'l City Mortg. Co.*, 131 Nev. 1285 (Nev. App. 2015) (no assignment needed where "PNC Bank became the beneficiary of the deed of trust through a chain of mergers").

merger does not constitute an assignment that must be recorded under Wyoming Statute § 34-4-103(a)(iii).  It's not that 12 U.S.C. § 215a(e) necessarily preempts Wyo. Stat. § 34-4-103(a)(iii); it's that the successor bank acquires the mortgages of the merging bank via the merger, not via assignment.  Applied to this case, the Garretts' first cause of action fails to state a plausible claim for relief because Wells Fargo was not required to record its acquisition of the subject mortgage under § 34-4-103(a)(iii) when the Wachovia Bank of Delaware merged into and with Wells Fargo.[4] Count I must be dismissed without prejudice.

## Count II – Failure to Notify Occupant

Wells Fargo offers multiple reasons why this claim should be dismissed, but the Court focuses on the argument that the Garretts lack standing to assert this claim.  (ECF 4-1 pp. 8-9.) The Garretts did not respond to this argument in their opposition.  (*See* ECF 8 pp. 11-15.)

"Each plaintiff must have standing to seek each form of relief in each claim."  *Collins v. Daniels*, 916 F.3d 1302, 1312 (10th Cir. 2019) (quoting *Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017)).  "The standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial resolution appropriate."  *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).  That personal stake in the dispute exists where the plaintiff "suffered an injury that the defendant caused and the court can remedy."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Casillas v. Madison Avenue Assocs., Inc.*, 926 F.3d 329, 333 (7th

---

[4]  The Garretts assert that an earlier mortgage they obtained from First Union National Bank of Delaware, which allegedly followed the same path to Wells Fargo, was in fact recorded as an "assignment" by Wells Fargo in December 2009.  (ECF 8 pp. 8-11; ECF 2 pp. 74-75.)  Assuming for purposes of this motion that this earlier mortgage did follow the same path to Wells Fargo via merger, it does not convince the Court that the Wyoming Supreme Court would decide the interpretation of Wyo. Stat. § 34-4-103(a)(iii) any differently.  There is no contention that Wells Fargo is or should be precluded from recording its acquisition through merger of a mortgage.  Indeed, the Court would not dissuade an entity from giving additional notice to the public of such an acquisition, but Wells Fargo's act of recording its acquisition of the earlier mortgage as an assignment does not render such recordation statutorily required for every other similarly-acquired mortgage.

Appellant's Appendix
Page 277 of 281

Cir. 2009)).

In Count II, the Garretts contend Wells Fargo failed to provide adequate notice of foreclosure proceedings to the occupant. The Garretts' complaint makes clear that they were not the occupants at the time and instead had a long-term tenant living at the Jackson property. (Compl. ¶¶ 13, 35.) The tenant was the "person in possession of the mortgaged premises," Wyo. Stat. § 34-4-103(a)(iv), and it was the tenant who suffered any harm from Wells Fargo's alleged failure to provide adequate notice to the occupant as required by the statute. In a rather conclusory fashion, the Garretts assert they "suffered substantial economic damages" from Wells Fargo's failure to provide notice to the occupant (Compl. ¶ 46), but they fail to connect this alleged statutory failure to their claimed injury with any supporting factual allegations. When examining a complaint under Rule 12(b)(6), courts must "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

In disregarding the Garretts' conclusory claim of monetary harm and examining only the factual allegations, the Court finds the complaint fails to plausibly allege the Garretts suffered a concrete and particularized injury caused by Wells Fargo's alleged failure to provide proper statutory notice to the occupant of the property. The Garretts lack the necessary "personal stake" to allege Count II, and they provide no authority or basis for allowing them to assert a cause of action belonging to their tenant. Whether more properly dismissed under Rule 12(b)(1) for lack of subject-matter jurisdiction, *see Colo. Env't. Coalition v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004) (standing is jurisdictional), or under Rule 12(b)(6) for failure to state claim on which relief can be granted, the Court concludes Count II must be dismissed without prejudice.[5]

_____

[5] As the Court is dismissing Count II based solely on the Garretts' lack of standing to assert a claim for lack of notice on their tenant's behalf, the Court declines Wells Fargo's request to take judicial notice of or consider Exhibit 1

Appellant's Appendix
Page 278 of 281

3.      **Count III – Breach of the Implied Covenant of Good Faith and Fair Dealing**

In Wyoming, "parties to a commercial contract may bring a claim for breach of the implied covenant of good faith and fair dealing." *Scherer Const., LLC v. Hedquist Const., Inc.*, 18 P.3d 645, 655 (Wyo. 2001). Primarily, this implied covenant demands "neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement." *Id.* at 653 (citations omitted). But a party may not rely on this implied duty to "establish new, independent rights or duties not agreed upon by the parties." *Id.* (citations omitted).

The Garretts' final cause of action alleges Wells Fargo breached the implied covenant of good faith and fair dealing based on its "failure to record the assignment of the mortgage and failure to notify the current occupant of the intent to foreclose as statutorily required." (Compl. ¶ 50.) Thus, the Garretts' claim for breach of the implied covenant rests on the statutory violations alleged in Counts I and II. As addressed above, though, Wells Fargo did not have a statutory duty to record its acquisition of the mortgage as an assignment under Wyo. Stat. § 34-4-103(a)(iii), and the Garretts have no standing to assert a lack of notice on behalf of the occupant of the Jackson property. Consequently, the Garretts have failed to state a claim for breach of the implied covenant on which relief can be granted because this claim is dependent on the two other futile claims.

Additionally, the Garretts' complaint does not otherwise demonstrate how the implied obligations underlying this alleged breach arise from the language used in the mortgage or how the statutory obligations are indispensable to effectuating the parties' intent. *See Skyco Resources, LLP v. Family Tree Corp.*, 512 P.3d 11, 25 (Wyo. 2022) ("The implied obligation must arise from the language used [in the contract] or it must be indispensable to effectuate the intention of the parties."). Therefore, whether based solely on Counts I and II (as the complaint appears to do) or

---

attached to its reply brief (ECF 9-1), which concerns Wells Fargo's notice of intent to foreclose that was sent to the Garretts in Florida.

independent of those claims, the Garretts have failed to state a plausible claim for relief based on the implied covenant of good faith and fair dealing.  Count III must be dismissed without prejudice.

**4.      Punitive Damages**

Contrary to Wells Fargo's argument, the Court does not understand the Garretts to be asserting an independent claim for punitive damages, as demonstrated by the fact that it is not set out as a separate count.  (*See* Compl. ¶¶ 52-57.)  Regardless, a demand for punitive damages is not a separate claim and is instead an element of a viable claim.  *See Cook v. Shoshone First Bank*, 126 P.3d 886, 897 (Wyo. 2006).  Dismissal of the underlying claims effectively disposes of Plaintiffs' request for punitive (and other) damages.  *See also Arnold v. Mountain W. Farm Bureau Mut. Ins. Co.*, 707 P.2d 161, 164 (Wyo. 1985) ("Punitive damages are generally not recoverable in an action upon a contract where the parties have made a written agreement between themselves setting their respective rights and obligations.").

**5.      Improper Request to Amend**

The Garretts conclude their opposition to dismissal by alternatively seeking leave to amend their complaint: "If this Court were to determine the Complaint is insufficient as plead [sic], Plaintiffs would respectfully seek leave of the Court to amend their claims and to further plead their claims." (ECF 8 p. 17.)  A valid request to amend a pleading must be presented to the Court by separate motion, not within a response brief, and it must include the proposed amended complaint and set forth the specific efforts taken to comply with the duty to confer.  *See* Local Civil Rules 7.1(b), 15.1; Fed. R. Civ. P. 15(a)(2).  "It is well-settled under our cases that these drive-by requests to amend the complaint do not rise to the status of a motion." *Johnson v. Spencer*, 950 F.3d 680, 721 (10th Cir. 2020) (internal quotation omitted).  "A district court may deny leave to amend when a plaintiff fails to file a written motion and instead merely suggest[s]

Appellant's Appendix
Page 277 of 278

she should be allowed to amend if the court conclude[s] her pleadings [a]re infirm." *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Wamick v. Cooley*, 895 F.3d 746, 755 (10th Cir. 2018)). "[A] bare request to amend in response to a motion to dismiss is insufficient to place the court and opposing parties on notice of the plaintiff's request to amend and the particular grounds upon which such a request would be based." *Id.* (quoting *Albers v. Bd. of Cty. Comm'rs*, 771 F.3d 697, 706 (10th Cir. 2014)). Accordingly, the Garretts' improper request to amend is denied.

**IT IS THEREFORE ORDERED** that Defendant Wells Fargo's Motion to Dismiss (ECF 4) is **GRANTED**. All causes of action alleged against Wells Fargo in this lawsuit are hereby **DISMISSED WITHOUT PREJUDICE**. The Clerk of Court will please issue a general judgment in Defendant's favor and close this case.

**ORDERED:** February _7th_, 2024.

Scott W. Skavdahl
United States District Judge